1  Daniel J. Mulligan (Cal. State Bar No. 103129)
   **JENKINS MULLIGAN & GABRIEL LLP**
2  10085 Carroll Canyon Road, Suite 210
   San Diego, CA 92131
3  Telephone: (415) 982-8500
   Facsimile: (415) 982-8515
4  dan@jmglawoffices.com

5
   Peter B. Fredman (State Bar No. 189097)
6  **LAW OFFICE OF PETER FREDMAN**
   125 University Ave, Suite 102
7  Berkeley, CA 94710
   Telephone: (510) 868-2626
8  Facsimile: (510) 868-2627
   peter@peterfredmanlaw.com
9
10 Attorneys for Plaintiff MARIE GAUDIN,
   for herself and persons similarly situated
11

12

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15
   MARIE GAUDIN, individually, and on        Case No. C 11-01663-JST
16 behalf of others similarly situated,
                                             **CLASS ACTION**
17            Plaintiff,
                                             PLAINTIFF'S NOTICE OF MOTION AND
18       v.                                  MOTION FOR CLASS CERTIFICATION
                                             AND APPOINTMENT OF CLASS
19 SAXON MORTGAGE SERVICES, INC. a           COUNSEL; MEMORANDUM OF POINTS
   Texas corporation, and Does 1-100,        AND AUTHORITIES
20
            Defendants.                      Hearing Date:  June 20, 2013
21                                           Hearing Time:  1:30 p.m.
                                             Courtroom 9, 19th Floor, SF
22                                           Hon. Jon S. Tigar

23                  **DOCUMENTS FILED UNDER SEAL**

24               **THIS IS THE REDACTED VERSION**

25

26

27

28
   PLAINTIFF'S MTN. FOR CLASS CERT.
   No. C 11-01663-JST, Gaudin v. Saxon Mortgage

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD

**PLEASE TAKE NOTICE** that on June 20, 2013 at 1:30 p.m. in Courtroom 9 of the United States District Court for the Northern District of California, San Francisco Division, the Honorable Jon S. Tigar presiding[1], Plaintiff Marie Gaudin, by and through counsel, and on behalf herself and persons similarly situated, will move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure for certification of the following class:

> All California residential mortgage borrowers who (a) entered into
> Homeowner Affordable Modification Program (HAMP) Trial Period
> Plans (TPPs) with Saxon Mortgage Services, Inc. effective on or
> before October 1, 2009, and (b) made at least three trial period
> payments, but (c) did not receive HAMP loan modifications.

Plaintiff will also move for an order appointing her counsel, Daniel Mulligan, Esq. of Jenkins Mulligan & Gabriel LLP and Peter Fredman, Esq. of the Law Office of Peter Fredman, as counsel for the aforementioned class ("Class Counsel").

This motion is based on this Notice, the Memorandum below, the declarations of Peter Fredman, Esq., Daniel Mulligan, Esq., and Marie Gaudin and exhibits thereto, and the Request for Judicial Notice submitted herewith, as well as any oral argument heard by the Court at the hearing and all pleadings, orders, and other documents on file in this action.

DATE: April 15, 2013

**JENKINS MULLIGAN & GABRIEL LLP**
**LAW OFFICE OF PETER FREDMAN**

By: ___/s/ Peter Fredman_____
Peter Fredman

---

[1] On December 4, 2012, this Court with Hon. Richard Seeborg presiding issued a stipulated scheduling Order setting this hearing and related briefing deadlines. *See* Dkt. No. 67.

PLAINTIFF'S MTN. FOR CLASS CERT.
No. C 11-01663-JST, Gaudin v. Saxon Mortgage

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

II.     SUMMARY OF ARGUMENT .............................................................................. 2

III.    PROCEDURAL BACKGROUND ......................................................................... 3

IV.     FACTS .................................................................................................................. 4

        A.      Plaintiff's Saxon mortgage ...................................................................... 4

        B.      Saxon's participation in HAMP ................................................................ 5

        C.      Saxon entered into a HAMP Trial Period Plan with Plaintiff but failed to modify her loan despite the fact that she made all her trial period payments ................................ 7

        D.      Saxon exists now only as an empty shell within Morgan Stanley after the sale of its entire servicing portfolio ..................................................... 10

        E.      Electronic records provide extensive loan level detail for each Class member .......... 11

V.      LAW & ARGUMENT ......................................................................................... 12

        A.      Legal standard: class certification is a procedural inquiry into whether Rule 23 is satisfied such that Plaintiff may proceed in a representative capacity to determine defendant's liability to a class as a whole .................................................. 12

        B.      An identifiable and ascertainable Class exists .......................................... 14

        C.      The Class is so numerous that joinder of all members is impracticable .................... 14

        D.      There are questions of law and fact common to the Class ............................ 14

        E.      Plaintiff's claims are typical of the claims of the Class ............................ 15

        F.      Plaintiff will fairly and adequately protect the interests of the Class .......... 15

        G.      The questions common to Class members predominate over any questions affecting only individual members ..................................................... 16

                1.      Common issues predominate the breach of contract claim because it turns on interpretation of the TPP and California law ................... 16

                2.      Common issues predominate for the rescission and restitution claim because it also turns on interpretation of the TPP and California law .......... 17

                3.      Common issues predominate the Rosenthal Act claim because it turns on application of an objective legal standard to the TPP ................... 17

                4.      Common issues predominate in the UCL claims ............................ 18

a.  Common issues predominate the unlawful practices claim because it is predicated on the Rosenthal Act violation ........................................ 19

b.  Common issues predominate the fraudulent practices claim because the standard is whether the public is likely to be deceived ................. 19

c.  Common issues predominate the unfair practices claim because it looks solely to nature, effect, and utility of Saxon's conduct ............. 20

H.  Class action is superior to other available methods for fairly and efficiently adjudicating the controversy ................................................................ 20

VI.  TRIAL PLAN .......................................................................................................... 21

A.  Notice ................................................................................................................ 21

B.  Further Discovery and Proceedings ................................................................. 21

C.  Dispositive Motions ......................................................................................... 22

D.  Common Proof at Trial ..................................................................................... 22

VII.  CONCLUSION ....................................................................................................... 23

1

2

**TABLE OF AUTHORITIES**

3                                                                                                    <u>Page</u>

Cases

4

*Am. Pipe & Constr. Co. v. Utah,*
    414 U.S. 538 (U.S. 1974) .............................................................................. 13

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    133 S. Ct. 1184 (U.S. 2013) ..................................................................... 12-13

*Arnold v. United Artists Theatre Circuit, Inc.,*
    158 F.R.D. 439 (N.D. Cal. 1994). ............................................................... 14

*Blackie v. Barrack,*
    524 F. 2d 891 (9th Cir. Cal. 1975) .............................................................. 13

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (Cal. 1999) ........................................................................ 19

*Charlebois v. Angels Baseball, LP,*
    2011 U.S. Dist. LEXIS 71452 (C.D. Cal. June 30, 2011) ........................ 14

*Fleming v. Kagan,*
    189 Cal. App. 2d 791 (1961) ...................................................................... 17

*Fletcher v. Sec. Pac. Nat'l Bank,*
    23 Cal. 3d 442 (Cal. 1979) ......................................................................... 19

*Gaudin v. Saxon Mortg. Servs.,*
    820 F. Supp. 2d 1051 (N.D. Cal. 2011) ....................................................... 3

*Gaudin v. Saxon Mortg. Servs.,*
    2011 U.S. Dist. LEXIS 132957 (N.D. Cal. Nov. 17, 2011) ........................ 3

*Gonzales v. Arrow Fin. Servs., LLC,*
    233 F.R.D. 577 (S.D. Cal. 2006) ................................................................ 18

*Gonzales v. Arrow Fin. Servs., LLC,*
    660 F. 3d 1055 (9th Cir. Cal. 2011) .......................................................... 18

*Gonzales v. Arrow Fin. Servs. LLC,*
    489 F. Supp. 2d 1140 (S.D. Cal. 2007) ...................................................... 18

*Gray v. Zurich Ins. Co.,*
    65 Cal. 2d 263 (Cal. 1966) ......................................................................... 16

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Hanlon v. Chrysler Corp.*,
   150 F. 3d 1011 (9th Cir. Cal. 1998) .................................................................. 14-15, 20-21

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (Cal. 2009) ................................................................................18-20

*Lucia v. Wells Fargo Bank, N.A.*,
   798 F. Supp. 2d 1059 (N.D. Cal. 2011)...............................................................3-4

*Mazza v. American Honda Motor Co., Inc.*,
   666 F. 3d 581 (9th Cir. Cal. 2012) ......................................................................20

*Meyer v. Benko*,
   55 Cal. App. 3d 937 (1976) ................................................................................16

*Morrell v. Clark*,
   106 Cal. App. 2d 198 (1951) ..............................................................................17

*Roshandel v. Chertoff*,
   554 F. Supp. 2d 1194 (W.D. Wash. 2008) .........................................................14-15

*Slaven v. BP America, Inc.*,
   190 F.R.D. 649 (C.D. Cal. 2000).........................................................................13

*Stagikas v. Saxon Mortg. Servs.*,
   795 F. Supp. 2d 129 (D. Mass. 2011)...................................................................5

*Stearns v. Ticketmaster Corp.*,
   655 F. 3d 1013 (9th Cir. Cal. 2011) ....................................................... 15-16, 18-19

*Sutcliffe v. Wells Fargo Bank, N.A.*,
   283 F.R.D. 533 (N.D. Cal. 2012) ........................................................................3-4

*Sweet v. Johnson*,
   169 Cal. App. 2d 630 (1959) ..............................................................................17

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F. 3d 1137 (9th Cir. Cal. 2008) ....................................................................20

*VP Racing Fuels, Inc. v. General Petroleum Corp.*,
   673 F. Supp. 2d 1073 (E.D. Cal. 2009) ...............................................................20

*Valentino v. Carter-Wallace, Inc.*,
   97 F. 3d 1227 (9th Cir. Cal. 1996). .....................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ......................................................................12-14, 16

*West v. JPMorgan Chase Bank, N.A.,*
    214 Cal. App. 4th 780 (2013) ................................................................................. 4

*Wigod v. Wells Fargo Bank,*
    673 F. 3d 547 (7th Cir. 2012) .............................................................................. 4-6

*Wolin v. Jaguar Land Rover North Am., LLC,*
    617 F. 3d 1168 (9th Cir. Cal. 2010) ...................................................................... 20

*Yokoyama v. Midland Nat'l Life Ins. Co.,*
    594 F. 3d 1087 (9th Cir. Haw. 2010) ............................................................... 13, 17


### STATUTES

12 U.S.C. § 5211 ............................................................................................................... 20

12 U.S.C. §§ 5219-5220 ................................................................................................... 20

15 U.S.C. § 1692e ............................................................................................................. 18

15 U.S.C. § 1692k ............................................................................................................. 18

CAL. BUS. & PROF. CODE § 17200 ................................................................................ 1, 19

CAL. BUS. & PROF. CODE § 17203 .................................................................................... 19

CAL. CIV. CODE § 1689 .................................................................................................... 17

CAL. CIV. CODE § 1788 ................................................................................................. 1, 18

Fed. R. Civ. P. 8 ............................................................................................................... 17

Fed. R. Civ. P. 23 ....................................................................................................... *passim*


### OTHER AUTHORITIES

MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1784 (3d Ed. 2005) .......... 23

NEWBERG ON CLASS ACTIONS § 4:54 (5th ed. 2012) ..................................................... 13

NEWBERG ON CLASS ACTIONS § 4:90 (5th ed. 2012) ..................................................... 13

NEWBERG ON CLASS ACTIONS § 7:26 (4th ed. 2002) ..................................................... 13

1

2

### MEMORANDUM OF POINTS AND AUTHORITIES

3

### I.      INTRODUCTION

4       This case concerns the standard form Trial Period Plan ("TPP") that Defendant Saxon

5   Mortgage Services, Inc. ("Saxon"), Morgan Stanley's defunct mortgage servicing subsidiary, entered

6   into with distressed residential mortgage borrowers pursuant to the federal Home Affordable

7   Modification Program ("HAMP") through October 1, 2009. In this particular form, the HAMP TPP

8   on its face promised permanent, affordable loan modifications to borrowers who successfully

9   completed a three month trial payment period. Indeed, this Court, with Judge Seeborg presiding,

10   observed that the TPP "strongly suggests" a "legally binding and enforceable contract". Nevertheless,

11   Saxon denied loan modifications to more than ▮% of its California mortgage borrowers who entered

12   into said TPP and made all their trial payments.

13       Plaintiff Marie Gaudin ("Plaintiff") is one of ▮▮▮ California borrowers that fit this

14   description. Like millions of others who suffered losses of income and equity as a result of the recent

15   financial crisis, Plaintiff reached out to her loan servicer seeking a loan modification so that she could

16   stay in her home. As with many others, this process turned into a lengthy nightmare as Saxon agreed

17   to a TPP, but then strung her along for many months (and many trial payments) beyond the

18   contractual three month "trial period" before denying modification on demonstrably false grounds. In

19   this manner, Saxon collected approximately $▮▮▮▮▮ trial payments from said ▮▮▮ California

20   borrowers before denying them loan modifications.

21       By this motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"),

22   Plaintiff seeks to certify a class of said **California borrowers who entered into HAMP TPPs with**

23   **Saxon through October 1, 2009, and made at least three trial period payments, but did not**

24   **receive HAMP loan modifications (the "Class")**. Plaintiff seeks certification in order to pursue this

25   action against Saxon for breach of contract (or rescission) and deceptive practices in violation of the

26   Rosenthal Fair Debt Collections Act, California Civil Code §§ 1788 *et seq* (the "Rosenthal Act") and

27   Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq* (the "UCL"), as

28   set forth in the First Amended Complaint ("FAC").

## II.   SUMMARY OF ARGUMENT

This case is relatively straightforward because Saxon incorrectly implemented the subject TPP on a class-wide basis. As the TPP clearly explains on its face, Saxon was supposed to determine whether borrowers qualified for a HAMP modification, **then** send them countersigned copies of the TPP **or** a notice that they did not qualify. *See Ex. A* at p. 1. Instead, Saxon's policy and practice was to counter-sign the TPP and collect trial period payments while it engaged in a lengthy (and incompetent) underwriting process. As a result, from April through October of 2009, when the TPP form changed, Saxon entered into apparent agreements to modify the mortgage loans of ▮▮ California borrowers who, like Plaintiff, it would subsequently deem ineligible or unqualified for one reason or another. As this Court has already observed, "[w]hile it may very well be that … lenders did not ever *intend* that binding commitments to provide modifications would be made … the change [in TPP forms] appears to reflect a recognition that the language of the TPPs reflect just such a promise." Dkt. 51 at p. 5.

The over-arching question thus presented is whether the TPP, once fully executed, is an enforceable contract despite Saxon's claim that it never intended this. The answer calls for a class-wide determination because California contract law looks to the parties' objective manifestations of intent as perceived by a hypothetical reasonable person. Similarly, a single class-wide legal determination will decide whether Saxon may invalidate the TPP agreement or renege on its obligations thereunder without reimbursing the trial payments it received. Finally, determining whether Saxon's usage of the TPP in this manner violated the Rosenthal Act or UCL also applies objective standards to evaluate Saxon's singular, class-wide conduct.

The Class should be certified because Rule 23 is satisfied. The common questions presented here predominate over any individualized issues, and the class action mechanism is the far superior means of resolving this controversy. Separate adjudications would risk the unfairness, inefficiency, and injustice of inconsistent rulings. As importantly, the members of this Class of financially distressed borrowers, faced against a mighty financial institution like Morgan Stanley, simply lack the ability to meaningfully litigate these legal claims individually. Thus class action is superior because it is the only way that the Class can obtain a meaningful resolution of their claims.

### III.   PROCEDURAL BACKGROUND

Since its inception on April 7, 2011, this action has been through two rounds of motions to dismiss by Saxon. *See* Dkt. No. 36 (*Gaudin v. Saxon Mortg. Servs.*, 820 F. Supp. 2d 1051 (N.D. Cal. 2011) (Aug. 22, 2011)); Dkt. No. 51 (*Gaudin v. Saxon Mortg. Servs.*, 2011 U.S. Dist. LEXIS 132957 (N.D. Cal. Nov. 17, 2011) (collectively "*Gaudin*"). The thrust of both these motions was Saxon's contention that the HAMP TPP was "simply not a legally binding and enforceable contract." Dkt. No. 36, p. 3; *see also* Dkt. No. 51, p. 2.[2] After careful analyzing the subject TPP language, this Court disagreed with the contention, finding to the contrary that "the face of the document ... strongly suggests otherwise." *Id.*

This Court also rejected Judge White's conclusion in *Lucia v. Wells Fargo Bank, N.A.,* 798 F. Supp. 2d 1059 (N.D. Cal. 2011) that certain language in the TPP effectively grants the lender unfettered discretion to deny HAMP modifications. *See* Dkt. No. 36, p. 4; Dkt. No. 51, p. 6-7; *Sutcliffe v. Wells Fargo Bank, N.A.,* 283 F.R.D. 533, 550-551 (N.D. Cal. 2012) (discussing *Lucia* and *Gaudin*). It was significant in this case that Saxon counter-signed the TPP, "implying that the lender found Gaudin to be qualified for a permanent loan modification." Dkt. No. 51, p. 2. The "TPP indicates that while it may initially be presented to the borrower only as an offer to determine eligibility, once the lender returns a signed copy of it to the borrower (rather than notifying the borrower that he or she does not 'qualify for the Offer'), then the borrower's eligibility for permanent modification has been determined". *Id.* at p. 4. This Court also found as to the Rosenthal and UCL claims that, regardless of the existence of an enforceable contract, "based on the facts presently alleged, the TPP was at a minimum misleading." *Id.* at p. 7.

This Court also rejected Saxon's argument that Plaintiff's claims were precluded based on the rule that there is no private right of action under HAMP. *See* Dkt No. 51, p. 5. "Gaudin has not attempted to state a claim that Saxon breached its obligations under HAMP and its servicing agreements by declining to offer her a permanent loan modification. Rather, Gaudin's claims are based solely on what Saxon allegedly was obliged to do by the terms of the TPP itself." *Id.*

---

[2] Saxon's first motion to dismiss also asserted that Plaintiff's bankruptcy precluded this action, and involved supplemental briefing to establish her post-bankruptcy standing. *See* Dkt. No. 20.

1    Since the Court issued these Orders in the Fall of 2011, the Seventh Circuit reached a similar

2    conclusion in the first and only TPP case to reach a circuit court decision thus far. *See Wigod v. Wells*

3    *Fargo Bank*, 673 F. 3d 547, 563 (7th Cir. 2012) (plaintiffs stated breach of contract claim based on

4    TPP and thus district court erred in dismissing claim). Subsequently, Magistrate Judge Spero found

5    the "reasoning of *Wigod* and *Gaudin* to be persuasive". *Sutcliffe*, 283 F.R.D. at 551. On March 18,

6    2013, the California Court of Appeal cited *Gaudin*, *Sutcliff* and *Wigod* to the same conclusion. *See*

7    *West v. JPMorgan Chase Bank, N.A.,* 214 Cal. App. 4th 780, 796-798 (2013). The *Lucia* decision in

8    is on appeal before the Ninth Circuit, which heard oral argument on March 20, 2013. *See*

9    *Corvello/Lucia v. Wells Fargo Bank, N.A.*, Ninth Circuit Case Nos. 11-16234/11-16242.

## IV.    FACTS

### A.    Plaintiff's Saxon mortgage

Plaintiff is a small business owner in San Francisco. *See* Declaration of Marie Gaudin

("Gaudin Decl.") at ¶ 4. In 1993, she purchased a home in Daly City. *See id.* On or about October 10,

2006, she refinanced that home, obtaining a mortgage loan from a now-defunct subprime lender

called WMC Mortgage Corp. *See id.*

Morgan Stanley packaged and securitized the mortgage loan through a wholly-owned

subsidiary called "Morgan Stanley ABS Capital I Inc. Trust 2007-HE4". **Ex. A**, Executed TPP, p. 1;

**Ex. B**, Morgan Stanley S.E.C. Form 10-K FY2008 (Ex. 21), p. 4.  Saxon, another wholly-owned

Morgan Stanley subsidiary, became Plaintiff's loan servicer. *See* **Ex. B** at p. 7; Gaudin Decl. at ¶ 4.

Plaintiff made her monthly mortgage payments to Saxon as it directed. *See* Gaudin Decl. at ¶ 4.

In 2008, as a result of the recession, Plaintiff suffered a reduction of income and financial

hardship that impeded her ability to pay her mortgage loan, and ultimately put her into bankruptcy.

*See id.* at ¶¶ 6-7. She sought relief from Saxon in the form of a loan modification. *See id.* Saxon

repeatedly requested her personal financial records, and she always promptly provided everything it

asked for. *See id.*  In April of 2009, Saxon denied Plaintiff's initial request for loan modification, but

she heard about a new government sponsored program, and persevered in her efforts. *See id.*

**B.      Saxon's participation in HAMP**

Meanwhile, "[i]n response to rapidly deteriorating financial market conditions in the late Summer and early Fall of 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765." *Wigod*, 673 F. 3d at 556. Its centerpiece was the Troubled Asset Relief Program ("TARP"). *See id.* Pursuant to TARP, the U.S. Treasury injected capital directly into various financial institutions, including Morgan Stanley. *See Ex. B*, Morgan Stanley S.E.C. Form 10-K FY2008, p. 41.

TARP also required the U.S. Treasury to "implement a plan that seeks to maximize assistance for homeowners" and "encourage servicers to minimize foreclosures." *Stagikas v. Saxon Mortg. Servs.*, 795 F. Supp. 2d 129, 132 (D. Mass. 2011). Congress granted Treasury authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.* Acting under this authority, in February 2009, Treasury announced the Making Home Affordable program ("MHA"), of which HAMP was the centerpiece. *See id.* at 133.

"On February 18, 2009, President Obama announced the Homeowner Affordability and Stability Plan to help up to 7 to 9 million families restructure or refinance their mortgages to avoid foreclosure." *Ex. C*, HAMP Supplemental Directive 09-01 (April 6, 2009) ("HAMP SD 09-01"), p. 1. "As part of this plan, the Treasury Department (Treasury) announced a national modification program aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." *Id.* "On March 4, 2009, the Treasury issued *uniform guidance for loan modifications* across the mortgage industry." *Id.* (emphasis added).

On April 6, 2009, Treasury issued its first Supplemental Directive setting forth the mechanics of the HAMP modification process as follows:

> Servicers must use a two-step process for HAMP modifications. Step one involves providing a Trial Period Plan outlining the terms of the trial period, and step two involves providing the borrower with an Agreement that outlines the terms of the final modification.
>
> In step one, the servicer should instruct the borrower to return the signed Trial Period Plan, together with a signed Hardship Affidavit and income verification documents (if not previously obtained from the borrower), and the first trial period payment... Upon

receipt of the Trial Period Plan from the borrower, the servicer must confirm that the borrower meets the underwriting and eligibility criteria. Once the servicer makes this determination and has received good funds for the first month's trial payment, the servicer should sign and immediately return an executed copy of the Trial Period Plan to the borrower... If the servicer determines that the borrower does not meet the underwriting and eligibility standards of the HAMP after the borrower has submitted a signed Trial Period Plan to the servicer, the servicer should promptly communicate that determination to the borrower in writing...

In step two, servicers must calculate the terms of the modification...

The trial period is three months in duration... If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period...

*Ex. C,* HAMP SD 09-01, pp. 14-15, 17-18.

Participation in HAMP was voluntary. *See Wigod,* 673 F. 3d at 556. HAMP is an incentive program designed to encourage servicers and investors to uniformly modify mortgages based on affordability. *See id.* The federal government set aside $50 billion of TARP funds to induce such participation. *See id.* "In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives." *Id.; see also Ex. C,* SD09-01, pp. 23-24. In order to participate in these incentives, Treasury required loan servicers to enter into a private contract called the Servicer Participation Agreement ("SPA"). *See id.*

On April 13, 2009, Saxon entered into a SPA with Treasury to participate in HAMP. *See Ex. D* at SAXON_0002188; *Ex. E,* Deposition of Saxon 30(b)(6) Designee Brent Laurie ("Laurie Dep."), 11:1-17. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See Ex. E* at 17:4-17.

By virtue of the SPA, Saxon agreed to perform HAMP loan modifications on all eligible loans in accordance with the Program Guidelines and any Supplemental Directives issued by the Treasury. *See Ex. D,* SAXON_0002178 at ¶ 1.A. Saxon also agreed to maintain complete and accurate records of said activities, and to develop internal controls to ensure effective delivery of said services in compliance with all laws. *See id.,* SAXON_0002179 at ¶ 4.E, SAXON_0002190 at ¶ 3(b), SAXON_0002191 at ¶¶ 4(a) & 5(b); *see also Ex. C,* HAMP SD 09-01, pp. 12-14. Treasury required

1    detailed loan-level tracking and reporting as a matter of compliance and condition of payment. *See*

2    *Ex. C*, HAMP SD 09-01, pp. 27-38.

3         A central purpose of HAMP was to establish "uniform" loan modification processes. See *Ex.*

4    *C* at p. 1.



16    **C.    Saxon entered into a HAMP Trial Period Plan with Plaintiff but failed to modify
17         her loan despite the fact that she made all her trial period payments**

18         On May 9, 2009, Saxon sent Plaintiff the subject TPP offer as part of a standard HAMP

19    application package. *See Ex. D* at SAXON_0000322-340; Gaudin Decl. at ¶ 8.  Saxon thus offered

      her the opportunity to reduce her mortgage payments to an affordable level, explaining the process as

20    follows:



27    *Ex. D* at SAXON_0000322 (italics added, bold in original).

28

The two enclosed TPP forms (SAXON_0000331-338) expressed the HAMP process in contractual terms, which were previously summarized by this Court in relevant part as follows:

> Immediately below the title is a parenthetical stating, "Step One of Two-Step Documentation process." The first full paragraph of text provides, in relevant part, "if I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, *then the Lender will provide me with a Home Affordable Modification Agreement . . . .*" (Emphasis added.) The second paragraph continues, "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan, *if I qualify for the Offer* or will send me written notice that I do not qualify for the Offer. This plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature." (Emphasis added.)

Dkt. No. 51 at p. 2; *see Ex. A,* Executed TPP, p. 1.

Plaintiff's TPP was effective June 1, 2009, and called for monthly trial payments of $1328.63 for June, July, and August of 2009. *See Ex. A* at p. 2. Plaintiff promptly signed and returned it, along with her first trial period payment and other required documents. *See* Gaudin Decl. at ¶¶ 8-11. In June, 2009, she received a counter-signed copy of the TPP back from Saxon. *See id.* On that basis, Plaintiff understood that she was approved for a loan modification under HAMP after she completed her three trial period payments, and that her new monthly mortgage payment amount would be about the same as the trial payment amount. *See id.*

Plaintiff made all three trial payments required by the TPP, and many more, each consecutive month after month, but her loan was never modified. *See* Gaudin Decl. at ¶ 12. Initially, when she called to inquire regarding the status of her final modification paperwork, Saxon representatives told

1   her that her that the documentation was in process, and that she should keep making her trial

2   payments monthly, which she did. *See id.* Later, Saxon began sending erroneous form letters,

3   claiming she had failed to make payments or to submit (unspecified) documentation. *See id.*; *Ex. H*,

4   Saxon letters.

5        On March 23, 2010, after cashing Plaintiff's ninth consecutive monthly trial period payment,

6   Saxon sent Plaintiff a letter stating that it was denying her HAMP modification because she failed to

7   "make all the required Trial Period Plan payments". *Ex. H* at 3/23/2010. As this was obviously false,

8   Plaintiff assumed it was an innocent mistake. *See* Gaudin Decl. at ¶ 13. She responded by alerting

9   Saxon representatives and transmitting proof of payments. *See id.* In telephone conversations, Saxon

10  representatives acknowledged that it had received all her payments, and told her to keep making the

11  trial payments as they attempted to resolve the matter. *See id.*

12       Plaintiff was diligent in her efforts to obtain loan modification without litigation. *See id.*

13  According to Saxon records, ███████████████████████████████████████████████

14  *See Ex. I*, Saxon Responses to Interrogatories (first), Response No. 20 at pp. 18-19. She continued

15  making trial payments from June of 2009 through June of 2010, thirteen payments in all. *See* Gaudin

16  Decl. at ¶ 13. Nevertheless, right up to the eve of this litigation, Saxon persistently asserted that

17  Plaintiff's "loan was removed from the Home Affordable Modification Program (HAMP) on March

18  23, 2010 because [she] did not make all the required trial payments". *Ex. H* at 1/26/2011.

19       Plaintiff sought out counsel because she felt she was being treated unfairly and illegally, and

20  had exhausted all of other options. *See* Gaudin Decl. at ¶¶ 14-16. She seeks to pursue her claims on a

21  class basis because she wants justice for all persons similarly situated. *See id.* Also, she cannot

22  possibly afford to litigate this matter individually. *See id.* She would not have sent or continued to

23  send trial payments to Saxon if she had known she was being deceived. *See id.*



24                                  *See Ex. F*, Lightfoot

25  Dep., 122:2-17.

26

27                                    *See*

28  Fredman Decl. at ¶ 5.



*Id.* at 18:25-19:11 (emphasis added).

at the motion to dismiss, it offered its interpretation of certain language at paragraph 2F of the TPP. *See* Dkt. No. 51 at 6:8-11; *Ex. A* at p. 2. In denying the motion to dismiss, this Court rejected that argument as follows:

> Read literally, this language would suggest that even if all other conditions are satisfied, a lender has no obligation to provide a loan modification agreement unless it in fact provides a modification agreement. As noted in the prior order, this provision conflicts with the clear tenor of the remainder of the document and would render the other agreement promises illusory.

Dkt. No. 51 at 6:11-15.

**D.    Saxon exists now only as an empty shell within Morgan Stanley after the sale of its entire servicing portfolio**

When Morgan Stanley acquired Saxon in 2006, its goal was to obtain "vertical integration in the residential mortgage business, with ownership and control of the entire value chain". *Ex. K*, Morgan Stanley Press Release (August 9, 2006). It touted the acquisition as an "important step in [its] long-term strategy of broadening [its] global franchise in the critical

residential mortgage business". *Id.* At its peak, Saxon "serviced a portfolio of more than 225,000

residential mortgage loans." *See Ex. L*, In Re Morgan Stanley, Consent Order (April 2, 2012), p. 2.

Saxon initiated at least 60,313 from January 1, 2009 to December 31, 2010 alone. *See id.*

Plaintiff likely would have been foreclosed on except for her bankruptcy and this case. *See* Gaudin

Decl. at ¶ 5. In an April 2, 2012 Consent Order, Morgan Stanley conceded that Saxon engaged in

flawed and dubious loss mitigation and foreclosure activities. *See Ex. L* at pp. 2-3.[3] By mid-2012,

Saxon and Morgan Stanley were out of "the business of residential mortgage loan servicing." *Id.* at p.

4. For remedial purposes, they agreed to maintain access to the information and documents of the

former Saxon servicing portfolio. *See id.* at p. 5.

**E.      Electronic records provide extensive loan level detail for each Class member**



---

[3] The Federal Reserve had jurisdiction because Morgan Stanley (like Goldman Sachs) obtained approval from it at the peak of the financial crisis to become a bank holding company in order to gain access to its discount window. *See Ex. B*, Morgan Stanley S.E.C. Form 10-K FY2008, p. 41.

[4] SAXON_0002035-2036 and SAXON_0002214-2215 are placeholders for large native Excel spreadsheet files that are not actually physically submitted herewith. *See* Fredman Decl. at ¶ 5.

## V.     LAW & ARGUMENT

**A.     Legal standard: class certification is a procedural inquiry into whether Rule 23 is satisfied such that Plaintiff may proceed in a representative capacity to determine defendant's liability to a class as a whole**

Under Rule 23, a member of a class may sue in a representative capacity for all class members if certain elements are satisfied. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-1195 (U.S. 2013) ("*Amgen*"). Under Rule 23(a), the basic elements of class certification are numerosity, commonality, typicality, and adequacy of representation, each of which is addressed in detail below. *See Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2548 (U.S. 2011) ("*Dukes*"). Where, as here, the plaintiff makes "individualized monetary claims" on behalf of the Class, she must

---

[5] Under HAMP guidelines Saxon would not initiate a TPP in the first instance unless the mortgaged property was a borrower occupied principal residence. *See Ex. C*, HAMP SD 09-01, p. 8.

[6] The aforementioned data clearly provides all the detail necessary to calculate formulaically the exact total of trial payments made by each Class member (among many other things). *See* Fredman Decl. at ¶ 12. Plaintiff only recently received the key data set (the native Excel files identified for production as SAXON_0002214-2215), on March 29, 2013, in somewhat unruly form, and it is still being analyzed and scrubbed. *See id.* at ¶ 10. Although the process takes only moments per Class member, it requires significant time cumulatively, and has not been completed. *See id.*

1   additionally satisfy the predominance and superiority elements set forth in Rule 23(b)(3), also

2   addressed in detail below. *See Dukes* at 2558.

3       The underlying merits of the case are not considered at the class certification stage except to

4   the extent necessary to determine whether Rule 23 is satisfied. *See Amgen* at 1194-1195. Although

5   class certification is by no means a "mere pleading standard," it is the elements of Rule 23 (and not

6   the merits) that the party seeking class certification must prove under a "rigorous analysis" standard.

7   *See Dukes* at 2551-2552. "Rule 23 grants courts no license to engage in free-ranging merits inquiries

8   at the certification stage." *Amgen* at 1194-1195. On the contrary, except as necessary to comply with

9   Rule 23, the court should treat the well pled allegations of the complaint as true, and defer

10  consideration of the merits until the motion for class certification has been resolved. *See 3 Newberg*

11  *& Conte, Newberg on Class Actions* § 7:26, p. 81 (4th ed. 2002); *Blackie v. Barrack*, 524 F. 2d 891,

12  901, n.17 (9th Cir. Cal. 1975); *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547-548 (U.S. 1974).

13      Similarly, it is well recognized that individual damages calculations do not preclude class

14  certification. *See Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F. 3d 1087, 1094 (9th Cir. Haw.

15  2010); *see also 2 W. Rubenstein, Newberg on Class Actions* § 4:54, p. 205-206 (5th ed. 2012);

16  *Blackie,* 524 F. 2d at 905. "The amount of damages is invariably an individual question and does not

17  defeat class action treatment." *Id.* "Indeed, a class may also be certified solely on the basis of

18  common liability, with individualized damages determinations left to subsequent proceedings." *2 W.*

19  *Rubenstein, supra,* § 4:54, pp. 207-208.

20      Further, under Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as

21  a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "[I]f common questions do

22  not predominate over the individual questions so that class certification of the entire action is

23  warranted," a court may use Rule 23(c)(4) to "isolate the common issues and proceed with class

24  treatment of these particular issues." *Valentino v. Carter-Wallace, Inc.,* 97 F. 3d 1227, 1234 (9th Cir.

25  Cal. 1996). For example, certifying a class to determine defendant's liability, while leaving the class

26  members to pursue their individual damages claims, is sometimes considered a species of such partial

27  certification. *See 2 W. Rubenstein, supra,* § 4:90, pp. 377-378, citing *Slaven v. BP America, Inc.,* 190

28  F.R.D. 649, 658 (C.D. Cal. 2000).

PLAINTIFF'S MTN. FOR CLASS CERT.          - 13 -
No. C 11-01663-JST, Gaudin v. Saxon Mortgage

**B.     An identifiable and ascertainable Class exists**

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009). This requirement is satisfied as noted above.

*See* Fredman Decl. at ¶ 8; *Ex. D* at SAXON_0002214.

**C.     The Class is so numerous that joinder of all members is impracticable**

Rule 23(a)(1) is satisfied here because the proposed Class is so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Whether joinder [is] impracticable depends on the facts and circumstances of each case and does not, as a matter of law, require the existence of any specific minimum number of class members." *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 448 (N.D. Cal. 1994). "Nonetheless, courts have recognized that the numerosity requirement is generally satisfied when the class is in excess of forty members." *Charlebois v. Angels Baseball, LP*, 2011 U.S. Dist. LEXIS 71452 (C.D. Cal. June 30, 2011) (listing cases). Here, Saxon admits that the Class consists of ███ members. *See Ex. J* at Response No. 23.

**D.     There are questions of law and fact common to the Class**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality under Rule 23(a)(2) – as distinguished from predominance under Rule 23(b)(3), discussed below – is liberally construed. *See Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1019-1020 (9th Cir. Cal. 1998). It exists when there are underlying facts or legal theories common throughout the class, even if the common facts support different legal theories or common legal theories rest on different facts. *See id.* The commonality "element can be met by raising a single common issue that is central to the class." *Roshandel v. Chertoff,* 554 F. Supp. 2d 1194, 1203 (W.D. Wash. 2008), citing *Slaven,* 190 F.R.D. at 655; *see Dukes* at 2556 ("We quite agree that for purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do"). Here, the commonality requirement is satisfied because everyone in the Class entered into the same TPP with Saxon and made at least the three trial payments it called for but did not obtain loan modification. *See, inter alia,*

1    *Ex. A*, Executed TPP*; Ex. F*, Lightfoot Dep., 16:4-13,18:16-19:11, 32:4-33:2; *Ex. G,* HAMP SD 09-

2    07, pp. 1, 6; *Ex. J*, Response No. 23.

3          **E.     Plaintiff's claims are typical of the claims of the Class**

4          Rule 23(a)(3) requires that the representative Plaintiff's claim be typical of the Class. "The

5    purpose of the typicality requirement is to assure that the interest of the named representative aligns

6    with the interests of the class." *Stearns v. Ticketmaster Corp.,* 655 F. 3d 1013, 1019 (9th Cir. Cal.

7    2011) ("*Ticketmaster*"). "The typicality requirement looks to whether the claims of the class

8    representatives [are] typical of those of the class, and [is] satisfied when each class member's claim

9    arises from the same course of events, and each class member makes similar legal arguments to prove

10    the defendant's liability." *Id.* (internal quotations omitted). "Under the rule's permissive standards,

11    representative claims are 'typical' if they are reasonably coextensive with those of absent class

12    members; they need not be substantially identical." *Hanlon*, 150 F. 3d at 1020. Here, the typicality

13    requirement is satisfied because Plaintiff entered into and performed in accordance with the same

14    TPP form as every other Class member, and brings the same legal claims that they could bring. *See,*

15    *inter alia,* Gaudin Decl. at ¶¶ 10-12; *Ex. A*, Executed TPP.

16          **F.     Plaintiff will fairly and adequately protect the interests of the Class**

17          Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

18    interests of the class." Fed. R. Civ. P. 23(a)(4)."To satisfy the adequacy requirement, plaintiffs must

19    show that their interests are not antagonistic to those of the class and that they are able to prosecute

20    the action vigorously through qualified and competent counsel." *Roshandel*, 554 F. Supp. 2d at 1204.

21    Both adequacy prongs are met here: Plaintiff's interests in this litigation are aligned with those of the

22    Class she represents because she seeks all possible relief for the same injury; her attorneys are

23    experienced in class action and consumer mortgage litigation; none of them have any actual or

24    potential conflicts with the Class. *See* Gaudin Decl. at ¶¶ 12-15; Fredman Decl. at ¶¶ 13-16; Mulligan

25    Decl. at ¶¶ 2-4. Plaintiff's persistence in dealing with Saxon preceding this litigation and the

26    procedural history of this case demonstrate their collective competence and commitment to vigorous

27    prosecution on behalf of the Class. *See id.*

28

### G. The questions common to Class members predominate over any questions affecting only individual members

The predominance element of Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The predominance inquiry … asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Ticketmaster,* 655 F.3d at 1019 (internal quotations omitted). "The focus is on the relationship between the common and individual issues." *Id.* The analysis "begins, of course, with the elements of the underlying cause of action." *Id.* at 1020. Here, predominance is satisfied as to each cause of action because as to each Saxon's liability turns class-wide on the interpretation of the subject TPP form in the context of its uniform HAMP implementation policies and practices. *See* FAC at Dkt. No. 39.

#### 1. Common issues predominate the breach of contract claim because it turns on interpretation of the TPP and California law

Specifically, common issues predominate in the breach of contract claim because interpretation of the TPP is a matter of law. *See Meyer v. Benko,* 55 Cal. App. 3d 937, 942 (1976). Contract interpretation is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purpose of the instrument may be given its objective effect. *See id.* "The existence of mutual consent," for example, "is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." *Id.* at 942-943. For an adhesion contract, like the TPP in this case, the "court interprets the form contract to mean what a reasonable buyer would expect it to mean, and thus protects the weaker party's expectation at the expense of the stronger's." *Gray v. Zurich Ins. Co.,* 65 Cal. 2d 263, 271 (Cal. 1966).

Here, because the Class, on the one hand, and Saxon, on the other, each executed the same TPP document, the questions pertaining to its nature, meaning, and effect may be "resolved in one stroke". *Dukes* at 2545; *see also, e.g., Ex. A,* Executed TPP. And those questions plainly predominate above all others in this litigation. *See, e.g.,* Dkt. Nos. 36 and 51, Orders on Motions to Dismiss. Further, assuming the TPP was a legally binding contract, and Saxon breached it, this case also presents a predominant common legal question as to whether the Class may recover some or all of

their trial payments, nominal damages, or any other remedies under California law. *See Morrell v. Clark,* 106 Cal. App. 2d 198, 202-203 (1951) (contracting party may recover consideration paid for other party's total failure of performance); *Sweet v. Johnson,* 169 Cal. App. 2d 630, 632 (1959) ("plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage"). As mentioned, to the extent individualized damages issues may arise, that would not defeat class certification where, as here, the interpretation of the instrument is the predominate question presented. *See Yokoyama,* 594 F. 3d at 1094.

### 2. Common issues predominate the rescission and restitution claim because it also turns on interpretation of the TPP and California law

Similarly, common issues predominate with respect to Plaintiff's alternative quasi-contract claim for rescission and restitution because it likewise turns on the legal nature, meaning, and effect of the TPP and, as applicable, the remedy available for Saxon's failure to honor it. Section 1689(b) of the California Civil Code provides that, as an alternative remedy to suing "on the contract," a party to a contract may rescind the contract:

> (1) [i]f the consent of the party rescinding ... was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds ... (2) [i]f the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds .... (4) [i]f the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause.

Cal. Civ. Code § 1689(b); *see also* Fed. R. Civ. P 8(d)(2) (inconsistent alternative claims permitted). Rightfully rescinding parties generally have the right to restitution payments made thereunder, including when the rescinded contract was void in the first instance. *See Fleming v. Kagan,* 189 Cal. App. 2d 791, 796-797 (1961). This claim is subject to the same common proof as the contract claim, especially given Saxon's admission ██████████████████████████████████ ██████████████████████████████ *See Ex. F,* Lightfoot Dep., 102:4-11.

### 3. Common issues predominate the Rosenthal Act claim because it turns on application of an objective legal standard to the TPP

Similarly, common issues predominate as to the Rosenthal Act claim because it also turns on application of an objective legal standard to the TPP in the context of Saxon's uniform practices, including its admission that it did not consider the TPP legally binding. *See id.* Specifically, the

1   Rosenthal Act standard, as applied here, essentially asks whether a hypothetical "least sophisticated

2   debtor" would have been deceived into believing the TPP was a contract ▓▓▓▓▓▓▓▓▓▓▓

3   ▓▓▓▓▓   See 15 U.S.C. § 1692e, as incorporated through Cal. Civ. Code § 1788.17; *Gonzales v.*

4   *Arrow Financial Services,* LLC, 233 F.R.D. 577, 581 (S.D. Cal. 2006); *Gonzales v. Arrow Financial*

5   *Services LLC,* 489 F. Supp. 2d 1140, 1146-1147 (S.D. Cal. 2007). Regardless of whether the

6   countersigned TPP actually promised a loan modification upon completion of the trial period

7   payments, a Rosenthal Act violation is stated if a "least sophisticated debtor" would reasonably have

8   believed this to be so. *See id;* Dkt No. 51, p. 7 ("based on the facts presently alleged, the TPP was at a

9   minimum misleading."). To the extent HAMP letter or guidelines are relevant, this is also a matter of

10  common proof. *See Exs. D* at SAXON_0000322-340 (letter forms); *C & G* (guidelines).

11       No actual deception, reliance, or damage is required to state a violation of the Rosenthal Act.

12  *Gonzales,* 489 F. Supp. 2d at 1149. The sole question is the likely objective effect on the hypothetical

13  recipient as determined by the Court. *See id.* Thus, it is generally recognized that common issues

14  predominate for Rosenthal Act claims based on uniform documents such as the TPP, and that liability

15  may be resolved through summary adjudication. *See Gonzales,* 233 F.R.D. at 583 (class certification

16  granted); *Gonzales v. Arrow Financial Services, LLC,* 660 F. 3d 1055, 1059 (9th Cir. Cal. 2011)

17  (summary judgment for plaintiff class affirmed). Assuming the Rosenthal Act violation occurred,

18  another predominant common legal question asks whether the Class may recover its trial payments as

19  "actual damages" under the Rosenthal Act in addition to the statutory damages of up to $500,000

20  available thereunder. *See* 15 U.S.C. § 1692k, as incorporated through Cal. Civ. Code § 1788.17.

21              **4.    Common issues predominate the UCL claims**

22       Common issues predominate as to each of the UCL claims because the UCL focuses squarely

23  on Saxon's conduct, as opposed to any personal characteristics of the individual Class members. *See*

24  *Ticketmaster,* 655 F. 3d at 1020-1021; *In re Tobacco II Cases,* 46 Cal. 4th 298 (2009). The Ninth

25  Circuit recently recognized that, as a matter of substantive California law, class-wide "relief under the

26  UCL is available without individualized proof of deception, reliance and injury." *Ticketmaster* at

27  1020, quoting *In re Tobacco II* at 320. "One might even say that, in effect, California has created

28  what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person

sees it and bites, the defendant has caused an injury; restitution is the remedy." *Id.* at 1021. "This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Id.* at 1020, quoting *In re Tobacco II* at 312.

Because the purpose of the UCL is to grant courts broad power to remedy and deter unscrupulous business practices, the UCL defines "unfair competition" to mean and include "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. When a violation occurs, the UCL empowers the court to provide restitution through "such orders or judgments ... as may be necessary to restore to any person in interest any money ... acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203. Assuming a UCL violation is established in this action, another predominant common legal question asks whether the Class may recover its trial payments as UCL restitution under section 17203. *See id.*

### a. Common issues predominate the unlawful practices claim because it is predicated on the Rosenthal Act violation

Common issues predominate the unlawful practices claim for the same reasons as stated in the Rosenthal Act section above. The unlawful prong of the UCL borrows violations of other laws and treats them as independently actionable UCL violations. *See Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180 (Cal. 1999). Common issues predominate the unlawful practices claim because it is entirely predicated on the Rosenthal Act violation, discussed above. *See id.* Thus, the alleged violation of the Rosenthal Act would violate the UCL as a matter of law, triggering the UCL restitution remedy. *See id.*

### b. Common issues predominate the fraudulent practices claim because the standard is whether the public is likely to be deceived

Common issues also predominate the fraudulent practices claim because it turns on the objective question of whether the public would likely be deceived. *See Fletcher v. Sec. Pac. Nat'l Bank,* 23 Cal. 3d 442, 451 (Cal. 1979). Indeed, the aforementioned discussion in *Ticketmaster* was addressed to the fraud prong of the UCL in particular. *See Ticketmaster* at 1020. Although the Ninth Circuit clarified that it was not "suggest[ing] that predominance would be shown in every California UCL case," it recognized that predominance was likely except where class members "were exposed

1    to quite disparate information." *Id.* Here, common issues predominate because the TPP to which the

2    Class members were exposed is undisputedly uniform. To the extent UCL fraudulent practices class

3    jurisprudence involves a presumption or inference of reliance or causation (*see In re Tobacco II* at

4    326-327), these arise in this case because the alleged misrepresentative nature of the TPP is plainly

5    material. *See Mazza v. Am. Honda Motor Co.*, 666 F. 3d 581, 596 (9th Cir. Cal. 2012).

6              **c.      Common issues predominate the unfair practices claim because it**
                         **looks to nature, effect, and utility of Saxon's conduct**

7              Common issues predominate the unfair practices claim because it focuses on the nature,

8    effect, and utility of Saxon's conduct in the context of public policy. *See VP Racing Fuels, Inc. v.*

9    *General Petroleum Corp.,* 673 F. Supp. 2d 1073, 1087 (E.D. Cal. 2009). For example, HAMP itself is

10   the product of significant public policy aimed at modifying mortgages and avoiding foreclosures. *See*

11   12 U.S.C. § 5211, §§ 5219-5220 (HAMP enabling legislation). If the TPP was a binding modification

12   contract, then Saxon's systematic breach of it could also constitute an unfair business practices. *See*

13   *Sybersound Records, Inc. v. UAV Corp.*, 517 F. 3d 1137, 1152 (9th Cir. Cal. 2008).

14

15             **H.      Class action is superior to other available methods for fairly and efficiently**
                         **adjudicating the controversy**

16             Rule 23(b)(3) also requires a class action be "superior to other available methods for fairly

17   and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors considered in

18   determining superiority include: (A) the interests of class members to individually pursue separate

19   actions, (B) if class members have already commenced litigation concerning the controversy at issue,

20   (C) the desirability of converging the matter into one action, (D) the manageability of a class action.

21   *See id.* The focus is on the benefits of the class mechanism in terms of uniformity and efficiency, as

22   compared to "alternative mechanisms of dispute resolution." *Hanlon*, 150 F. 3d at 1023.

23             The Ninth Circuit generally holds that "there is clear justification for handling the dispute on a

24   representative rather than an individual basis" where, as here, "common questions present a

25   significant aspect of the case and they can be resolved for all members of the class in a single

26   adjudication...." *Mazza*, 666 F. 3d at 589.  Where, as is also the case here, "recovery on an individual

27   basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of

28   class certification." *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F. 3d 1168, 1175 (9th Cir. Cal.

1   2010). Also, in this case, the fact that ▮ individual claims "would not only unnecessarily burden

2   the judiciary, but would prove uneconomic for potential plaintiffs" weighs heavily in favor of class

3   action. *See Hanlon*, 150 F. 3d at 1023.

4       A Class action is superior because the benefits of efficiency and judicial economy outweigh

5   any possible detriments. Indeed, no contrary fairness or manageability concerns are indicated. The

6   bottom line is that the Class consists of financially distressed people who by definition could not

7   afford their mortgages. They have no realistic ability to litigate this case against Morgan Stanley

8   individually. It took many months and tens of thousands of dollars in attorney fees simply to

9   overcome Saxon's motions to dismiss. Thus, a class action is superior, not only based on judicial

10   economy, but because it truly represents the only option for the Class members to obtain meaningful

11   resolutions of their claims.

12              **VI.   TRIAL PLAN**

13       Manageability of the class process is also a consideration at the certification stage. *See* Fed. R.

14   Civ. P. 23(b)(3)(D). As set forth below, this matter plainly presents no manageability concerns.

15       **A.   Notice**

16       Plaintiff already has an anonymous class list by FAID, and individualized Class member

17   information is readily available that will provide for robust class notice. *See* Fredman Decl. at ¶ 8.

18   Following certification, Plaintiff will propound discovery to obtain last known contact information as

19   well as supplemental locator information (such as borrower social security numbers) for each FAID,

20   in order to allow the notice administrator to deliver the most effective notice. Additionally, to the

21   extent any individual Class member lawsuits are currently pending against Saxon, they will be

22   identified through discovery, and Plaintiff will endeavor to contact those plaintiffs in order to ensure

23   they have the opportunity to opt-out and/or coordinate with this action as appropriate.

24       **B.   Further Discovery and Proceedings**

25       As Saxon has been resistant to pre-certification "merits" discovery (*see, e.g.,* Dkt. 53, Joint

26   Case Management Conference Statement, at 5:6-8), Plaintiff anticipates some additional discovery

27   before trial. This is expected to consist of depositions of former Saxon employees with policies and

28

procedures knowledge, and associated documents. Also, some further discovery regarding Plaintiff's transaction may be required.

**C.   Dispositive Motions**

Insofar as the material facts do not appear in dispute, it is anticipated that most liability issues may be resolved (or at least framed) through summary adjudication prior to trial, including:

1.   Whether the TPP was a legally binding contract.

2.   Contract liability, if applicable.

3.   Whether rescission is applicable in this case.

4.   Whether the TPP was deceptive within the meaning of the Rosenthal Act.

5.   Rosenthal Act and, thus, derivative UCL liability.

6.   Whether the Class may recover its trial payments as restitution or damages.

**D.   Common Proof at Trial**

Assuming trial of all claims and damages occur at the same time, all issues may be determined based on the following common evidence:

1.   Subject form of TPP agreement. *Ex. A.*

2.   HAMP TPP cover letter and application package. *Ex. D* at SAXON_0000322-340.

3.   Saxon HAMP SPA and Supplemental Directives. *Ex. D* at SAXON_0002176-2195; *Exs. C & G*, HAMP Supplemental Directives.

4.   Saxon 30(b)(6) testimony of Lightfoot and Laurie. *Exs. E & F.*

5.   Additional Saxon former employee testimony regarding loss mitigation policies and procedures, HAMP administration and reporting, and the like.

6.   The Morgan Stanley/Saxon Consent Decree and related testimony regarding its corporate structure and loss mitigation processes. *Ex. L.*

7.   Saxon financial data pertaining to the Class, presented through expert testimony. *See* Fredman Decl. at ¶¶ 5-12.

8.   Follow up Saxon 30(b)(6) testimony pertaining to recent data productions.

9.   Plaintiff will testify regarding the facts of her case and her documents in order to lay a foundation for the Class, and may be supplemented with the testimony and documents of additional Class members. *See* Gaudin Decl.

10. Post-certification discovery may reveal additional Saxon personnel and documents relevant to these matters.

1        This evidence will provide the basis for disposition of all issues, including individualized

2   Class member trial payment restitution or damages derived formulaically through Saxon's electronic

3   record production (or other damages theories, if necessary). Plaintiff will also request a verdict

4   specifying Rosenthal Act statutory damages and aggregated damages and/or restitution. Subject to

5   further developments, these funds should be distributed to the Class pro rata to their trial payments

6   through an administrative process. *See* 7AA *C. Wright, A. Miller & M. Kane, Federal Practice and*

7   *Procedure* § 1784 (3d Ed. 2005) ("courts must use their discretion [] and … ingenuity [] to shape

8   decrees or to develop procedures for ascertaining damages and distributing relief"). To the extent a

9   there is a residual of undeliverable funds, Plaintiff will propose an appropriate *cy pres* recipient.

10                       **VII.   CONCLUSION**

11       The class action mechanism is plainly the superior means to resolve this controversy.  The

12  requirements of Rule 23 are readily satisfied in this case.  Plaintiffs therefore respectfully request that

13  the Court certify the Class as defined in the notice, or subject to such changes the Court sees fit,

14  appoint Plaintiff as the Class representative, appoint her attorneys as Class Counsel, and order that

15  class notice be provided.

16  DATE: April 15, 2013                **JENKINS MULLIGAN & GABRIEL LLP**

17                                  **LAW OFFICE OF PETER FREDMAN**

18                              By: ___/s/ Peter B. Fredman_____

19                              Peter B. Fredman (Cal. State Bar No. 189097)

20                              125 University Ave, Suite 102
                                Berkeley, CA  94710

21                              Telephone: (510) 868-2626
                                Facsimile:  (510) 868-2627

22                              peter@peterfredmanlaw.com

23                              Daniel J. Mulligan (Cal. State Bar No. 103129)
                                **JENKINS MULLIGAN & GABRIEL LLP**

24                              10085 Carroll Canyon Road, Suite 210
                                San Diego, CA 92131

25                              Telephone: (415) 982-8500
                                Facsimile: (415) 982-8515

26                              dan@jmglawoffices.com

27                              Attorneys for Plaintiff MARIE GAUDIN,
                                for herself and persons similarly situated

28