**FILED UNDER SEAL**

JOHN B. SULLIVAN (State Bar No. 96742)
jbs@severson.com
ERIK KEMP (State Bar No. 246196)
ek@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344

JEFFREY Q. SMITH (*not yet admitted pro hac vice*)
jqsmith@bingham.com
LAILA ABOU-RAHME (*pro hac vice*)
laila.abou-rahme@bingham.com
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Attorneys for Defendant
SAXON MORTGAGE SERVICES, INC.

Attorneys for Defendant
SAXON MORTGAGE SERVICES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIE GAUDIN, individually, and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAXON MORTGAGE SERVICES, INC., a Texas corporation,<br><br>Defendant. | Case No.: 3:11-cv-01663-JST<br><br>**SAXON MORTGAGE SERVICES, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**<br><br>Date: June 20, 2013<br>Time: 2:00 p.m.<br>Department: Courtroom 9<br>Judge: Hon. Jon S. Tigar |

A/75512217.17

1
2

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 3

    A.    Overview of HAMP and Treasury Requirements ................................... 3

    B.    Plaintiff's Mortgage Loan ....................................................................... 7

    C.    Procedural History .................................................................................. 9

ARGUMENT ...................................................................................................................... 11

I.    PLAINTIFF DOES NOT COME CLOSE TO SATISFYING THE REQUIREMENTS OF RULE 23, WHICH SETS RIGOROUS STANDARDS FOR CLASS CERTIFICATION ............................................. 11

II.    PLAINTIFF CANNOT DEMONSTRATE THE REQUISITE COMMONALITY ................................................................................. 12

III.    PLAINTIFF IS NOT TYPICAL OF THE PROPOSED CLASS ...................... 13

IV.    PLAINTIFF IS NOT AN ADEQUATE REPRESENTATIVE OF THE PUTATIVE CLASS ................................................................................ 15

V.    COMMON QUESTIONS FOR EACH CLAIM DO NOT PREDOMINATE ....................................................................................... 17

    A.    Legal Standard for Predominance ......................................................... 17

    B.    Common Questions Regarding Breach of Contract Do Not Predominate ............................................................................................ 18

    C.    Common Questions Regarding Rescission and Restitution Do Not Predominate ..................................................................................... 21

    D.    Common Questions Regarding the Rosenthal Act Claim Do Not Predominate ............................................................................................ 22

    E.    Common Questions Regarding the UCL Claim Do Not Predominate ............................................................................................ 23

VI.    PLAINTIFF FAILS TO ESTABLISH THE SUPERIORITY REQUIREMENT ....................................................................................... 25

CONCLUSION ................................................................................................................... 25

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.             Case No. 3:11-cv-01663-JST

i

A/75512217.17

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................ 16

Andrews v. Chevy Chase Bank,
    545 F.3d 570 (7th Cir. 2008)............................................................................. 22

Blackie v. Barrack,
    524 F.2d 891 (9th Cir. 1975)............................................................................. 20

Brown v. Ticor Title Ins. Co.,
    982 F.2d 386 (9th Cir. 1992)............................................................................. 16

Campion v. Old Republic Home Protection Co.,
    272 F.R.D. 517 (S.D. Cal. 2011).........................................................19, 22, 24-25

Comcast Corp. v. Behrend,
    133 S. Ct. 1426 (2013) .............................................................................11, 20-21

Cowden v. Parker & Assocs., Inc.,
    No. 09-cv-323, 2013 WL 2285163 (E.D. Ky. May 22, 2013).............................. 21

De Giovanni v. Jani-King Int'l, Inc.,
    262 F.R.D. 71 (D. Mass. 2009) ........................................................................ 19

Durmic v. J.P. Morgan Chase Bank, N.A.,
    No. 10-cv-10380, 2010 WL 5141359 (D. Mass. Dec. 10, 2010)................. 14-15, 19

Ellis v. Costco Wholesale Corp.,
    657 F.3d 970 (9th Cir. 2011)......................................................................12-13, 15

Faulk v. Sears Roebuck & Co.,
    No. 11-cv-02159, 2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) .................... passim

Gaudin v. Saxon Mortg. Servs., Inc.,
    820 F. Supp. 2d 1051 (N.D. Cal. 2011) ............................................................ 10

Gaudin v. Saxon Mortg. Servs., Inc.,
    No. 11-cv-1663, 2011 WL 5825144 (N.D. Cal. Nov. 17, 2011) ...............10, 18, 20

Gonzales v. Arrow Fin. Servs., LLC,
    660 F.3d 1055 (9th Cir. 2011).......................................................................... 23

Hanni v. Am. Airlines,
    No. 08-cv-732, 2010 WL 289297 (N.D. Cal. Jan. 15, 2010)......................... passim

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.           Case No. 3:11-cv-01663-JST

ii

A/75512217.17

Hanon v. Dataproducts Corp.,
   976 F.2d 497 (9th Cir. 1992) ................................................................................... 15

Herrera v. Serv. Employees Int'l Union Local 87,
   No. 10-cv-1888, 2013 WL 1320443 (N.D. Cal. Apr. 1, 2013) ............................... 11

In re Countrywide Fin. Corp. Mortg. Marketing & Sales Practices Litig.,
   No. 08-md-1988, 2011 WL 6325877 (S.D. Cal. Dec. 16, 2011) ............................ 24

In re Gaudin,
   No. 10-30254 (Bankr. N.D. Cal.) .......................................................................... 9, 17

Lucia v. Wells Fargo Bank,
   Nos. 10-cv-4749, 10-cv-5073, 2011 WL 3134422 (N.D. Cal. Apr. 22, 2011) ....... 19-20

Mazza v. American Honda Motor Co.,
   666 F.3d 581 (9th Cir. 2012) ................................................................................... 25

Nguyen v. BAC Home Loan Servs., LP,
   No. 10-cv-1712, 2010 WL 3894986 (N.D. Cal. Oct. 1, 2010) .................................. 4

Nielson v. Sports Auth.,
   No. 11-cv-4724, 2012 WL 5941614 (N.D. Cal. Nov. 27, 2012) ............................ 16

Nool v. HomeQ Servicing,
   653 F. Supp. 2d 1047 (E.D. Cal. 2009) ................................................................... 23

O'Connor v. Boeing N. Am. Inc.,
   197 F.R.D. 404 (C.D. Cal. 2000) ............................................................................. 12

O'Donovan v. CashCall, Inc.,
   278 F.R.D. 479 (N.D. Cal. 2011) ............................................................................ 23

Pandit v. Saxon Mortg. Services, Inc.,
   No. 11-cv-3935, 2012 WL 4174888 (E.D.N.Y. Sept. 17, 2012) ............................ 10

Pennington v. HSBC Bank USA,
   493 Fed. Appx. 548 (5th Cir. 2012) ........................................................................ 10

Quezada v. Loan Ctr. of Cal.,
   No. 08-cv-177, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) ............................... 12

Reyes v. Wells Fargo Bank,
   No. 10-cv-1667, 2011 WL 30759 (N.D. Cal. Jan. 3, 2011) ................................. 21-22

Robinson v. Sheriff of Cook Cnty.,
   167 F.3d 1155 (7th Cir. 1999) ................................................................................. 16

Rogers v. NationsCredit Fin. Servs. Corp.,
   No. 98-cv-2680, 2000 WL 1499354 (N.D. Cal. Aug. 7, 2000) .................... 14-15, 23

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

iii

A/75512217.17

Rosas v. Carnegie Mortg., LLC,
   No. 11-cv-7692, 2012 WL 1865480 (C.D. Cal. May 21, 2012) ............................... 14

Savino v. Computer Credit, Inc.,
   164 F.3d 87 (2d Cir. 1998) ...................................................................................... 17

Stearns v. Ticketmaster Corp.,
   655 F.3d 1013 (9th Cir. 2011)............................................................................23-24

Strong v. Ark. Blue Cross & Blue Shield,
   87 F.R.D. 496 (E.D. Ark. 1980).............................................................................. 16

VP Racing Fuels, Inc. v. General Petroleum Corp.,
   673 F. Supp. 2d 1073 (E.D. Cal. 2009)................................................................... 24

Wal-Mart Stores, Inc. v. Dukes,
   131 S. Ct. 2541 (2011) ..................................................................................... passim

Wang v. Chinese Daily News, Inc.,
   709 F.3d 829 (9th Cir. 2013)....................................................................12-13, 18-19

Wang v. The Hearst Corp.,
   No. 12-cv-793, 2013 WL 1903787 (S.D.N.Y. May 8, 2013) ................................. 13

Williams v. Geithner,
   No. 09-cv-1959, 2009 WL 3757380 (D. Minn. Nov. 9, 2009) ............................. 3, 6

Witt v. Chesapeake Exploration, L.L.C.,
   276 F.R.D. 458 (E.D. Tex. 2011)............................................................................ 20

Yau v. Deutsche Bank Nat'l Trust Co. Ams.,
   No. 11-cv-06, 2011 WL 8327957 (C.D. Cal. May 9, 2011) ................................... 19

Yokoyama v. Midland Nat'l Life Ins. Co.,
   594 F.3d 1087 (9th Cir. 2010)................................................................................. 20

STATE CASES

Fleming v. Kagan,
   189 Cal. App. 2d 791 (Cal. Ct. App. 1961) ............................................................ 22

Fletcher v. Sec. Pac. Nat'l Bank,
   591 P.2d 51 (Cal. 1979) .......................................................................................... 25

Gray v. Zurich Ins. Co.,
   419 P.2d 168 (Cal. 1966) ........................................................................................ 18

In re Tobacco II Cases,
   207 P.3d 20 (Cal. 2009) ......................................................................................23-24

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

iv

A/75512217.17

Kaldenbach v. Mutual of Omaha Life Ins. Co.,
    178 Cal. App. 4th 830 (Cal. Ct. App. 2009) .......................................................................... 24

Meyer v. Benko,
    55 Cal. App. 3d 937 (Cal. Ct. App. 1976) ........................................................................... 18

Morrell v. Clark,
    106 Cal. App. 2d 198 (Cal. Ct. App. 1951) ......................................................................... 18

Sweet v. Johnson,
    169 Cal. App. 2d 630 (Cal. Ct. App. 1959) ........................................................................ 18

**FEDERAL STATUTES**

12 U.S.C. § 5201 *et seq.* ............................................................................................................ 3

12 U.S.C. § 5219(a)(1) ............................................................................................................... 3

**STATE STATUTES**

Cal. Civ. Code § 1691 ........................................................................................................ 15, 22

**RULES**

Local Rule 79-5 .......................................................................................................................... 1

Fed. R. Civ. P. 23 ............................................................................................................... passim

Fed. R. Civ. P. 30(b)(6) .............................................................................................................. 4

**OTHER AUTHORITIES**

3 Newberg on Class Actions §§ 3:19, 3:68 ............................................................................. 17

1 Witkin, Summary 10th Contracts § 847 ................................................................................ 19

Richard A. Nagareda, Class Certification in the
    Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97 (2009) ....................................................... 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

v

A/75512217.17

Defendant Saxon Mortgage Services, Inc. ("Saxon") respectfully submits this Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification and Appointment of Class Counsel ("Pl. Br.").[1]

## PRELIMINARY STATEMENT

In response to the credit crisis, the Department of Treasury ("Treasury") created the Home Affordable Modification Program ("HAMP") in order to assist borrowers seeking to modify the terms of their existing mortgage loans. Mortgage loan servicers participating in HAMP must offer borrowers meeting certain criteria the opportunity to qualify for a permanent modification of the terms of their mortgage loans. As part of the qualification process, borrowers first enter into a Trial Period Plan ("TPP") with the investor who owns the loan. Pursuant to a TPP, borrowers must make certain representations, provide certain documents and information about their financial circumstances, and make at least three timely mortgage payments in an amount specified by the servicer (in accordance with Treasury's directives). With limited exceptions not relevant here, servicers participating in HAMP do not have discretion to offer a permanent modification under HAMP if the borrower does not satisfy the Treasury's eligibility criteria.

Plaintiff Marie Gaudin ("Gaudin" or "Plaintiff") entered into a TPP and timely made the three payments, but Saxon denied her a HAMP permanent loan modification because Saxon determined that she did not qualify under the Treasury's criteria. Gaudin now moves to certify a proposed class of "California borrowers who entered into HAMP TPPs with Saxon through October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications" (the "Class"). Pl. Br. 1.

Gaudin argues that class treatment is appropriate under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") because (1) the TPP is an enforceable contract; (2) the TPP advised

---

[1]     Pursuant to the Court's April 25, 2013 Order granting in part and denying in part Plaintiff's Motion to File Under Seal, certain portions of Plaintiff's motion papers were filed under seal. Pursuant to Local Rule 79-5 and this Court's Standing Order Governing Administrative Motions to File Under Seal and Declarations in Support of Sealing, Saxon is filing the accompanying Motion to File Under Seal, which seeks permission to submit certain portions of Saxon's opposition papers under seal.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

A/75512217.17

1   borrowers that if they made three monthly payments, they would be granted a permanent loan

2   modification; and (3) Saxon breached the contract by denying the borrowers in the purported

3   Class a permanent loan modification. Pl. Br. 2. But this argument, while convenient, ignores the

4   obvious – whether a borrower qualifies for a HAMP modification and whether Saxon acted

5   improperly in denying such a request involves individual issues that necessarily vary among

6   borrowers.

7        Thus, Gaudin's motion overlooks that even if the TPP is an enforceable contract, which it

8   is not, the most important inquiry – whether Saxon <u>breached</u> the alleged contract – can only be

9   determined based upon an individual inquiry. While Gaudin attempts to suggest that the three

10   trial period payments were the only requirements to a permanent loan modification, she

11   elsewhere admits – and this Court has already held – that making three monthly payments is <u>not</u>

12   the only requirement under the TPP. Rather, to determine whether Saxon breached the supposed

13   contract with respect to each of the borrowers who made three monthly payments, a factual

14   inquiry into each borrower's loan file is necessary to determine whether each borrower <u>also</u>

15   satisfied all the other conditions under the TPP. If, for example, an individual made her three

16   monthly payments, but submitted incorrect or false financial information – or failed to submit all

17   the requested documentation – then, as <u>Plaintiff admits</u>, a denial of a permanent modification in

18   those circumstances would be appropriate.

19        Furthermore, for reasons discussed more fully below and in the accompanying expert

20   report of Allan W. Kleidon, PhD ("Kleidon Rep."), there is no common class-wide formula for

21   determining each class member's purported damages. As Dr. Kleidon points out, the damages

22   resulting from denial of a permanent modification will differ depending on, among other things,

23   whether the individual was in default when the TPP began, whether and when the individual's

24   house was foreclosed on, and the value each borrower ascribes to the opportunity to stay in

25   his/her home for a longer or shorter period of time.

26        For these and other reasons discussed more fully below, Plaintiff cannot satisfy the

27   requisite elements for class certification under Rule 23, and her motion for class certification

28   should be denied. There have been dozens of similar HAMP class actions filed across the

---

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.             Case No. 3:11-cv-01663-JST

A/75512217.17

country, and no court has ever granted class certification in such a case. This case is a uniquely poor candidate to break new ground.

## BACKGROUND

**A.    Overview of HAMP and Treasury Requirements**

In 2008, with mortgage loans defaulting at alarming rates, Congress passed the Emergency Economic Stabilization Act, which required the Secretary of the Treasury to "encourage" mortgage servicers to "minimize foreclosures." 12 U.S.C. § 5201 *et seq*. In February 2009, the Treasury announced the Making Home Affordable Program, which includes HAMP. HAMP focuses on helping certain eligible borrowers who are in default or at risk of default, and the relief provided is a reduction in monthly payments and/or interest rates to sustainable levels. Williams v. Geithner, No. 09-cv-1959, 2009 WL 3757380, at *2 (D. Minn. Nov. 9, 2009). The federal government designed HAMP with the recognition that for some loans (but certainly not all), there is an intersection of the borrower's and investor's interests – namely, a monthly payment that (1) is affordable for the borrower and (2) provides the investor with a reasonable degree of the financial benefit for which it bargained. Thus, HAMP's purpose has been and is to prevent "avoidable" foreclosures. 12 U.S.C. § 5219(a)(1). To this end, HAMP offers financial incentives for borrowers and investors to enter into loan modifications that make sense for both parties. See Pl. Ex.[2] C, at 22-25.

The real parties in interest in loan modifications are the borrowers and investors. However, servicers like Saxon play a role with respect to mortgage loans like Plaintiff's that are owned by a securitization trust. Monsivais Decl.[3] ¶¶ 3-4. With respect to these loans, servicers generally are required to act on behalf of the trustee with respect to loan modifications. See id. Accordingly, the federal government asked servicers to help facilitate HAMP and gave them financial incentives to do so.[4] Id. ¶¶ 5-10.

---

[2]    "Pl. Ex." refers to the exhibits accompanying the Declaration of Peter Fredman, dated April 15, 2013.

[3]    "Monsivais Decl." refers to the accompanying Declaration of Veronica Monsivais, dated May 30, 2013.

[4]    Servicers are compensated under HAMP only if they permanently modify borrowers' loans; thus, the financial incentive is to help borrowers avoid foreclosure. Pl. Ex. C, at 23; Monsivais Decl. ¶ 9. Contrary to what Plaintiff suggests (Pl. Br. 11-12), Saxon did not profit from its participation in HAMP, much less from denying permanent modifications. See Pl. Ex. E (Laurie Tr.) 17:4-18:6; Monsivais Decl. ¶ 10.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                      Case No. 3:11-cv-01663-JST

3

1    Servicers wishing to participate in HAMP must execute a uniform Servicer Participation

2  Agreement ("SPA") with Fannie Mae, as financial agent for the Treasury.  Monsivais Ex. 1.[5]

3  Saxon executed a SPA on April 13, 2009.  Id.  The servicers' obligations under HAMP are set

4  forth in the SPA and in uniform HAMP directives promulgated by the Treasury.  Pl. Ex. C, at 1.

5  Saxon and other servicers are obligated to follow Treasury directives in implementing HAMP,

6  including using HAMP form documents, provided by Treasury, like the TPP.  Def. Ex.[6] 1

7  (Lightfoot Tr.[7]) 34:18-25, 43:10-20.  When HAMP was first inaugurated (which is the relevant

8  time period in this lawsuit), Treasury's directives were provided in writing and verbally.  Id. at

9  121:11-16.

10    Each mortgage loan involves a unique borrower with individualized circumstances and a

11  distinct property.   Whether a borrower qualifies for a TPP, and then for a permanent

12  modification, turns on individual considerations.  The HAMP directives do not mandate that

13  participating servicers offer a trial modification to every applicant, and Gaudin admits that not

14  every participant in the trial period is automatically entitled to a permanent modification.  Def.

15  Ex. 2, at (Gaudin Tr.[8]) 86:15-87:1, 89:7-14.  Rather, servicers must consider eligible loans for

16  potential modification under HAMP's detailed underwriting criteria.  Pl. Ex. C, at 1; see Nguyen

17  v. BAC Home Loan Servs., LP, No. 10-cv-1712, 2010 WL 3894986, at *2 (N.D. Cal. Oct. 1,

18  2010).

19    During the time period at issue in this case (between April 13, 2009 and October 1,

20  2009), borrowers were allowed to receive trial modifications based on information the borrowers

21  provided verbally, and many did so.  Pl. Ex. C, at 5; Def. Ex. 1, at 21:12-22:3, 30:7-17.  Treasury

22  allowed this procedure in an attempt to provide relief as quickly as possible in light of the rapidly

23  deteriorating economy and the fact that most servicers did not have the staffing and procedures

24  immediately in place to implement continually changing HAMP directives.  Def. Ex. 1, at 9:5-

25  13, 22:15-23:11; Monsivais Decl. ¶ 11.  Saxon therefore relied on a uniform process flow manual

---

26    [5]    "Monsivais Ex. __" refers to exhibits accompanying the Monsivais Declaration.

27    [6]    "Def. Ex. __" refers to exhibits accompanying the Declaration of Laila Abou-Rahme, dated May 30, 2013.
      [7]    Def. Ex. 1 is the deposition transcript of Saxon's Rule 30(b)(6) designee, Tim Lightfoot.

28    [8]    Def. Ex. 2 is the transcript of the deposition of Plaintiff Marie Gaudin, held on October 16, 2012.

---

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                          Case No. 3:11-cv-01663-JST

4

1   to determine eligibility for the TPP.  Monsivais Ex. 2 (copy of manual); see Def. Ex. 1, at 10:20-

2   12:15.  The information obtained from the borrower, such as her income, was recorded in

3   Saxon's proprietary servicing system, Tri-Calc, which performed calculations and eligibility

4   checks. Def. Ex. 1, at 12:22-13:9, 13:20-14:2; Monsivais Decl. ¶ 12.

5       For early trial participants like the putative class members, Treasury outlined a two-stage

6   procedure to determine whether the borrower could receive a permanent modification.  Pl. Ex. C,

7   at 4-10; Def. Ex. 1, at 37:2-38:6.  In each case, the analysis was defined by the specific

8   circumstances of the individual loan, borrower, and property.

9       The first stage focuses on the borrower's interest in an affordable payment.  Here, the

10  servicer must, as Plaintiff acknowledged in her deposition, verify the borrower's income via

11  documentation that could be submitted after a borrower's initial verbal representation of

12  qualification.[9] Pl. Ex. C, at 5; see Def. Ex. 2, at 86:15-87:1, 89:7-14; Def. Ex. 1, at 35-36.  The

13  servicer must try to identify a way in which to reduce the monthly mortgage loan payment to an

14  amount that is 31% of the borrower's gross monthly income.[10]  Pl. Ex. C, at 8-10.  Treasury

15  apparently considers 31% of a borrower's gross monthly income to be the largest monthly

16  payment that most borrowers could afford to make.  See Monsivais Decl. ¶ 15.  Of course, the

17  size-of-payment analysis necessarily considers the borrower's individual circumstances,

18  including income, and the nature of the existing loan.  Per Treasury directives, the effort to

19  reduce the payment to 31% of the borrower's income is only allowed to go so far down a

20  waterfall of potential adjustments – for example, the interest rate cannot dip below 2% and loans

21  cannot be amortized beyond 40 years.  Pl. Ex. C, at 9.  If the servicer is unable to produce an

22  affordable payment for a specific borrower within these parameters, "the modification will not

23  satisfy the HAMP requirements." RJN Ex.[11] 1 (HAMP FAQs Q2309), at 26; see Def. Ex. 1, at

24  37:6-38:6.  An obvious example would be a borrower – like Gaudin – who, as it turned out, had

25  almost no verified income.  Def. Ex. 1, at 123:12-18.  It was not possible to reduce her payment

26  _____

27  [9]     Income data were contemporaneously inputted into an electronic tracking system. Def. Ex. 1, at 68:3-69:1.
    [10]    A borrower does not qualify under HAMP if the regular monthly payment is already less than 31% of
    verified gross monthly income.  See Pl. Ex. C, at 8, 22.

28  [11]    "RJN Ex." refers to exhibits attached to Saxon's accompanying Request for Judicial Notice.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

A/75512217.17

to 31% of her gross income because the denominator in the calculation (i.e., her gross income) was ▮▮▮▮▮[12] Id. In these circumstances, a servicer is not permitted to offer a permanent modification.

The second stage, which is reached only if the waterfall produces an affordable payment that satisfies the foregoing criteria (and which was never reached in Gaudin's case), focuses on the investor's financial interests in a feasible modification that retains some profitability. The servicer calculates the "net present value" ("NPV") of the loan to the investor based on Treasury-specified criteria. Pl. Ex. C, at 4-5; Def. Ex. 1, at 37:22-38:6, 39:12-24; see Williams, 2009 WL 3757380, at *3 n.3. The purpose of the calculation is "to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure." Williams, 2009 WL 3757380, at *3 n.3; see Pl. Ex. C, at 4-5. If the NPV test produces a "negative" result (i.e., the modification scenario produces a greater loss to the investor than a foreclosure), the servicer is not required, but may still choose, to modify the loan. Pl. Ex. C, at 4.

In addition, the TPP states that each borrower must satisfy certain other requirements, including the following:

- Accurately represent her income in the verbal qualification call. Pl. Ex A ¶ 1.E.
- Provide certain documentation needed to verify her financial condition. Id. ¶ 1.D.
- Make all trial payments on a timely basis. Id. ¶ 2.
- Have sufficient income to warrant a permanent modification (but not so much income that Treasury deemed a modification unnecessary). Id. ¶ 2.G; see Pl. Ex. C at 2, 4-5.
- Live in the property as her principal residence. Pl. Ex. A ¶ 1.B.
- Not have a change in ownership in the property since the borrower obtained the original loan. Id. ¶ 1.C.
- Obtain credit counseling, if she was required to do so. Id. ¶ 1.F.
- Pay taxes, insurance, and other assessments. Id. ¶ 4.B.
- Obtain a title endorsement and/or subordination agreement from other lien holders. Id. ¶ 2.G.

---

[12] Plaintiff does not dispute that Saxon was required to verify the financial information she verbally provided. But, she contends that once Saxon signed the TPP, this act signified that she was qualified for a permanent modification. Pl. Br. 2-3. However, Plaintiff has offered no evidence supporting her position, which would render many provisions of the TPP illusory, such as the provision requiring that Plaintiff's representations remain true. Pl. Ex. A (preamble). The undisputed evidence shows that Saxon counter-signed TPPs once the borrower submitted the first payment, but before verifying whether the borrower had sufficient income. Def. Ex. 1, at 11:21-12:12, 19:5-11, 50:8-18. Saxon was not required to have made such a determination at that stage. See Pl. Ex. C, at 5.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

6

A/75512217.17

1    In seeking class certification, Plaintiff ignores all of these provisions and focuses solely on

2    whether the first three trial payments were made (at any time).   But, as stated in the

3    accompanying Monsivais Declaration, there are many examples of putative class members who

4    were denied permanent modifications because they failed to meet one or more of the above

5    requirements.[13]   Monsivais Decl. ¶ 19.   For example, █████████████████did not submit

6    the required documents, ████ proved to have too much income to qualify for a reduction in

7    payments, ████ had a negative NPV result, and ████ rejected the terms of the offers (after

8    qualifying) or they withdrew their requests.   Id.   Furthermore, ██████████████were denied

9    because it was mathematically impossible for Saxon to defer the principal repayment in a way

10   that satisfied Treasury's directives.   Id.   This category includes people who lacked sufficient

11   income to meet the above-referenced 31% requirement.   Id.

12   **B.   Plaintiff's Mortgage Loan**

13       Gaudin owns a condominium and derives virtually all of her income from a bridal store

14   that she owns and operates.   See Def. Ex. 2, at 27:7-12.   She purchased her home in 1993 for

15   approximately $180,000 and obtained a mortgage loan at that time.   Id. at 31:21-32:5.   In

16   October 2006, she refinanced her existing loan and took out a loan of $400,000 made by WMC

17   Mortgage Corp. (based on an appraised home value of approximately $475,000).   Id. at 33:18-

18   20, 35:2-6.   She refinanced because property values were up and she wanted additional capital

19   for her bridal store.   Id. at 34:6-11.   The refinanced loan had an adjustable interest rate capped at

20   13.25%, although Plaintiff claims she did not understand the interest rate provision at the time

21   because her broker did not explain it to her.   Id. at 38:10-15.   Her loan was initially serviced by a

22   company other than Saxon.   Id. at 39:21-23.   The loan was thereafter included in a securitization

23   transaction known as Morgan Stanley ABS Capital I Inc. Trust 2007-HE4.   Pl. Ex. A at 4.   In

24   December 2006, the servicing of Gaudin's loan was transferred to Saxon.   Monsivais Decl. ¶ 23.

25       Due to the downturn in the economy, Plaintiff's income was significantly reduced from

26

27   [13]      Plaintiff misstates the terms of the OCC Consent Order.   It does *not* admit that Saxon engaged in "flawed
     and dubious loss mitigation and foreclosure activities."   Pl. Br. 11.   To the contrary, the document states that these

28   are *allegations*, not concessions or findings.   Pl. Ex. L, at 2.   And there is no suggestion that these allegations were
     made in respect to Gaudin's application.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                          Case No. 3:11-cv-01663-JST

7

A/75512217.17

1    2007 through 2009, as reflected in financial documents submitted to Saxon. Def. Ex. 2, at 41:6-

2    12.  On or about April 15, 2009, Gaudin asked to receive a HAMP modification and verbally

3    provided income information to Saxon on the telephone.   Def. Ex. 1, at 122:23-123:11;

4    Monsivais Decl. ¶ 24.  Saxon's Tri-Calc servicing system shows that on May 7, 2009, Saxon's

5    representative entered Gaudin's net income as ███████ which, after adjustments for depreciation

6    and meals and entertainment, became an adjusted annual income of ███████  Monsivais Ex.

7    3 (SAXON_0002217); see Def. Ex. 1, at 12:22-13:9, 123:5-11.  Another Saxon servicing system,

8    Fiserv, confirms that this information came from Gaudin on May 7, 2009.  Monsivais Ex. 4

9    (SAXON_0000092).    Based solely on the verbal information Gaudin provided, Saxon

10   determined that Gaudin preliminarily qualified for a TPP and sent her a proposed modified

11   payment plan under which her monthly mortgage payment was reduced from $2,236.15 to

12   $1,328.63.  Pl. Ex. A; see Def. Ex. 1, at 122:23-123:4; Monsivais Decl. ¶ 24.  At the time Gaudin

13   received the TPP and after Saxon counter-signed the TPP, Gaudin admits understanding that she

14   would not receive a modification if her income was not verified, or if she provided false

15   information, or if the information that she provided to Saxon was no longer true and correct.

16   Def. Ex. 2, at 90:12-93:12, 96:24-97:11.

17       Thereafter, there was some delay in evaluating the application of Gaudin and other

18   borrowers who were seeking a permanent modification under HAMP because the verbal and

19   written directives issued by Treasury were in flux during that time period.  Def. Ex. 1, at 8:17-

20   9:4, 22:15-23:11; Monsivais Decl. ¶ 25.   As a result, the TPP was extended on multiple

21   occasions at the direction of Treasury, and in Gaudin's case, it lasted thirteen months.[14]  Gaudin

22   Decl.[15] ¶ 13; Monsivais Decl. ¶ 25; see, e.g., RJN Exs. 2-3 (HAMP directives).  Throughout this

23   time, Gaudin was paying (without any financial penalty) approximately $900 less on her

24   mortgage each month than was otherwise required, representing in the aggregate $11,797.78 in

25   savings to her in the short term.  See supra.

26   

27   [14]      Treasury initially anticipated that financial verification could occur within the initial three months of the
     trial period, but this proved to be unworkable.  Def. Ex. 1, at 22:15-23:18, 24:12-22; Monsivais Decl. ¶ 17. Treasury
     issued supplemental directives to address the issue.  See, e.g., RJN Ex. 2 (SD 09-10).

28   [15]      Declaration of Marie Gaudin in Support of Plaintiff's Motion for Class Certification, dated April 12, 2013.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                          Case No. 3:11-cv-01663-JST

A/75512217.17

1   Ultimately, though, Plaintiff was denied a permanent loan modification for failure to have

2   sufficient income.  Def. Ex. 3 (Gaudin Dep. Ex. 23).  As it turned out, her documented income

3   was far less than what she verbally represented, thus failing to satisfy the requirement in the TPP

4   that her verbal representations regarding her income were true and that her loan was capable of

5   reaching the 31% of gross income threshold.  Pl. Ex. A, at 1; Monsivais Decl. ¶¶ 25-26;

6   Monsivais Ex. 5 (SAXON_0002218); Def. Ex. 1, at 123:12-18.  Simply put, Gaudin inflated her

7   income in order to receive reduced monthly payments to which she was not entitled.[16]

8   Monsivais Ex. 6 (SAXON_0000441) (transcript of 2007 tax return showing income of ████ in

9   2007); Def. Ex. 4 (Gaudin Dep. Ex. 13), at Gaudin 0000154-55 (draft 2008 tax return showing

10  income of –$25,922).  With verified income of less than ████ a year, it was impossible for

11  Saxon to create a sustainable payment for Gaudin on a $400,000 loan in accordance with the

12  31% requirement.[17]  Def. Ex. 1, at 123:14-18.

13  Plaintiff has been in bankruptcy since January 28, 2010.  In re Gaudin, Case No. 10-

14  30254 (Bankr. N.D. Cal.).  The last substantive activity appearing on the docket is the June 2012

15  transfer of the mortgage loan claim to Ocwen Loan Servicing, LLC ("Ocwen") (on behalf of the

16  investor), along with the servicing of Plaintiff's loan.  Id. (ECF No. 65).  Plaintiff continues to

17  reside in her home and, as of the date of transfer of her loan to Ocwen, Plaintiff was still not

18  current on her loan payments.  Id. (ECF No. 48-1).  Gaudin has not tendered the consideration

19  she received under the TPP – the difference between the reduced monthly payments and the

20  original payments owed (i.e., $11,797.78).  Monsivais Decl. ¶ 28.

21  **C.     Procedural History**

22  Gaudin filed her initial Complaint on April 4, 2011.  On May 20, 2011, Saxon filed a

23  Motion to Dismiss, which this Court granted.  Gaudin v. Saxon Mortg. Servs., Inc., 820 F. Supp.

24

---

25  [16]     Before Saxon could inform Plaintiff that it determined she was denied a permanent modification, a
payment made by Gaudin under her TPP was not properly recorded by Saxon. Monsivais Decl. ¶ 26. This caused

26  Gaudin to be prematurely denied a HAMP modification. Def. Ex. 1, at 123:19-125:4. When this error was brought
to Saxon's attention, however, the issue was investigated, the mistake was corrected, and Plaintiff's application was

27  reconsidered for a permanent modification. Id. at 124:14-22. The reason for the denial Saxon initially reported to
Treasury ("Trial Plan Default") was not updated (nor was it required to be). Monsivais Decl. ¶ 20.

28  [17]     Plaintiff and Saxon subsequently discussed multiple alternative options, but to no avail. Def. Exs. 5-7.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                              Case No. 3:11-cv-01663-JST

9

A/75512217.17

1   2d 1051 (N.D. Cal. 2011) ("Gaudin I"). Among other things, the Court held that Gaudin failed

2   to plead a viable claim for breach of contract because she failed to allege that her application

3   satisfied all of the conditions necessary to obtain a permanent modification. Id. at 1054. The

4   Court noted that the TPP "made very clear that it was not, in and of itself a permanent

5   modification, or an unconditional commitment by the lender to provide one." Id. Specifically,

6   the Court recognized that after Saxon signed the TPP on behalf of the investor, Saxon must still

7   "verify[] the accuracy of the information previously provided." See id. n.5. The Court gave

8   Gaudin leave to replead.

9       Plaintiff filed the First Amended Complaint ("FAC") on September 12, 2011 and this

10  time she alleged – on information and belief and in conclusory terms – that "all the conditions

11  that obligated Saxon to provide Plaintiff a permanent modification agreement were satisfied and

12  Plaintiff qualified for a permanent loan modification under the objective standards set forth in the

13  HAMP program." FAC ¶ 29. The Court found that once the signed copy of the TPP was

14  returned to the borrower, then the "borrower's eligibility for permanent modification has been

15  determined, and the only remaining contingencies are those listed specifically in the TPP and

16  summarized above." Id. at *4 (emphasis added). One of the contingencies listed in the TPP and

17  summarized by the Court is that the borrower's "representations in Section 1 continue to be true

18  in all material respects." Id. at *2-3. The FAC survived Saxon's second Motion to Dismiss

19  because the Court deemed the revised allegations sufficient at the pleadings stage since Plaintiff

20  alleged that she satisfied all of the conditions necessary to qualify for a permanent

21  modification.[18] Gaudin v. Saxon Mortg. Servs., Inc., No. 11-cv-1663, 2011 WL 5825144, at *4

22  (N.D. Cal. Nov. 17, 2011) ("Gaudin II").

23      Thereafter, the parties engaged in discovery, including the depositions of Plaintiff and

24  certain Saxon representatives. On April 15, 2013, Plaintiff filed her Motion for Class

25

26  [18]   Plaintiff cites a number of other HAMP decisions that also, at the pleadings stage, sustained similar claims.
    Pl. Br. 4. Although these decisions did not involve class certification, it bears noting that many courts across the
27  country and in California have taken the opposite view and dismissed similar claims. See, e.g., Pennington v. HSBC
    Bank USA, 493 Fed. Appx. 548 (5th Cir. 2012); Pandit v. Saxon Mortg. Services, Inc., No. 11-cv-3935, 2012 WL 4174888
28  (E.D.N.Y. Sept. 17, 2012). These cases make it clear that the TPP is not a contract for a permanent modification.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                                    Case No. 3:11-cv-01663-JST

10

A/75512217.17

1    Certification and Appointment of Class Counsel.  Plaintiff asserts class action claims for (i)

2    breach of contract and the implied covenant of good faith and fair dealing, (ii) rescission and

3    restitution, (iii) violation of California's Rosenthal Fair Debt Collection Practices Act, and (iv)

4    violation of California's Unfair Competition Law.  FAC ¶¶ 38-58.

5         Plaintiff seeks to certify a class composed of:

6              All California residential mortgage borrowers who (a) entered into
               Homeowner Affordable Modification Program (HAMP) Trial Period
7              Plans (TPPs) with Saxon Mortgage Services, Inc. effective on or before
               October 1, 2009, and (b) made at least three trial period payments, but (c)
8              did not receive HAMP loan modifications.

9    Notice of Motion (ECF No. 81).

10                                  **ARGUMENT**

11   **I.    PLAINTIFF DOES NOT COME CLOSE TO
            SATISFYING THE REQUIREMENTS OF RULE 23, WHICH
12          SETS RIGOROUS STANDARDS FOR CLASS CERTIFICATION**

13        To prevail on her motion for class certification, Plaintiff must affirmatively demonstrate,

14   by a preponderance of the evidence, compliance with Rules 23(a) and 23(b)(3).[19]  Wal-Mart

15   Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011); Comcast Corp. v. Behrend, 133 S. Ct. 1426,

16   1432 (2013).  Rule 23(a) requires that:

17        (1)   the class is so numerous that joinder of all members is
                impracticable;
18        (2)   there are questions of law or fact common to the class;
          (3)   the claims or defenses of the representative parties are typical of
19              the claims or defenses of the class; and
          (4)   the representative parties will fairly and adequately protect the
20              interests of the class.

21   Fed. R. Civ. P. 23(a).  Rule 23(b)(3) requires that "questions of law or fact common to class

22   members predominate over any questions affecting only individual members, and that a class

23   action is superior to other available methods for fairly and efficiently adjudicating the

24   controversy." Fed. R. Civ. P. 23(b)(3).

25        "The class action is an exception to the usual rule that litigation is conducted by and on

26   behalf of the individual named parties only."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541,

---

27   [19]     Furthermore, Rule 23 must be satisfied for each cause of action.  See Hanni v. Am. Airlines, No. 08-cv-
          732, 2010 WL 289297, at *11 (N.D. Cal. Jan. 15, 2010) (analyzing claims independently); see also Herrera v. Serv.
28        Employees Int'l Union Local 87, No. 10-cv-1888, 2013 WL 1320443, at *4 (N.D. Cal. Apr. 1, 2013).

1   2551 (2011) (internal quotation omitted).  The Ninth Circuit has recognized that Wal-Mart

2   established "new precedent altering existing case law."  Ellis v. Costco Wholesale Corp., 657

3   F.3d 970, 974 (9th Cir. 2011).  In the aftermath of Wal-Mart, "it is not correct to say a district

4   court may consider the merits to the extent that they overlap with class certification issues;

5   rather, a district court must consider the merits if they overlap with the Rule 23(a) requirements."

6   Id. at 981 (emphasis in original) (citing Wal-Mart, 131 S. Ct. at 2551-52).  Now, in assessing

7   whether a plaintiff has carried her burden under Rule 23, a district court must make "findings"

8   after applying a "rigorous analysis," which "frequently" involves consideration of the merits of a

9   plaintiff's substantive claims, which "are often highly relevant when determining whether to

10  certify a class."  Ellis, 657 F.3d at 981.

11          In this case, certain merits-related issues are integral to the class certification inquiry, and

12  those issues demonstrate why Plaintiff's motion for class certification should be denied.  Indeed,

13  it is readily apparent that Plaintiff cannot demonstrate the commonality, typicality, adequacy,

14  predominance, and superiority that Rule 23 requires before a class may be certified.[20]

15  **II.   PLAINTIFF CANNOT DEMONSTRATE THE REQUISITE COMMONALITY**

16          Plaintiff claims, in conclusory fashion, that commonality exists because each class

17  member entered into a TPP, made at least three payments, and did not receive permanent

18  modification.  Pl. Br. 14-15.  But, Plaintiff fails to engage in the proper inquiry.  In Wal-Mart,

19  the Supreme Court ruled that what matters "is not the raising of common 'questions' – even in

20  droves – but, rather, the capacity of a class-wide proceeding to generate common answers apt to

21  drive the resolution of the litigation."      Id. at 2551 (quoting Richard A. Nagareda, Class

22  Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009)); accord Wang

23  v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (commonality lacking

24  notwithstanding uniform policy at issue).

25          In Wal-Mart, the proposed class members were female employees of the same company

26

27  [20]      As noted throughout the below argument, the class certification inquiry also demonstrates that Plaintiff's individual claims are not viable, which independently requires denial of class certification.  See O'Connor v. Boeing

28  N. Am. Inc., 197 F.R.D. 404, 413 (C.D. Cal. 2000); Quezada v. Loan Ctr. of Cal., No. 08-cv-177, 2009 WL 5113506, at *8 (E.D. Cal. Dec. 18, 2009).

1    who allegedly suffered from discriminatory employment decisions.  The Supreme Court found

2    commonality lacking because "[w]ithout some glue holding the alleged reasons for all those

3    decisions together, it will be impossible to say that examination of all the class members' claims

4    for relief will produce a common answer to the crucial question <u>why was I disfavored</u>."  <u>Id.</u> at

5    2552 (emphasis in original).  As in <u>Wal-Mart</u>, the legal claims here arise not just from the

6    existence of negative decisions, but rather from whether each decision was made for an improper

7    reason.  <u>Id.</u> at 2552; <u>see</u> <u>Ellis</u>, 657 F.3d at 981 (noting that plaintiffs must "connect many

8    individual promotional decisions to their claim for class relief").[21]

9           It is inescapable that in this case, the Court will need to look at each borrower in the

10   proposed class to determine whether he/she was denied a permanent modification for an

11   improper reason.  There are several conditions in a TPP that a borrower must satisfy in order to

12   qualify for a permanent HAMP modification.  Pl. Ex. A.  Discovery shows that many class

13   members failed to satisfy one or more of these conditions, such as the ███████who did not

14   submit the required documents or the ███████whose documented incomes were too high to

15   justify reductions in payments.  Monsivais Decl. ¶ 19.  In these circumstances, commonality

16   cannot be satisfied because notwithstanding the uniform contract, the critical question concerns

17   the alleged breach.[22]  <u>See</u> <u>Hanni v. Am. Airlines</u>, No. 08-cv-00732, 2010 WL 289297, at *10-11

18   (N.D. Cal. Jan. 15, 2010); <u>Wang v. The Hearst Corp.</u>, No. 12-cv-793, 2013 WL 1903787, at *6-7

19   (S.D.N.Y. May 8, 2013).

20   **III.    PLAINTIFF IS NOT TYPICAL OF THE PROPOSED CLASS**

21          As with commonality, Plaintiff contends, with no analysis, that typicality exists because

22   all class members entered into the TPP, made at least three payments, and did not receive

23

24   [21]    <u>Wal-Mart</u> involved 1.5 million putative class members, but the Ninth Circuit has held that the size of the
     class is not the relevant question.  <u>Wang</u>, 709 F.3d at 834.  In <u>Wang</u>, the Ninth Circuit vacated the certification of a
25   class consisting of 200 members ████████████████████ for lack of commonality.  <u>Id.</u>
     [22]    The issue of breach also implicates the implicit Rule 23 requirement of ascertainability.  <u>Hanni</u>, 2010 WL
26   289297, at *9.  Plaintiff contends ascertainability is met because she can locate the putative class members (Pl. Br.
     14), but she ignores the proper inquiry, which seeks "a set of common characteristics sufficient to allow a member
27   of that group to identify himself or herself <u>as having a right to recover based on the description</u>."  <u>Hanni</u>, 2010 WL
     289297, at *9 (emphasis added).  Plaintiff overbroadly defines the class because breach is not susceptible to class-
28   wide proof.

---

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                                    Case No. 3:11-cv-01663-JST

A/75512217.17

1    permanent modification. Pl. Br. 15. Once again, Plaintiff fails to meet her burden. Typicality

2    looks at "whether other members have the same or similar injury, whether the action is based on

3    conduct which is not unique to the named plaintiffs, and whether other class members have been

4    injured by the same course of conduct." Rogers v. NationsCredit Fin. Servs. Corp., No. 98-cv-

5    2680, 2000 WL 1499354, at *4 (N.D. Cal. Aug. 7, 2000). Typicality does not exist to the extent

6    that the proposed class includes individuals without a legal claim. Id. at *3-4.

7         Here, Plaintiff is not typical with respect to the alleged injury. Plaintiff obtained a

8    temporary payment reduction to which she was not entitled after misrepresenting her income,

9    and as a result she saved over $11,000 in the short term. See p. 9, supra. This deficiency in

10   Plaintiff's individual claim is enough to defeat typicality, as a court held in another HAMP class

11   action. See Durmic v. J.P. Morgan Chase Bank, N.A., No. 10-cv-10380, 2010 WL 5141359, at

12   *4 (D. Mass. Dec. 10, 2010); see also Hanni, 2010 WL 289297, at *11. Indeed, as noted in the

13   expert report of Dr. Kleidon, Plaintiff's misrepresentation enabled her to benefit by staying in her

14   house longer and waiting for her financial situation to possibly improve. Kleidon Rep. ¶ 24

15   (Def. Ex. 8). Furthermore, the measurement of any borrower's injury would have to assess,

16   among other things, whether the borrower obtained an alternative modification, which may have

17   been similar to HAMP. Id. ¶ 21.

18        Damages also present a typicality problem in this case. Plaintiff fails to even address the

19   legal consequences of rescission and in particular how it would affect the putative class

20   members' underlying mortgages. Indeed, as Dr. Kleidon observes, some borrowers may be

21   worse off with a rescission of the TPP because the alternative scenario for them would be

22   payment of the higher monthly payments pursuant to their mortgages. See Kleidon Rep. ¶ 25.

23   Furthermore, Plaintiff also lacks typicality because she has not tendered the consideration she

24   received from the TPP to restore Saxon to status quo ante by, among other things, returning the

25   difference between the reduced monthly payments and the original payments owed ($11,797.78)

26   or the value of staying in the subject property for a longer period of time, as required for

27   rescission under California Civil Code § 1691. Rosas v. Carnegie Mortg., LLC, No. 11-cv-

28   7692, 2012 WL 1865480, at *9 (C.D. Cal. May 21, 2012). These issues negate typicality.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

14

A/75512217.17

1  Rogers, 2000 WL 1499354, at *4 (typicality lacking where putative class members would not

2  want declaratory judgment sought by plaintiff in light of conflicting interests).

3      Typicality is further undermined by the inclusion of class members who failed to meet

4  the TPP's requirements for other reasons, such as a failure to occupy the subject property.  Pl.

5  Ex. A; Monsivais Decl. ¶ 19; see Durmic, 2010 WL 5141359, at *3; Rogers, 2000 WL 1499354,

6  at *3-4.  Thus, each borrower's case depends on the reason for her failure to obtain a permanent

7  modification.  See Durmic, 2010 WL 5141359, at *3; Rogers, 2000 WL 1499354, at *3-4.

8  Plaintiff's alleged injury stemmed from individual interactions with Saxon, including an

9  assessment of her individual borrower file and conversations she had with many different Saxon

10 employees.  Pl. Br. 9.  These personal interactions obviously affected only her loan, and not the

11 loan of any other borrower.

12      Finally, another typicality obstacle arises because Plaintiff is subject to defenses that do

13 not apply class-wide.  See Hanon v. Dataproducts Corp., 976 F.2d 497 (9th Cir. 1992); Ellis, 657

14 F.3d at 984-85; Rogers, 2000 WL 1499354, at *5.  The inquiry into defenses focuses not on the

15 legal doctrine supporting the defense, but rather the factual circumstances giving rise to the

16 defense.  See Ellis, 657 F.3d at 984-85; Rogers, 2000 WL 1499354, at *5.  Here, as demonstrated

17 by Plaintiff's circumstances, Saxon has a variety of defenses available, including failure to

18 mitigate damages (by, for example, not pursing alternative opportunities, which Plaintiff

19 repeatedly refused to do), fraudulent inducement (by, for example, misrepresenting income to

20 qualify for the trial modification), and unclean hands (same).  Furthermore, with respect to the

21 Rosenthal Act claim, Plaintiff is atypical of the class she seeks to represent because she was not

22 in default at the time Saxon began to service her loan and thus has no claim.[23]

23 **IV.    PLAINTIFF IS NOT AN ADEQUATE**
   **REPRESENTATIVE OF THE PUTATIVE CLASS**
24

25      Plaintiff contends, in conclusory fashion, that adequacy exists because she has no

26 conflicts with putative class members.  Pl. Br. 15.  Plaintiff is mistaken.  For the reasons set forth

27
   ---
28 [23]    The Rescission/Restitution (Count II) and UCL (Count IV) claims are based on the breach of contract and
   Rosenthal Act claims (Pl. Br. 17, 19-20), and thus the evidence needed to prove these claims is borrower-specific.

---

1    below, Plaintiff is an inadequate class representative.[24]

2          ***Conflicts with Proposed Class***.  The issue of adequacy tends to merge with typicality

3    concerns.  Wal-Mart, 131 S. Ct. at 2551 n.5; Brown v. Ticor Title Ins. Co., 982 F. 2d 386, 390

4    (9th Cir. 1992).  The absence of typicality is relevant to adequacy because a class representative

5    may lack motivation to adequately pursue claims of absent class members if her individual

6    claims are atypical.  Hanni, 2010 WL 289297, at *11; see Robinson v. Sheriff of Cook Cnty.,

7    167 F.3d 1155, 1157 (7th Cir. 1999) (affirming district court's rejection of class representative

8    applicants and finding that when putative representative's claim is weak, "this is an independent

9    reason to doubt the adequacy of his representation").  For example, a class representative without

10   a strong personal claim may be incentivized to settle the case more quickly than someone who

11   has a strong claim.  See Strong v. Ark. Blue Cross & Blue Shield, 87 F.R.D. 496, 510 (E.D. Ark.

12   1980) (warning that atypically weak plaintiff might inappropriately seize upon "inadequate

13   settlements"); cf. Nielson v. Sports Auth., No. 11-cv-4724, 2012 WL 5941614 (N.D. Cal. Nov.

14   27, 2012).  As described above, Plaintiff does not have a viable claim against Saxon because she

15   improperly obtained the TPP by misrepresenting her income, and thus she is not an adequate

16   representative of the purported class.

17          Furthermore, while Plaintiff claims to have been harmed by Saxon's handling of her trial

18   modification, some class members may have benefited in the short term from their trial

19   modifications by paying less on their mortgages for several months.  Kleidon Rep. ¶ 25.  Such

20   borrowers may not want the relief that Plaintiff seeks.  Allied Orthopedic Appliances, Inc. v.

21   Tyco Healthcare Grp. L.P., 247 F.R.D. 156, 177 (C.D. Cal. 2007) (noting that "conflict is

22   fundamental" when plaintiff claims to have been harmed by same conduct that benefited others).

23          ***Lack of Credibility***.  In determining adequacy, a court may consider the class

24   representative's honesty and trustworthiness, and courts have rejected adequacy when the named

25   plaintiff lacks credibility.  Newberg § 3:68.  The requirement is not met if there are "confirmed

26   examples of past dishonesty" or "inconsistent testimony on material issues in the litigation."  Id.;

27

28   ─────────────────
     [24]    Saxon does not dispute that Plaintiff's counsel satisfies the adequacy of counsel requirement.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

16

A/75512217.17

1    see Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998). In this case, discovery has

2    uncovered serious reasons to question Plaintiff's credibility – she misrepresented her income

3    when she applied for the TPP. Def. Ex. 1, at 12:22-13:9, 123:5-11; Monsivais Decl. ¶¶ 24-25.

4         ***Plaintiff's Bankruptcy***.  In Gaudin I, the Court held that "neither Gaudin's filing of a

5    bankruptcy petition nor the confirmation of her plan serves as a basis for dismissal." 2011 WL

6    5075050, at *2.  However, the Court noted at that time that it was "unclear whether further

7    proceedings in the bankruptcy court might become necessary as a result of Gaudin's pursuit of

8    these claims, should they otherwise prove viable," and "[a]ny such complications could bear on

9    her suitability to serve as a class representative, if the matter ultimately reaches that stage." Id.

10   n.2.  Plaintiff's bankruptcy has enabled her to stay in her property without being subject to

11   foreclosure and while not paying anything on her mortgage. See In re Gaudin, No. 10-30254

12   (ECF. No. 57).  For Gaudin and others in bankruptcy, the status of their individual claims for

13   relief will necessarily differ because the bankruptcy court ultimately must approve any

14   permanent modifications. See RJN Ex. 1 (HAMP FAQs Q1305), at 7.

15   **V.      COMMON QUESTIONS FOR EACH CLAIM DO NOT PREDOMINATE**

16        **A.      Legal Standard for Predominance**

17        Plaintiff argues that a common question for the proposed class is the interpretation of the

18   TPP.  Pl. Br. 16.  Then, Plaintiff assumes – without any analysis – that the issue of contract

19   interpretation predominates over individual issues for purposes of Rule 23(b)(3). Id. However,

20   by ignoring the impact of individual issues, Plaintiff fails to meet her burden on predominance.

21        The crucial step of weighing common and individual questions initially involves the

22   identification of each substantive issue related to a claim, including elements of the claim and

23   affirmative defenses. Faulk v. Sears Roebuck & Co., No. 11-cv-2159, 2013 WL 1703378, at *6-

24   7 (N.D. Cal. Apr. 19, 2013).  A court then must consider the "proof necessary to establish each

25   element of the claim or defense" and "how these issues would be tried." Id.  The predominance

26   requirement fails if "after adjudication of the classwide issues, plaintiffs must still introduce a

27   great deal of individualized proof or argue a number of individualized legal points to establish

28   most or all of the elements of their individual claims." Id. at *5 (citation omitted).  A plaintiff

---

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

A/75512217.17

1   may not establish predominance with "conclusory assertion[s] that common questions

2   predominate." Id. at *8; Wang, 709 F.3d at 834.   Plaintiff here did not engage in the full

3   predominance inquiry required by the law (and hence failed to meet her burden), but the outcome

4   of the required inquiry clearly dooms her motion in any event.[25]

5       **B.    Common Questions Regarding Breach of Contract Do Not Predominate**

6       A proper analysis of the breach of contract claim demonstrates that most elements cannot

7   be established with common proof across the proposed class.[26]

8       **1.    *The issue of borrowers' performance requires individualized assessments***

9       A plaintiff may not recover for breach of contract if she did not perform her obligations

10  under the contract. Faulk, 2013 WL 1703378, at *7. As recognized by Judge Seeborg, the TPP

11  itself demonstrates that borrowers were required to do more than simply make three payments.[27]

12  Gaudin II, 2011 WL 5825144, at *2-4. Among other things, borrowers also had to accurately

13  represent their financial circumstances and have sufficient income to support a sustainable

14  monthly payment.   See id.   As Plaintiff's circumstances demonstrate, not all borrowers

15  performed their obligations under TPPs. See, e.g., Monsivais Decl. ¶ 19 (many class members

16  like Plaintiff lacked sufficient income to allow for a payment reduction that satisfied Treasury

17  guidelines). And some borrowers who had sufficient income were not entitled to a permanent

18  modification because the NPV of the modification was less than the NPV without the

19  modification. See, e.g., Monsivais Decl. ¶ 19.

20      While courts in similar cases have been divided on whether a plaintiff can state a claim

21  for breach of contract by alleging she qualified for a permanent modification, the courts that have

22

23  [25]    Plaintiff's citation to contract cases not involving class actions fails to demonstrate predominance. Pl. Br. 16-17 (citing Meyer v. Benko, 55 Cal. App. 3d 937 (Cal. Ct. App. 1976); Gray v. Zurich Ins. Co., 419 P.2d 168 (Cal. 1966); Morrell v. Clark, 106 Cal. App. 2d 198 (Cal. Ct. App. 1951); Sweet v. Johnson, 169 Cal. App. 2d 630 (Cal. Ct. App. 1959)).

24

25  [26]    Plaintiff's brief makes no mention of her allegations of breach of the implied covenant of good faith and fair dealing, which were pled as part of Count I. See FAC ¶ 40.   In Gaudin II, the Court sustained this claim but recognized that it "may be subsumed in or duplicative of a breach of contract claim." Gaudin II, 2011 WL 5825144,

26  at *5. To the extent Plaintiff has not abandoned this claim, it cannot be maintained class-wide for the same reasons discussed in connection with Plaintiff's breach of contract claim.

27  [27]    Plaintiff contends that the TPP should be interpreted in her favor because it is "an adhesion contract." Pl. Br. 16. The issue of whether the TPP is an adhesion contract is irrelevant because Plaintiff failed to satisfy a

28  condition precedent by accurately reporting her income.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                          Case No. 3:11-cv-01663-JST

A/75512217.17

1   addressed class certification have uniformly expressed skepticism or denied it. <u>See</u> <u>Yau v.</u>

2   <u>Deutsche Bank Nat'l Trust Co. Ams.</u>, No. 11-cv-06, 2011 WL 8327957 (C.D. Cal. May 9, 2011)

3   (recognizing individual issues such as "each Plaintiff's eligibility for HAMP, application for

4   HAMP" and whether each class member's "representation of income matched the documented

5   income provided, and whether the NPV test performed for his/her loan was proper"); <u>Durmic</u>,

6   2010 WL 5141359, at *3 (denying provisional class certification).

7         **2.    *The issue of Saxon's alleged breach requires individualized assessments***

8         A breach is the "wrongful, i.e., the unjustified or unexcused, failure to perform a

9   contract." 1 Witkin, Summary 10th (2005) Contracts § 847.  In this case, the Court must

10  separately consider whether Saxon wrongfully denied a permanent modification to anyone who

11  satisfied the requisite criteria because each borrower's application was individually assessed

12  based on the unique circumstances of the application.  Courts routinely deny class certification in

13  cases like this where breach is an individualized issue, even when a form contract is present. <u>See</u>

14  <u>Faulk</u>, 2013 WL 1703378, at *6-7 (rejecting contention that "systematic breach of contract is

15  susceptible to common proof"); <u>Campion v. Old Republic Home Protection Co.</u>, 272 F.R.D. 517,

16  530-31 (S.D. Cal. 2011); <u>Hanni</u>, 2010 WL 289297, at *10; <u>Wang</u>, 709 F.3d at 835; <u>De Giovanni</u>

17  <u>v. Jani-King Int'l, Inc.</u>, 262 F.R.D. 71, 77 (D. Mass. 2009) (denying class certification and noting

18  that "[d]emonstrating that the terms of the contracts were the same for all class members

19  accomplishes only half of the battle").

20        **3.    *The issue of consideration requires individualized assessments***

21        "Consideration consists of a benefit bestowed or a detriment suffered as bargained for by

22  the parties." <u>Lucia v. Wells Fargo Bank</u>, Nos. 10-cv-4749, 10-cv-5073, 2011 WL 3134422, at *5

23  (N.D. Cal. Apr. 22, 2011).  The Court previously held that "at least at the pleading stage,"

24  Plaintiff pled adequate consideration because she "exposed herself to greater liability for interest

25  and late charges should permanent modification not be consummated." <u>Gaudin II</u>, 2011 WL

26  5825144, at *4.  Although Saxon maintains that Plaintiff cannot demonstrate consideration, at a

27  minimum, the issue of consideration is individualized.  Proof of breach of contract depends on

28  whether each borrower provided consideration in the form of providing a benefit to Saxon or

---

incurring a detriment.   For example, the Court must determine whether each borrower was actually exposed to additional interest or charges as a result of temporarily making lower payments and not receiving a permanent modification.   Witt v. Chesapeake Exploration, L.L.C., 276 F.R.D. 458, 467 (E.D. Tex. 2011).   Likewise, the court must look at whether any borrowers suffered negative credit consequences or actually submitted the required documentation (which, undisputedly, some did not).   Lucia, 2011 WL 3134422, at *5; Monsivais Decl. ¶ 19.

**4.   *The issue of damages to borrowers requires individualized assessments***

The Supreme Court's recent Comcast decision, which Plaintiff conveniently ignores, requires that any theory of damages be tied to the alleged liability.   Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013).   Plaintiff's scattershot theory of damages – that class members should recover "some or all of their trial payments, nominal damages, or any other remedies under California law" (Pl. Br. 16-17) – does not reflect Saxon's alleged liability because it ignores the undisputed facts that (1) the trial payments were necessarily less than borrowers' normal payments, and (2) each borrower had unique circumstances.[28]   Indeed, regardless of how Plaintiff may try to measures damages,[29] common questions do not predominate.

Based on one interpretation of Plaintiff's damages theory, monetary damages reflect the present value of the modification calculated by Saxon pursuant to the NPV test based on verified information at the time the borrower should have received it.   FAC p. 13; see Kleidon Rep. ¶ 32. It is undisputed that a servicer must offer a borrower a permanent modification only if the present value of the sum of all payments as modified is higher than the present value of such payments without a modification.   See Kleidon Rep. ¶ 34.   Thus, it necessarily follows that some putative class members may not have any damages.   If the borrower passed the NPV test mandated by Treasury, the present value of the sum of her cash payments to the investor would

---

[28]     The cases on which Plaintiff relies at best support the unremarkable view that in some cases (often involving securities), damages calculations do not preclude class certification where damages reflect liability and can be computed with a common formula. Pl. Br. 13 (citing Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087 (9th Cir. 2010) (pre-Comcast decision involving annuities); Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975) (pre-Comcast decision involving stock)).

[29]     To the extent Plaintiff seeks a return of the trial payments, this is addressed in the next section, which concerns the Rescission/Restitution "claim."

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                               Case No. 3:11-cv-01663-JST

A/75512217.17

necessarily be <u>greater</u> than they would be without the modification.[30] <u>Id.</u> Thus, anyone who rightfully qualified for a permanent modification would actually pay more in the long term. <u>Id.</u> Under this interpretation of Plaintiff's damages theory, denial of a permanent modification actually results in no damages.

Any alternative measure of monetary damages would require individualized proof of each borrower's circumstances such as her ability to pay and motivation to stay in her home. Kleidon Rep. ¶ 35. These issues would quickly overwhelm the common question of contract interpretation.[31] <u>See</u> <u>Comcast</u>, 133 S. Ct. at 1432; <u>Cowden v. Parker & Assocs., Inc.</u>, No. 09-cv-323, 2013 WL 2285163, at *7 (E.D. Ky. May 22, 2013) (class certification fails per <u>Comcast</u> when one plaintiff's contract damages, even as sole individualized issue, might be entirely "irrelevant" to any other class member).

### C.     Common Questions Regarding Rescission and Restitution Do Not Predominate

"Rescission and restitution" (Count II) are two distinct concepts. Plaintiff substantively addresses only rescission, Pl. Br. 17, and thus has done nothing to meet her burden with respect to restitution.[32] Moreover, rescission is not a stand-alone claim, but rather merely a remedy for breach of contract. <u>See</u> <u>Reyes</u>, 2011 WL 30759, at *17. Saxon has demonstrated that Plaintiff has no viable breach of contract claim, and thus Count II should be dismissed along with Count I. Even if Plaintiff can maintain a breach of contract claim herself (which she cannot), for the reasons outlined above, she has not demonstrated that certification of this claim is proper.

---

[30]     This analysis is subject to the value of any incentive payments the borrower and/or investor may have received.

[31]     Another individualized damages issue arises from the bankruptcy filings by Plaintiff and any other class members. These bankruptcies raise a myriad of individual issues because any permanent modification would require approval of the bankruptcy court. <u>See</u> RJN Ex. 1 (HAMP FAQs Q1305), at 7.

[32]     Restitution appears to be a separate cause of action in California. <u>See</u> <u>Reyes v. Wells Fargo Bank</u>, No. 10-cv-1667, 2011 WL 30759, at *17-18 (N.D. Cal. Jan. 3, 2011). Plaintiff has said nothing in her Motion about restitution with respect to Count II aside from conflating it with rescission. Pl. Br. 17 (citing only rescission statute). The elements of restitution are the "receipt of a benefit and the unjust retention of the benefit at the expense of another" where the "circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it." <u>Reyes</u>, 2011 WL 30759, at *18. Here, a claim for restitution cannot be certified because, as discussed in the breach of contract section and elsewhere, the circumstances surrounding each borrower's trial modification are unique in many respects, which means the court would need to examine the "circumstances of [the] receipt or retention" of the alleged benefit retained by Saxon. <u>Id.</u> at *18.

---

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.

Case No. 3:11-cv-01663-JST

A/75512217.17

1    Accordingly, since the breach of contract claim cannot be treated on a class-wide basis, then the

2    remedy of rescission cannot be determined class-wide either.

3         In any event, rescission damages cannot be shown with common proof.  Plaintiff cannot

4    demonstrate a threshold requirement for rescission – tender of the benefits she received.  See

5    supra.  Indeed, Plaintiff has not shown that she is willing and has the ability to restore the

6    investor to status quo ante by returning the amount she saved during the trial period.  Even a case

7    relied on by Plaintiff recognizes that she must "restor[e] to [Saxon] everything of value which

8    [she] has received in the transaction."  Fleming v. Kagan, 189 Cal. App. 2d 791, 796-97 (Cal. Ct.

9    App. 1961).[33]  The issue of tender is obviously individualized.

10        Furthermore, as noted previously, Plaintiff fails to address the legal consequences of

11   rescission and in particular how it would affect the putative class members' underlying

12   mortgages.  In this case, it is undisputed that class members received significant short-term

13   benefits from Saxon, including the right to make reduced monthly payments and stay in their

14   houses for longer periods of time.  If they had not received a TPP, borrowers faced a variety of

15   immediate alternatives, including having to enter into foreclosure, rent their houses, or enter into

16   a short sale.  Kleidon Rep. ¶¶ 24-25.  Individual inquiries would be needed to determine the

17   benefits received by class members and the values of those benefits.  See Cal. Civ. Code §

18   1691(b); Campion, 272 F.R.D. at 531 (finding predominance not satisfied if plaintiff seeks

19   rescission in light of individualized nature of benefits received by putative class members);

20   Andrews v. Chevy Chase Bank, 545 F.3d 570, 574-77 (7th Cir. 2008) ("The variations in the

21   transactional 'unwinding' process that may arise from one rescission to the next make it an

22   extremely poor fit for the class-action mechanism.").

23   **D.     Common Questions Regarding the Rosenthal Act Claim Do Not Predominate**

24        Plaintiff also fails to establish that common questions regarding the Rosenthal Act claim

25   predominate.  Plaintiff's own claim is barred because she was not in default at the time Saxon

26

---

[33]     Plaintiff cites Fleming for the proposition that "[r]ightfully rescinding parties generally have the right to
27   restitution payments made thereunder, including when the rescinded contract was void in the first instance."  Pl. Br.
     17.  However, Fleming makes clear that unless Plaintiff alleges (which she does not) that the TPP was fraudulently
28   executed and thus void, she must return the benefits that she obtained from Saxon.  Id. at 796-97.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                          Case No. 3:11-cv-01663-JST

                                           22

1    began servicing her loan.  Monsivais Decl. ¶ 23; see Nool v. HomeQ Servicing, 653 F. Supp. 2d

2    1047, 1053 (E.D. Cal. 2009).  The Court would need to look at each borrower to determine if his

3    claim is disqualified because he was not in default at the time Saxon began servicing the loan.

4    See Rogers, 2000 WL 1499354, at *3-4.

5         Another obstacle to certification of this claim is that Plaintiff incorrectly suggests that the

6    Rosenthal Act claim is based solely on the TPP and uniform HAMP guidelines.  Pl. Br. 17-18.

7    This contention is undermined by Plaintiff's own allegations of deceptive conduct, which are

8    based on a lengthy series of verbal and written communications that Saxon had with Plaintiff.

9    Pl. Br. 9.  Thus, a determination of whether any particular putative class member has a viable

10   claim necessarily requires an examination of each communication Saxon had with the particular

11   class member and whether the communications were deceptive.[34]  See O'Donovan v. CashCall,

12   Inc., 278 F.R.D. 479, 498 (N.D. Cal. 2011).

13        Finally, contrary to Plaintiff's contention (Pl. Br. 18), the issue of actual damages under

14   the Rosenthal Act necessarily requires individualized inquiry for the same reasons discussed

15   previously and noted in the Kleidon report.

16   **E.    Common Questions Regarding the UCL Claim Do Not Predominate**

17        Plaintiff brings claims under all three UCL prongs – unlawful, unfair, and fraudulent.

18   For reasons already discussed, common questions do not predominate regarding any prong.[35]

19   ***Claims under the "unlawful" prong do not predominate***.  Plaintiff bases this prong of

20   the UCL claim on the alleged violation of the Rosenthal Act, Pl. Br. 19, and thus the same proof

21   _____

22   [34]      Plaintiff incorrectly suggests that an objective standard based on uniform conduct can resolve the Rosenthal
     Act claim and mistakenly relies on various decisions in Gonzales v. Arrow Financial Services, LLC.  See, e.g., 660
23   F.3d 1055 (9th Cir. 2011).  Pl. Br. 17-18.  However, unlike this case, Gonzales involved only uniform and
     misleading conduct (an illegal threat to submit certain credit reports about class members).  660 F.3d at 1059.
24   [35]      Plaintiff relies heavily on the decision in Stearns v. Ticketmaster Corp., 655 F.3d 1013 (9th Cir. 2011), to
     argue that the elements of her UCL claim are somehow relaxed or reduced because Saxon put out "tainted bait" to
25   the public.  Pl. Br. 18-19.  As the Ticketmaster decision explains, however, this doctrine applies only to cases "based
     on false advertising or promotional practices."  655 F.3d at 1020 (emphasis added); see In re Tobacco II Cases, 207
26   P.3d 20, 29 (Cal. 2009) (same).  Ticketmaster involved an allegedly undisclosed transfer of consumer credit card
     data from one company to another followed by undisclosed charges made by the transferee company.  Id. at 1017-
27   18.  The lack of interaction between the putative class members and defendants is precisely what gave rise to the
     claims and made certification proper.  See id.; see also In re Tobacco II Cases, 207 P.3d at 26-27.  In contrast, here
28   the allegedly deceptive conduct consisted of personal dealings between Saxon and borrowers, which as Ticketmaster
     recognized, would render certification improper.  See 655 F.3d at 1020.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.          Case No. 3:11-cv-01663-JST

23

A/75512217.17

1   that would establish the Rosenthal Act violation would establish a violation of this prong.  See

2   Faulk, 2013 WL 1703378, at *10.  Saxon has established that certification under the Rosenthal

3   Act claim is not appropriate, and accordingly the "unlawful practice" UCL claim likewise should

4   not be certified.

5          ***Claims under the "unfair" prong do not predominate***.  Plaintiff alleges that Saxon

6   violated the "unfair" prong through a "systematic breach" of the TPP.  Pl. Br. 20.  But, this

7   contention fails because, as discussed above, the issue of breach actually requires an analysis of

8   each borrower's individual circumstances.   Accordingly, common questions regarding the

9   "unfair" prong of the UCL claim do not predominate over individual issues.  See Faulk, 2013

10   WL 1703378, at *9.[36]  To the extent Plaintiff labors to suggest that Saxon somehow violated the

11   "unfair" prong by violating the spirit or policy of HAMP (Pl. Br. 20), this is easily refuted by the

12   fact that Saxon provided HAMP modifications to thousands of borrowers who, unlike Plaintiff,

13   qualified under the Treasury directives.  Monsivais Decl. ¶ 6; see Monsivais Ex. 7.

14          ***Claims under the "fraudulent" prong do not predominate***.  Plaintiff alleges that Saxon

15   violated the "fraudulent" prong of the UCL claim because the public would "likely be deceived"

16   by the Treasury's form TPP.  Pl. Br. 19-20.  But, in the FAC, the alleged fraudulent conduct is

17   supposedly based not on one form document, but rather on a lengthy series of individual written

18   and verbal communications between borrowers and Saxon.  Courts have rejected attempts to

19   certify fraudulent practices claims by oversimplification.   See Campion, 272 F.R.D. at 536-37

20   (individualized inquiry needed in light of "varying means by which misrepresentations are

21   alleged to have been made"); In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices

22   Litig., No. 08-md-1988, 2011 WL 6325877, at *6 (S.D. Cal. Dec. 16, 2011); Kaldenbach v. Mut.

23   of Omaha Life Ins. Co., 178 Cal. App. 4th 830, 846 (Cal. Ct. App. 2009).[37]

24                          *        *        *

25   ──────────────────

26   [36]      Once again, Plaintiff relies on inapposite cases involving false advertising.  Pl. Br. 20 (citing VP Racing Fuels, Inc. v. Gen. Petroleum Corp., 673 F. Supp. 2d 1073 (E.D. Cal. 2009)).

27   [37]      The decision in Mazza v. American Honda Motor Co., also cited by Plaintiff, actually supports Saxon's contention that certification is improper where class members were exposed to "disparate information."  666 F.3d

28   581, 596 (9th Cir. 2012).  Finally, Plaintiff's citation to Fletcher v. Sec. Pac. Nat'l Bank, 23 591 P.2d 51 (Cal. 1979), Pl. Br. 19, adds nothing to the analysis because that case did not involve a claim under the UCL.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                                    Case No. 3:11-cv-01663-JST

24

A/75512217.17

1  Finally, contrary to Plaintiff's contention (Pl. Br. 19), the issue of the restitution remedy

2  under the UCL depends on a variety of individual factors previously discussed.  See supra n.31;

3  Campion, 272 F.R.D. 517, 533 ("[A]n individualized analysis would be necessary to determine

4  whether restitution [under the UCL] is appropriate and, if so, the amount of any restitution.").

5  **VI.  PLAINTIFF FAILS TO ESTABLISH THE SUPERIORITY REQUIREMENT**

6  Plaintiff contends that the class meets the superiority requirement because the claims are

7  relatively small and "common questions present a significant aspect of the case."  Pl. Br. 20.

8  While each class member may not have a monetarily large individual claim, no other factor

9  supports the superiority requirement.  Plaintiff fails to analyze "the likely difficulties in

10  managing a class action."  Fed. R. Civ. P. 23(b)(3).  This aspect of the superiority requirement

11  looks at some of the same factors relevant to the predominance inquiry.  See Faulk, 2013 WL

12  1703378, at *10.  For these reasons, this case would be difficult to manage as a class action.  Id.

13  (superiority not satisfied because of "concerns that each member of the putative class may need

14  to litigate myriad individual issues to establish his or her own right to recovery"); Campion, 272

15  F.R.D. at 539; Hanni, 2010 WL 289297, at *13.  Furthermore, individual actions would not risk

16  inconsistent judgments (Pl. Br. 2) because each class member's entitlement to relief would

17  rightfully turn on her unique circumstances.

18  **CONCLUSION**

19  For the foregoing reasons, Plaintiff's Motion for Class Certification should be denied. [38]

---

[38]  Plaintiff states that under Rule 23(c)(4), the Court may certify the class with respect to certain issues, even if certification of the entire class action is not appropriate. Pl. Br. 13. Plaintiff makes this point in passing, does not even identify any "issue class" that would be appropriate for certification, and thus has done nothing to meet her burden of establishing such a class.  Wal-Mart, 131 S. Ct. at 2551. Plaintiff mentions that some cases have certified issue classes for liability, Pl. Br. 13, but as demonstrated above, liability in this case cannot be determined with common proof.

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

25

A/75512217.17

DATED:  May 30, 2013                    Respectfully submitted,


                                        BINGHAM MCCUTCHEN LLP

                                        /s/ Laila Abou-Rahme
                                        Jeffrey Q. Smith (*not yet admitted pro hac vice*)
                                        Laila Abou-Rahme (*pro hac vice*)
                                        399 Park Avenue
                                        New York, NY 10022
                                        Tel: (212) 705-7000
                                        Email:  jqsmith@bingham.com
                                                laila.abou-rahme@bingham.com

                                               - and -

                                        SEVERSON & WERSON
                                        A Professional Corporation

                                        John B. Sullivan (State Bar No. 96742)
                                        Erik Kemp (State Bar No. 246196)
                                        One Embarcadero Center, Suite 2600
                                        San Francisco, CA 94111
                                        Tel:  (415) 398-3344
                                        Email:  jbs@severson.com
                                                ek@severson.com

                                        *Attorneys for Defendant*
                                          *Saxon Mortgage Services, Inc.*

---

Saxon's Mem. Law Opp. Pl. Mot. Class Cert.                    Case No. 3:11-cv-01663-JST

A/75512217.17