Daniel J. Mulligan (Cal. State Bar No. 103129)
**JENKINS MULLIGAN & GABRIEL LLP**
10085 Carroll Canyon Road, Suite 210
San Diego, CA 92131
Telephone: (415) 982-8500
Facsimile: (415) 982-8515
dan@jmglawoffices.com

Peter B. Fredman (State Bar No. 189097)
**LAW OFFICE OF PETER FREDMAN**
125 University Ave, Suite 102
Berkeley, CA 94710
Telephone: (510) 868-2626
Facsimile: (510) 868-2627
peter@peterfredmanlaw.com

Attorneys for Plaintiff MARIE GAUDIN,
for herself and persons similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIE GAUDIN, individually, and on behalf of others similarly situated,<br><br>              Plaintiff,<br><br>     v.<br><br>SAXON MORTGAGE SERVICES, INC. a Texas corporation, and Does 1-100,<br><br>         Defendants. | Case No. C 11-01663-JST<br><br>**CLASS ACTION**<br><br>PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION<br><br>Hearing Date:  June 20, 2013<br>Hearing Time:  2 p.m.<br>Courtroom 9, 19th Floor, SF<br>Hon. Jon S. Tigar |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................................ 1

II. POINTS ON REPLY ...................................................................................................... 2

    A. Plaintiff's claims do *not* depend on an allegation that she or any Class member actually qualified for HAMP ......................................................................... 2

    B. The Rosenthal Act (unlike the FDCPA) *does* apply to loans that were not in default when the mortgage servicer acquired them ............................................ 2

    C. Plaintiff and the Class did *not* receive actual mortgage relief as a result of the TPP or bankruptcy ................................................................................................... 3

    D. No precedent calls for denying class certification in HAMP cases .............................. 4

    E. Gaudin did *not* misrepresent her income ....................................................... 5

III. ARGUMENT ON REPLY ............................................................................................. 7

    A. Commonality is easily satisfied based on the common TPP ....................................... 7

    B. Plaintiff is a typical and adequate class representative .............................................. 8

    C. Common question of fact and law predominate, and a class action is the superior means to fairly and efficiently resolve this litigation .................................. 9

        1. Common issues predominate because of Saxon's practice of automatically countersigning and returning the TPP ............................................. 9

        2. Extensive Class member loan data makes this case uniquely suitable for classwide resolution ................................................................................. 10

        3. Generalized proof resolves any issues implicated by express conditions of the TPP ...................................................................................................... 11

        4. Potential individualized damage issues cannot defeat class treatment ............ 12

IV. EVIDENTIARY OBJECTIONS .................................................................................. 15

    A. Objection to Monsivais Declaration and Exhibits .................................................... 15

    B. Objection to Kleidon Report ..................................................................................... 15

V. CONCLUSION ............................................................................................................. 16

# TABLE OF AUTHORITIES

**Page**

CASES

*Auerbach v. Great Western Bank*,
  74 Cal. App. 4th 1172 (1999) ................................................................. 14

*Aguilera v. Pirelli Armstrong Tire Corp.*,
  223 F.3d 1010 (9th Cir. Cal. 2000). ........................................................ 13

*Blackie v. Barrack*,
  524 F. 2d 891 (9th Cir. Cal. 1975) ......................................................... 12

*Chavez v. Blue Sky Natural Bev. Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010) ...................................................... 8, 15

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ........................................................................... 14

*Dupler v. Costco Wholesale Corp.*,
  249 F.R.D. 29 (E.D.N.Y. 2008) ............................................................ 7-8

*Durmic v. J.P. Morgan Chase Bank, NA*,
  2010 U.S. Dist. LEXIS 131069 (D. Mass. Dec. 10, 2010) .................... 4-5

*Ellis v. Costco Wholesale Corp.*,
  285 F. R. D. 492 (N.D. Cal. 2012) ...................................................... 9-11

*Ellis v. Costco Wholesale Corp.*,
  657 F. 3d 970 (9th Cir. Cal. 2011) ......................................................... 9

*Fireside Bank v. Superior Court*,
  40 Cal. 4th 1069 (2007) .......................................................................... 14

*Gonzales v. Arrow Fin. Servs., LLC*,
  233 F. R. D. 577 (S.D. Cal. 2006) .......................................................... 13

*Hanon v. Dataproducts Corp.*,
  976 F. 2d 497 (9th Cir. 1992). ................................................................. 8

*Hood v. Santa Barbara Bank & Trust*,
  143 Cal. App. 4th 526 (2006) ................................................................. 14

*In re Bank of Am. HAMP Lit.*,
  746 F. Supp. 2d 1359 (J.P.M.L. 2010) .................................................... 5

*In re CitiMortgage HAMP Lit.*,
  816 F. Supp. 2d 1375 (J.P.M.L. 2011). ................................................... 5

*In re JPMorgan Chase Mortg. Mod. Lit.*,
    818 F. Supp. 2d 1378 (J.P.M.L. 2011) ..................................................................4-5

*In re Med. Capital Secs. Litig*,
    2011 U.S. Dist. LEXIS 126659 (C.D. Cal. July 26, 2011).....................................8

*In re Roderick*,
    425 B. R. 556 (Bankr. E.D. Cal. 2010) ................................................................4

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (Cal. 2009) ................................................................................14

*Izenberg v. ETS Servs.*, LLC,
    589 F. Supp. 2d 1193 (C.D. Cal. 2008)................................................................2

*Leyva v. Medline Indus.*,
    __ F.3d __, 2013 U.S. App. LEXIS 10649 (9th Cir. Cal. May 28, 2013)........12, 14

*Lozano v. AT&T Wireless Servs.*,
    504 F. 3d 718 (9th Cir. Cal. 2007) ......................................................................8

*Medrazo v. Honda of North Hollywood*,
    205 Cal. App. 4th 1 (2012) ................................................................................14

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F. 3d 1036 (9th Cir. Cal. 2012) ....................................................................4

*Midland Pacific Building Corp. v. King*,
    157 Cal. App. 4th 264 (2007)............................................................................13

*Moore v. PaineWebber, Inc.*,
    306 F. 3d 1247 (2d Cir. N.Y. 2002) ...................................................................10

*Nool v. Homeq Servicing*,
    653 F. Supp. 2d 1047 (E.D. Cal. 2009) ..............................................................2-3

*North American Specialty Ins. Co. v. Myers*,
    111 F. 3d 1273 (6th Cir. 1997) .........................................................................15

*Perry v. Stewart Title Co.*,
    756 F. 2d 1197 (5th Cir. Tex. 1985)....................................................................2

*ProMex, LLC v. Hernandez*,
    781 F. Supp. 2d 1013 (C.D. Cal. 2011) ..............................................................13

*Ramirez v. Greenpoint Mortg. Funding, Inc.*,
    268 F. R. D. 627 (N.D. Cal. 2010) ......................................................................9

*Rudgayzer v. Yahoo! Inc.*,
   2012 U.S. Dist. LEXIS 161302 (N.D. Cal. Nov. 9, 2012) ...................................... 13

*Savino v. Computer Credit, Inc*.,
   164 F. 3d 81 (2d Cir. 1998) .......................................................................................... 9

*Selby v. Bank of Am., Inc.*,
   2010 U.S. Dist. LEXIS 139966 (S.D. Cal. Oct. 27, 2010) ........................................... 2

*Sweet v. Johnson*,
   169 Cal. App. 2d 630 (1959) ...................................................................................... 13

*U.S. v. Console*,
   13 F. 3d 641 (3rd Cir. 1993) ............................................................................................ 15

*U.S. v. Zipkin*,
   729 F.2d 384 (6th Cir. 1984) .......................................................................................... 15

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .......................................................................................... 7, 12

*Yau v. Deutsche Bank Nat'l Trust Co. Ams.*,
   2013 U.S. App. LEXIS 10564 (9th Cir. Cal. May 24, 2013) ................................... 4-5

*Yau v. Deutsche Bank Nat'l Trust Co. Ams.*,
   2011 U.S. Dist. LEXIS 155749 (C.D. Cal. May 9, 2011) ........................................ 4-5

*Young v. Wells Fargo Bank*,
   __ F.3d __, 2013 U.S. App. LEXIS 10189 (1st Cir. Mass. May 21, 2013) ............... 5

STATUTES

15 U.S.C. § 1692a............................................................................................................2-3

15 U.S.C. § 1692k.............................................................................................................. 15

CAL. BUS. & PROF. CODE § 17203 ................................................................................... 14

CAL. CIV. CODE § 1788.2 ...............................................................................................2-3

CAL. CIV. CODE § 1788.17 ............................................................................................... 13

CAL. CIV. CODE § 3360 ................................................................................................... 13

Fed. R. Civ. P. 23(c)(4) ................................................................................................... 14

Fed. R. Ev. 702 ................................................................................................................ 15

Fed. R. Ev. 802 ................................................................................................................ 15

# I.     INTRODUCTION

To oppose this motion, Saxon attempts to tie-in class certification to HAMP qualification criteria so that it can argue that each Class member's qualifications must be examined separately. This argument begs the very question presented. Plaintiff alleges that (1) the fully executed TPP was an enforceable contract to modify her mortgage if she met *its* conditions and (2) that Saxon's counter-execution and delivery of it without intending to bind itself was deceptive and unfair. The central question presented – which is ideally suited for class treatment – is whether the fully executed TPP had the legal effect claimed by Plaintiff or Saxon. No individual inquiry is required.

This Court's Order denying the second motion to dismiss highlights the fallacy of Saxon's predicate that the Class members' claims depend on whether they actually qualified for HAMP. "[T]here is no basis to conclude that once Gaudin was provided with a signed copy of the TPP, Saxon's obligation to provide a permanent loan modification remained contingent on an evaluation of her eligibility under HAMP guidelines." Dkt. No. 51 at p. 5. "Even assuming Saxon may ultimately prevail on grounds that the TPP was not an enforceable contract or that Gaudin did not satisfy some applicable condition … the TPP was at a minimum misleading." *Id.* at p. 7.

Saxon's other bold rhetoric in opposition does not hold up to routine scrutiny. Saxon is wrong when it says that California's Rosenthal Act does not apply to loans that were not in default when the servicer acquired them. It misstates the consequences of the reduced trial period payments and bankruptcy. Its claim that Gaudin misrepresented her income is demonstrably false. The *single* case that Saxon cites for its proposition that courts have "uniformly" denied class certification in similar cases is *now currently* pending on a motion for class certification in one of the many HAMP Multi-District Litigation ("MDL") actions. Finally, Saxon's damages argument ignores Plaintiff's actual claims and the rule that individualized damages issues cannot defeat class certification.

This case is uniquely suitable for certification because Plaintiff has carefully framed a class of California homeowners who entered into the same instrument with Saxon under the same circumstance. As Saxon's opposition makes clear, all the pertinent evidence is contained in uniform documents and computerized databases. Whether Saxon's conduct violated the law can and should be decided on a classwide basis.

## II.    POINTS ON REPLY

### A.    Plaintiff's claims do *not* depend on an allegation that she or any Class member actually qualified for HAMP

First, this case concerns the legal effect of Saxon's non-compliance with the fully executed TPP, *not* whether any Class member qualified for HAMP. Saxon misstates the procedural history of this case when it insists that the "FAC survived because … Plaintiff alleged that she satisfied all the conditions necessary to qualify for a permanent modification". Saxon Opposition Brief ("Opp.") at 10:18-22. The Order denying Saxon's second motion to dismiss is starkly to the contrary:

> Saxon insists that any obligations it had under the TPP were limited to evaluating Gaudin's eligibility for a loan modification under the federal guidelines of the HAMP program… The flaw in Saxon's argument is that express language of the TPP simply does not include any such limitation … once the lender returns a signed copy of it to the borrower (rather than notifying the borrower that he or she does not "qualify for the Offer"), then the borrower's eligibility for permanent modification has been determined…

Dkt. No. 51, pp. 4-5.

### B.    The Rosenthal Act (unlike the FDCPA) *does* apply to loans that were not in default when the mortgage servicer acquired them

Contrary to Saxon's assertions, California's Rosenthal Act – unlike the *federal* Fair Debt Collections Practices Act ("FDCPA") – clearly applies to loan servicers regardless of whether the borrower's loan was in default when they acquired the servicing rights. *See Izenberg v. ETS Servs.*, LLC, 589 F. Supp. 2d 1193, 1199 (C.D. Cal. 2008); *Selby v. Bank of Am., Inc.*, 2010 U.S. Dist. LEXIS 139966, *18-19 (S.D. Cal. Oct. 27, 2010). This is because, "[d]espite the overlap between the federal and state statutory schemes, the definition of 'debt collector' is broader under California law." *Selby* at 18. Specifically, the FDCPA definition excludes, among others, "any person collecting … a debt which was not in default at the time it was obtained by such person". 15 U.S.C. § 1692a(6)(F)(iii); *see Perry v. Stewart Title Co.*, 756 F. 2d 1197, 1208 (5th Cir. Tex. 1985).

The definition in the Rosenthal Act, on the other hand, plainly includes Saxon in this case: the "term 'debt collector' means any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." Cal. Civ. Code § 1788.2(c). *Nool v. Homeq Servicing*, 653 F. Supp. 2d 1047 (E.D. Cal. 2009) is distinguishable because it involved a dubious foreclosure defense complaint that included a myriad of disparate claims and theories,

including an FDCPA theory that the servicer had no right to "enforce or collect on the loan." *Id.* at 1053, *see also* 1049-1050. After briefly analyzing the FDCPA definition, the court concluded that because "[n]othing in the complaint suggests that [the servicer] is a 'debt collector' … the FDCPA is not triggered by Plaintiff's allegations." *Id.* at 1052-1053; 15 U.S.C. § 1692a(6)(F).

Saxon's argument that it is not a debt collector under the Rosenthal Act is based solely on *Nool's* single unsupported sentence that follows: "The absence of a violation of FDCPA results in failure of Plaintiff's California RFDCPA claim, as the scope of California's law mirrors the federal statute." *Nool* at 1053. This statement is literally incorrect as stated above. Although the Rosenthal Act incorporates many provisions of the FDCPA, they use different definitions of "debt collector". 15 U.S.C. § 1692a(6) *cf.* Cal. Civ. Code § 1788.2(c).

### C.   Plaintiff and the Class did *not* receive actual mortgage relief as a result of the TPP or bankruptcy

Saxon's brief is also not reliable with respect to the consequences of the trial period and bankruptcy. It makes misstatements to the effect that Gaudin "saved over $11,000". Opp. at 14:7-9. This was, Saxon asserts, the result of "the consideration she received under the TPP – the difference between the reduced monthly payments and the original payments owed (i.e., $11,797.78)." *Id.* at 9:18-20. It further asserts that "her bankruptcy has enabled her to stay in her property without being subject to foreclosure and while not paying anything on her mortgage". *Id.* at 17:10-12.

The reality for Ms. Gaudin and the other Class members is that the trial period did not reduce their actual monthly mortgage obligations. *See Ex. A*, Executed TPP at § 2D, § 3; *Ex. D* at SAXON_0000325. On the contrary, during their trial periods their mortgage debts (including interest and late fees) continued to grow, and their credit continued to deteriorate, in accordance with the original loan documents, which remained in full effect. *See id.* Because they were ultimately denied HAMP modifications, they did not receive any actual mortgage relief. *See id.*

Accordingly, when Ms. Gaudin filed for Chapter 13 bankruptcy, Saxon, as a secured creditor of her residence, had a priority claim for all of her pre-petition mortgage arrearages. *See* 11 U.S.C. § 1322 (b)(2) (the "plan may…modify the rights … other than a claim secured only by a security interest in real property that is the debtor's principal residence…"); *Ex. M*, Gaudin Bankruptcy

1   ("BK") Docs at Dkt. No. 18. Ms. Gaudin's Chapter 13 plan required her to pay  these arrearages in

2   full as a condition of confirmation, as she is doing. *See id.;* Gaudin Reply Decl. at ¶ 4. Like any

3   mortgage debtor, Gaudin is routinely required to pay her post-petition monthly mortgage at the

4   unmodified contractual amount in order to avoid default and foreclosure. *See In re Roderick,* 425 B.

5   R. 556, 565 (Bankr. E.D. Cal. 2010). Where a bankruptcy debtor fails to do so, lenders are routinely

6   entitled to relief from the automatic stay in order to proceed with foreclosure, and are be entitled to

7   the entire contractual mortgage debt to the extent of the security, just as they would be in the absence

8   of bankruptcy. *See id.; **Ex. M*** at Dkt. No. 60. Here Saxon seems to have made a tactical decision to

9   delay foreclosure. *See id.;* Reply Declaration of Peter Fredman, Esq. ("Fredman Reply Decl.") at ¶ 5.

10        **D.        No precedent calls for denying class certification in HAMP cases**

11        Also misleading is Saxon's sweeping claim that "no court has ever granted class certification"

12   despite "dozens of similar HAMP class actions filed across the country". Opp. at 2:28-3:2. Saxon's

13   brief actually cites just two district court orders, in *Durmic* and *Yau,*  in support of its assertion that

14   the "courts that addressed class certification have uniformly expressed skepticism or denied it." Opp.

15   at 18:21-19:6. And neither of these cases actually supports its position, much less its grander

16   representations regarding the state of HAMP class litigation.

17        In *Durmic*, the district court simply denied "provisional" class certification (which plaintiffs

18   sought in connection with a preliminary injunction) because of "the importance of developing a more

19   robust factual record through discovery before the certification issue is joined." *Durmic v. J.P.*

20   *Morgan Chase Bank, NA*, 2010 U.S. Dist. LEXIS 131069, *12 (D. Mass. Dec. 10, 2010); *see Meyer*

21   *v. Portfolio Recovery Assocs., LLC*, 707 F. 3d 1036, 1043 (9th Cir. Cal. 2012) (re "provisional" class

22   certification generally). At this time, *Durmic* is essentially the lead case in the JPMorgan Chase

23   modification MDL. *In re JPMorgan Chase Mortg. Mod. Lit.,* 818 F. Supp. 2d 1378, 1379-80

24   (J.P.M.L. 2011); Fredman Reply Decl. at ¶ 6. There, the consolidated plaintiffs' motion for class

25   certification is fully briefed and pending hearing on an unspecified future date. *See id.*

26        In *Yau*, the district court forcefully dismissed (and denied leave to amend) a meandering third

27   amended complaint, which included class allegations. *See Yau v. Deutsche Bank Nat'l Trust Co.*

28   *Ams.*, 2011 U.S. Dist. LEXIS 155749, *2-3 (C.D. Cal. May 9, 2011). Noting that the question of class

1    certification was not before it, the district court nevertheless expressed doubt that the complaint was

2    appropriate for class treatment. *See id.* at *31-33. But the Ninth Circuit partially reversed, while

3    noting the problem "that the mortgagors' counsel is ill-equipped to deal with a putative class action

4    the size and scope of the one pled here." *Yau,* 2013 U.S. App. LEXIS 10564, *9 Fn. 1 (9th Cir. Cal.

5    May 24, 2013) (partial dissent). In its proper context, *Yau* has no precedential value.

6           The fact is that due to the challenges of litigating against the big banks few, if any, of the

7    modification cases have reached class certification decisions. Many have been rolled up into slow

8    moving MDLs. *See In re JPMorgan Chase,* 818 F. Supp. 2d 1378; *In re Bank of Am. HAMP Lit.,* 746

9    F. Supp. 2d 1359 (J.P.M.L. 2010); *In re CitiMortgage HAMP Lit.* 816 F. Supp. 2d 1375, 1376

10   (J.P.M.L. 2011). Others have been up on appeal and back. *See* Pltf.'s Opening Brief at 3:1-4.

11   Unmistakable, however, is the broader trend in appellate cases favoring plaintiff borrowers. *See id.*

12   To wit, the First Circuit recently joined the Seventh Circuit and the California Court of Appeals in

13   recognizing the TPP as an enforceable contract. *See Young v. Wells Fargo Bank*, __ F.3d __, 2013,

14   N.A., 2013 U.S. App. LEXIS 10189 (1st Cir. Mass. May 21, 2013).

15          Regardless of the outcome of the MDLs, this case is uniquely suitable for certification.

16   Whereas none of the named plaintiffs in *Durmic* ever received a counter-executed copy of the TPP

17   back from the servicer, here every class member did. *See Durmic* at *4. Whereas the *In re JPMorgan*

18   *Chase* MDL encompasses nationwide classes and several different versions of the TPP, here

19   Plaintiff's claims are narrowly focused on the interpretation of a single, fully-executed TPP document

20   under a single legal regime. *See* Fredman Reply Decl. at ¶ 6.

21          **E.      Gaudin did *not* misrepresent her income**

22          Saxon's desperate attempt make Ms. Gaudin out as a liar also has no merit. She did not

23   misrepresent her income (or anything else) to Saxon. *See* Reply Declaration of Plaintiff Marie Gaudin

24   ("Gaudin Reply Decl.") at ¶ 5; Abou-Rahme Decl., Ex. 2, Gaudin Dep. at 92:6-10, 92:23-93:5. There

25   is no reason to think that she would or could have done so because she provided Saxon her 2007  tax

26   return no later than March 26, 2009. *See* Gaudin Reply Decl. at ¶ 5.

27          Ms. Gaudin's 2007 tax return is the precise basis for Saxon's ultimate determination of her

28   income. Specifically, Saxon submits as Exhibit 5 to the Monsivais Declaration "a screen capture from

1    Saxon's Tri-Calc electronic database system reflecting data that was inputted on March 17, 2010".

2    Monsivais Decl. at ¶5 at p. 8 and Ex. 5. The data reflected in said "screen capture" is from Gaudin's

3    2007 Schedule C Profit or Loss From Business form. *See id. c.f.* ***Ex. N*** at SAXON_0001487 (see

4    lines 13, 24b, and 31).

5          That Saxon had her 2007 tax return by March 26, 2009 is evidenced by the fax transmission

6    stamp on the document as found in Saxon's file. *See **Ex. N*** at SAXON_0001487. Saxon's servicing

7    log also confirms receipt of the fax on that day, and references the content of the 2007 tax return on

8    April 13, 2009. *See* Monsivais Decl., Ex. 4 at SAXON_0000088-90. On or about May 24, 2009, Ms.

9    Gaudin re-sent her 2007 tax return with her signed TPP and completed HAMP application package.

10   *See* Gaudin Reply Decl. at ¶ 7; ***Ex. O***, HAMP Checklist *cf. **Ex. D*** at SAXON_0000324. (Ms. Gaudin

11   was on extension, so she did not have a 2008 tax return. *See* Gaudin Reply Decl. at ¶ 8.)

12         Saxon's declarant does not supply any foundation for her hearsay statement that Gaudin

13   "verbally represented that her income was approximately $54,200 a year." Monsivais Decl. at ¶ 24.

14   Saxon's servicing log does not support the statement. *See id.*, Ex 4 at SAXON_0000090. Rather, the

15   $54,200 figure comes from another purported "screen capture from Saxon's Tri-Calc electronic

16   database system reflecting data that was inputted on May 7, 2009". *Id.* at ¶ 3 at p. 8, Ex. 3.[1] There, the

17   figure $54,200 appears as "IRS Schedule C … Net Income … Line 31". *See id.*

18         The bottom line is that Ms. Gaudin never told anyone she made $54,200 a year, much less that

19   such a figure appeared on her Schedule C. *See* Gaudin Reply Decl., ¶ 5. One possible explanation for

20   the erroneous figure might be a data entry error by Saxon related the financial statement that Ms.

21   Gaudin submitted on March 26, 2009 with her 2007 tax return. *See **Ex. N*** at SAXON_0001480.

22   There, per Saxon's instructions, Ms. Gaudin projected future income of $5,420/mo. based on (as she

23   notated) projected reductions in business expenses and the exclusion of business debt (which was

24   drowning her until her Chapter 13 bankruptcy). *See id.;* Gaudin Reply Decl., ¶ 6. Ms. Gaudin

25   explained this in her accompanying hardship letter, including that she had "had to use credit to pay

26

27         [1] Monsivais Exhibit 3 is not a "screen capture" in any conventional sense because it refers to
     events subsequent to the purported "capture" date. *See id.* (Description section). Plaintiff has not had
28   the opportunity to conduct discovery on the subject. *See* Fredman Reply Decl. at ¶ 7.

for some of [her] basic monthly expenses." ***Ex. N*** at SAXON_0001496. This proved a reasonable projection, consistent with her filings in bankruptcy, which applies a similar methodology to determine income. *See* ***Ex. O,*** Gaudin BK Docs, Dkt. No. 1 at p. 23.

There is simply no support in the record for Saxon's assault on Ms. Gaudin's character and credibility. Saxon's citations are solely to the unsupported hearsay from its own declarant and 30(b)(6) designee. *See* Opp. at 17:1-3. Assuming *arguendo* that Saxon has erroneous income information in Tri-Calc system does not mean that Ms. Gaudin made misrepresentations. Her deposition testimony on the subject was stalwart and compelling:

> Q. …you understood that if you provided Saxon with false information, they could deny you a permanent modification.
>
> GAUDIN: I understood that, and I did not.
>
> Q. I'm not saying you did. Thank you.
>
> ***
> Q. So you understood that if the information you gave Saxon was not -- was no longer true and correct that your loan would not be permanently modified?
>
> (objections)
>
> GAUDIN: My information was true and correct.
>
> Q. But you understood that if it wasn't correct—
>
> GAUDIN: Of course.
>
> Q. --you could be denied the loan modification?
>
> GAUDIN: Of course.

Abou-Rahme Decl., Ex. 2, Gaudin Dep. at 92:6-10, 92:23-93:5.

### III.    ARGUMENT ON REPLY

**A.    Commonality is easily satisfied based on the common TPP**

Commonality is easily satisfied here because all of the claims are based on the common TPP. Saxon's effort to equate this case to *Walmart* is obviously far-fetched. This case involves a relatively tiny Class of Californians who all entered into the same written contract with the same entity. "An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action treatment." *Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 37

1   (E.D.N.Y. 2008) (listing cases); *see In re Med. Capital Secs. Litig.*, 2011 U.S. Dist. LEXIS 126659,

2   *17-19 (C.D. Cal. July 26, 2011) (listing cases).

3       **B.    Plaintiff is a typical and adequate class representative**

4           Saxon's typicality argument improperly focuses on Plaintiff's alleged injury and damages. *See*

5   Opp. at 14:7-15:2. "In determining whether typicality is met, the focus should be on the defendants'

6   conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Lozano v. AT&T Wireless*

7   *Servs.*, 504 F. 3d 718, 734 (9th Cir. Cal. 2007) (internal quotation marks omitted). "Under Rule

8   23(a)(3)'s permissive standards, representative claims are 'typical' if they are reasonably co-extensive

9   with those of absent class members." *Chavez v. Blue Sky Natural Bev. Co.*, 268 F. R. D. 365, 378

10  (N.D. Cal. 2010). Plaintiff's is fundamentally typical within the meaning of Rule 23 simply because

11  she entered into the same TPP as every other class member.

12          Saxon's argument that Ms. Gaudin is subject to unique defenses has no merit. The rule is that

13  "a named plaintiff's motion for class certification should not be granted if there is a danger that

14  absent class members will suffer if their representative is preoccupied with defenses unique to it."

15  *Hanon v. Dataproducts Corp.*, 976 F. 2d 497, 508 (9th Cir. 1992). *Hanon* was a securities action

16  where the proposed class representative was a professional plaintiff whose deposition evidenced a

17  "strong inference that he bought his stock in order to bring this lawsuit." *Id.* at 507. As such, his

18  "reliance on the integrity of the market would be subject to serious dispute". *Id.* at 508. And non-

19  reliance would "rebut the fraud-on-the-market theory" on which the case was based. *Id.* at 507.

20  Although reliance was a question of fact, typicality was not satisfied because of this "unique

21  defense[] which threaten[ed] to become the focus of the litigation." *Id.* at 508.

22          Saxon's false and unsupported assertion that Ms. Gaudin verbally misrepresented her income

23  involves no such danger. It  boils down to a claim that someone at Saxon input erroneous information

24  into a computer that caused Saxon to send Ms. Gaudin a *blank* TPP and application package.  *See*

25  Monsivais Decl. at Ex. 3; Abou-Rahme Decl., Ex. 1, at 123:6-11. It is really no defense at all because

26  Saxon counter-signed and returned the TPP. *See Ex. A* at p. 1. It is not an atypical defense given the

27  thrust of Saxon's position that its signature on the TPP is irrelevant because it "was permitted to

28  provide a trial modification based on information provided by borrowers verbally." Monsivais Decl.

at ¶ 11; *see* Opp. at 4:19-21. At bottom, it is just a caustic way of arguing that Gaudin did not receive a modification because Saxon determined she did not qualify for one under HAMP guidelines, the same argument it is making with respect to every other Class member. *See Ellis v. Costco Wholesale Corp.,* 285 F. R. D. 492, 535 (N.D. Cal. 2012) (rejecting typicality challenge based on alleged misrepresentations); *cf. Ellis v. Costco*, 657 F. 3d 970, 985 (9th Cir. Cal. 2011) (expressly "declin[ing] to express an opinion … about whether these defenses are typical").

Saxon's argument against Ms. Gaudin's adequacy is similarly meritless. In effort to formulate a conflict-of-interest between her and the class, Saxon argues that her case is particularly weak because she misrepresented her income, and thus she is not sufficiently motivated to pursue the case. *See* Opp. at 16:14-16. Alternatively, it argues she lacks the credibility to be an adequate representative because "discovery has uncovered serious reasons to question Plaintiff's credibility – she misrepresented her income when she applied for the TPP." *Id.* at 17:1-3. These self-serving assertions have no factual as noted above.

They have no legal support either. In *Ramirez v. Greenpoint Mortg. Funding, Inc.,* 268 F. R. D. 627, 639-640 (N.D. Cal. 2010), for example, the court found that false statements in the named plaintiffs' mortgage applications did not impede class certification where they did not fill out or read the applications before signing them. In *Savino v. Computer Credit, Inc*., 164 F. 3d 81, 87 (2d Cir. 1998), which Saxon cites, the plaintiff's problem was that "he repeatedly changed his position" as to whether or not he actually received the debt collections letter central to that FDCPA litigation. Here, there is no reason to doubt Plaintiff's integrity or reliability as a class representative.

**C.    Common question of fact and law predominate, and a class action is the superior means to fairly and efficiently resolve this litigation**

**1.    Common issues predominate because of Saxon's practice of automatically countersigning and returning the TPP**

Common issues predominate because of Saxon's uniform practice of automatically countersigning and returning the TPP without underwriting the enclosed application. *See* Monsivais Decl. at ¶¶ 13-14. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to

1   individualized proof." *Ellis v. Costco,* 285 F. R. D. at 538, *quoting Moore v. PaineWebber, Inc.,* 306

2   F. 3d 1247, 1252 (2d Cir. N.Y. 2002). Such is the case here.

3          There is no merit to Saxon's argument that its representatives' prior telephone discussions

4   with Class members negate predominance. Assuming *arguendo* Saxon relied on verbal information to

5   send a *blank* TPP, the following plain language of the document precludes its claim to such reliance

6   in returning the *counter-signed* TPP:

7                   If I [i.e. the applicant] have not already done so, I am providing confirmation
                    of the reasons I cannot afford my mortgage payment and documents to permit
8                   verification of all of my income … to determine whether I qualify for the offer
                    described in this [TPP] (the "Offer"). I understand that after I sign and return
9                   two copies of this Plan to the Lender, the Lender will send me a signed copy
                    of this Plan if I qualify for the Offer or will send me written notice that I do
10                  not qualify for the Offer.

11  ***Ex. A***, Executed TPP, at p. 1

12         Saxon's admission that it simply ignored this language – and the process it describes – is itself

13  grounds for class certification. *See* Monsivais Decl. at ¶¶ 13-15. Saxon sent each Class member a

14  *blank* TPP and application package, informing them that they "may qualify" for a HAMP TPP, and

15  instructing them to return a *signed* TPP, *completed* application, and actual proof-of-income

16  documentation with their first trial payment. *See **Ex. D*** at SAXON_0000322-340. Saxon's insistence

17  that it could automatically return counter-signed TPPs to unqualified applicants without legal

18  consequence is precisely the sort of overarching common question that routinely justifies class

19  certification.

            2.       **Extensive Class member loan data makes this case uniquely suitable for**
20                   **classwide resolution**

21         The extensive data that Saxon was required to maintain for each HAMP applicant further

22  enhances the suitability of this case for class certification. *See* Fredman Decl. at ¶ 8; Monsivais Decl.

23  at ¶ 19.  It starkly disproves Saxon's urging that the Court must consider each reason that it denied

24  each Class member's modification. As the data demonstrates, Saxon's various denial reasons are

25  mostly irrelevant under Plaintiff's theory of the case. *See* Monsivais Decl. at ¶ 19. Assuming they

26  were valid reasons to deny the TPP in the first instance (e.g. "negative NPV result"), for the most part

27  they have no bearing on the parties' respective rights under a fully executed TPP, or whether

28  returning a counter-signed TPP was deceptive. *See id.*

This data is precisely the sort of "generalized proof" that facilitates fair and efficient resolution through the class action mechanism. *See Ellis v. Costco,* 285 F. R. D. at 537-538. It reveals, for example, that Saxon denied modifications to the vast majority of Class members based on their purported failures to make "one or more trial payments as agreed upon during their extended trial periods". *Id.*  But the Class is *by definition* borrowers who made all three of the trial payments expressly called for by the TPP. *See Ex. J,* Interrogatory Response Nos. 23-25. This frames the issue for Saxon to argue its case that a properly interpreted TPP permitted it to require "extended trial periods". No individualized inquiry is necessary.

**3.     Generalized proof resolves any issues implicated by express conditions of the TPP**

Similarly, the data demonstrates that there is no merit to Saxon's assertion that express conditions set forth *within* the TPP prevent certification. *See* Opp. at 6:14-7:11. The TPP promised each Class member: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature." *Ex. A* at § 3. All Class members by definition satisfied Section 2, which just requires the three trial payments. *See id.; Ex. J* at 23-25; Fredman Decl. ¶ 8.

As for Section 1, none of its six provisions (nor any other purported conditions elsewhere in the TPP) suggests individual issues that impede class certification. *See id.* at § 1.  First, Saxon's records demonstrates that these six conditions potentially affect no more than about 10% of Class membership, as follows:

| | |
|---|---|
| "My Representations. I certify, represent to Lender and agree:" *Ex. A* at § 1. | |
| (1) "I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future" *Ex. A* at § 1.A. | (1) Saxon denied modification to one Class member because he or she "was determined not to be in imminent risk of default."  Monsivais Decl. at ¶ 19. |
| (2) "I live in the Property as my principal residence, and the Property has not been condemned" *Ex. A* at § 1.B. | (2) Saxon denied modification to about 1% of Class members because they "were found not to be living in the subject property". *Id.* |

| | |
|---|---|
| (3) "There has been no change in the ownership of the Property since I signed the Loan Documents" *Ex. A* at § 1.C. | (3) Saxon did not deny any Class member's modification for any reason that implicates this provision. *See id.* |
| (4) "I am providing or already have provided documentation for all income that I receive". *Ex. A* at § 1.D. | (4) Saxon denied modification to about 9% of Class members because they "had incomplete requests (i.e., they did not submit all required information needed to evaluate their application)." *Id.* |
| (5) "Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct". *Ex. A* at § 1.E. | (5) Saxon did not deny any Class member's modification for any reason that implicates this provision. *See id.* |
| (6) "If Lender requires me to obtain credit counseling, I will do so." *Ex. A* at § 1.F. | (6) Saxon did not deny any Class member's modification for any reason that implicates this provision. *See id.* |

Second, any issues implicated are subject to classwide resolution through generalized proof pursuant to a common interpretation of the TPP. Saxon points out, for example, that it denied modification to roughly 9% of Class members based on purportedly "incomplete requests," and presumably argues that it was justified to deny their modifications because they breached Section 1.D. *See* Monsivais Decl. at ¶ 19; Opp. at 7:1-6. Plaintiff would argue that the better interpretation is that Section 1.D. merely affirms that the Class member disclosed *all* their income, whereas Saxon's counter-signature on the TPP confirmed receipt of all required documents. *See Ex. A*. Regardless, the class mechanism is uniquely appropriate to resolve these conflicting interpretations of the TPP. No individual inquiry is required.

### 4.      Potential individualized damage issues cannot defeat class treatment

Saxon also argues that damages require individual inquiry, but the Ninth Circuit recently reiterated that the "amount of damages is invariably an individual question and does not defeat class action treatment." *Leyva v. Medline Indus.*, __ F.3d __, 2013 U.S. App. LEXIS 10649, *8 (9th Cir. Cal. May 28, 2013), quoting *Blackie v. Barrack*, 524 F. 2d 891, 905 (9th Cir. 1975); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011) ("individualized monetary claims belong in Rule 23(b)(3)"). In *Leyva*, the district court had found that predominance was lacking because

1   "evaluating each putative class member's claims would require fact-specific, individualized inquiries"

2   *Id.* at *6. The Ninth Circuit reversed because the district court "applied the wrong legal standard and

3   abused its discretion". *Id.* at *14. *Leyva* cautions that manageability (and superiority) concerns must

4   be weighed against the impracticality of "other means for putative class members to adjudicate their

5   claims." *Id.* at *12.

6   In any event, this case does not turn on proving individualized damages. Even without any

7   actual damages whatsoever, the Class has a collective claim for statutory damages of up to $500,000

8   (plus attorney fees and costs) under the Rosenthal Act.  *See* Cal. Civ. Code § 1788.17, incorporating

9   15 U.S.C. § 1692k(a)(2)(B); see *Gonzales v. Arrow Financial Services, LLC,* 233 F. R. D. 577, 581

10  (S.D. Cal. 2006). As for the contract claims, "[e]ven where no actual damages can be established, a

11  plaintiff who has established that a contract was breached is entitled to an award of nominal

12  damages." *ProMex, LLC v. Hernandez,* 781 F. Supp. 2d 1013, 1019 (C.D. Cal. 2011); *Midland*

13  *Pacific Building Corp. v. King*, 157 Cal. App. 4th 264, 275 (2007); *Sweet v. Johnson,* 169 Cal. App.

14  2d 630, 632 (1959); Cal. Civ. Code § 3360.[2]

15  Further, subject to the Court's interpretation of the TPP, at least some resulting contract

16  damages can be adduced or calculated formulaically from Saxon's records. *See* Fredman Decl. at ¶¶

17  6, 8. For example, each Class member incurred a late charge each month of they paid only the trial

18  period amount. *See* Ex. A at § 2.D. In the TPP, Saxon agreed to waive those (and all other) late

19  charges that the Class member incurred, *but only if and when* it granted actual HAMP modification.

20  *See id.* at § 3; ***Ex. D*** at SAXON_0000325. Insofar as Saxon's breach of the TPP resulted in the non-

21  waiver of such charges, the late fees each Class member incurred during the trial period are readily

22  calculable on a classwide basis. *See **Ex. N,*** Gaudin's Note at SAXON_0001004.

23  Of course, Saxon's records set forth the exact amount of the trial payments each Class

24  member made. Indeed, one of the common questions of law that predominate in this proceeding is

25  whether Class members may recover trial period payments that Saxon allegedly acquired in violation

---

26   [2] The Ninth Circuit has held that, under "California law, a breach of contract claim requires a
27  showing of appreciable and actual damage." *Aguilera v. Pirelli Armstrong Tire Corp.,* 223 F. 3d
    1010, 1015 (9th Cir. Cal. 2000). This has been reconciled with California law to mean that courts
    may award nominal damages where "they were unable to quantify the actual damages." *Rudgayzer v.*
28  *Yahoo! Inc.,* 2012 U.S. Dist. LEXIS 161302, *18 (N.D. Cal. Nov. 9, 2012).

1   of the UCL notwithstanding the 'pre-existing debt' rules that apply to contract and tort claims. *See*

2   *Auerbach v. Great Western Bank*, 74 Cal. App. 4th 1172 (1999) (payment of pre-existing debt is not

3   tort or contract damages). Although there is no authority directly on point, the potential availability of

4   UCL restitution is plainly indicated by the language of the UCL and its oft-stated purpose of ensuring

5   "that wrongdoers not retain the benefits of their misconduct". *In re Tobacco II Cases*, 46 Cal. 4th

6   298, 320 (2009); Cal. Bus. & Prof. Code § 17203.[3]

7          The answer to the UCL restitution question, like virtually everything else in this case, will

8   flow from the Court's interpretation of the TPP under the common factual context of this case. This is

9   not to say the answer is necessarily all or nothing. Insofar as the facts indicate that Saxon had a

10   practice of dragging out the trial periods for months before denying modification, for example, the

11   Court's interpretation of the TPP might reasonably lead it to conclude that UCL restitution is

12   available as to those trial payments made beyond the three month period contemplated by the TPP.

13   *See* Fredman Decl. at ¶ 11. For purposes of this motion, the simple point is that such restitution is a

14   major potential remedy that is readily calculable without any individualized proceedings.

15          Finally, even "individualized questions with respect to any particular class member's

16   entitlement to relief" do not preclude class certification where, as here, "the individualized hearings

17   required are narrow in scope and significance when compared to the threshold, classwide issues

18   subject to generalized proof." *Ellis v. Costco*, 285 F. R. D. at 539. "[A] class may be certified for

19   liability purposes only, leaving individual damages calculations to subsequent proceedings". *Comcast

20   Corp. v. Behrend,* 133 S. Ct. 1426, 1437 (2013) (dissent); *see* Fed. R. Civ. P. 23(c)(4). As necessary,

21   the Court may appoint a special master to quantify damages. *See Leyva* at *14.

22          Indeed, Court's routinely certify class actions, such as those involving small retail purchases,

23   where it is obviously impossible to determine class member damages (or identities even) except

24

25          [3] There is no reason to assume the contrary. At least two UCL opinions have dealt with
    preexisting debt without concern. *See Fireside Bank v. Superior Court*, 40 Cal. 4th 1069 (2007)
26   (payment of preexisting debt conferred UCL standing); *Hood v. Santa Barbara Bank & Trust*, 143
    Cal. App. 4th 526 (2006) (UCL and Rosenthal claims where defendant wrongly disbursed tax refund
27   to pay preexisting debt). *Medrazo v. Honda of North Hollywood*, 205 Cal. App. 4th 1 (2012),
    emphasizes that the UCL mechanically requires the refund of the full amount of charges acquired by
28   means of the UCL violation. *See id.* at 13-14

through a claims process. *See Chavez*, 268 F.R.D. at 377, 380. Here, it is clear that Class members suffered substantial objectively quantifiable economic detriment as a result of not receiving the loan modification that Saxon allegedly agreed to provide, and that Saxon's records include all necessary data to calculate that economic value. *See* Fredman Decl. at ¶ 8. The amount each Class member paid to Saxon as a result of the alleged deception is known to the penny. *See id.* Subject to the Court's ultimate interpretation of the TPP, it should not deny class certification simply because some individual consideration of each Class member's broader circumstances might eventually prove necessary or appropriate to determine each of their remedies.

## IV.    EVIDENTIARY OBJECTIONS

### A.    Objection to Monsivais Declaration and Exhibits

Plaintiff objects that Ms. Monsivais's statement that "[Gaudin] verbally represented that her income was approximately $54,200 a year" is inadmissible because it lacks foundation and is hearsay. *See* Fed. R. Evid. 802; Monsivais Decl. at ¶ 24. Plaintiff objects to Exhibits 3 and 5 to the Monsivais Declaration because they are hearsay and do not fall within any exception to the rule against hearsay. The business records exception does not apply because the authenticating witness cannot say that the document was prepared contemporaneously with the event described, and this does not appear to be the case. *See U.S. v. Console*, 13 F. 3d 641 (3rd Cir. 1993); Footnote 1, *supra*.

### B.    Objection to Kleidon Report

Plaintiff first objects to the Report of Allan W. Kleidon PhD pursuant to the page limitations in the local rules insofar as it is essentially 17 extra pages of legal argument. *See* Local Rule 7-4. Plaintiff further objects that it is not admissible expert opinion testimony because it cannot "help the trier of fact to understand the evidence or to determine a fact in issue". Fed. R. Evid. 702(a); *North American Specialty Ins. Co. v. Myers*, 111 F. 3d 1273 (6th Cir. 1997). In addition, Plaintiff makes the following specific objections to the report: (1) pages 4-7, the overview of HAMP and Saxon's role, are complete hearsay and lacking in any foundation; and (2) pages 8-15, the recitation of the law with respect to what remedies are available, is impermissible expert witness testimony (*see id.; U.S. v. Zipkin*, 729 F.2d 384 (6th Cir. 1984) (admission of testimony of bankruptcy judge on bankruptcy issues reversible error)).

1

## V.   CONCLUSION

2       Plaintiff's motion for class certification should be granted.

3

4   DATE: June 14, 2013                          **JENKINS MULLIGAN & GABRIEL LLP**
                                                 **LAW OFFICE OF PETER FREDMAN**
5

6                                                By: ___/s/ Peter B. Fredman_____
                                                 Peter B. Fredman (Cal. State Bar No. 189097)
7                                                125 University Ave, Suite 102
                                                 Berkeley, CA  94710
8                                                Telephone: (510) 868-2626
                                                 Facsimile:  (510) 868-2627
9                                                peter@peterfredmanlaw.com

10                                               Daniel J. Mulligan (Cal. State Bar No. 103129)
11                                               **JENKINS MULLIGAN & GABRIEL LLP**
                                                 10085 Carroll Canyon Road, Suite 210
12                                               San Diego, CA 92131
                                                 Telephone: (415) 982-8500
13                                               Facsimile: (415) 982-8515
                                                 dan@jmglawoffices.com
14

15                                               Attorneys for Plaintiff MARIE GAUDIN,
                                                 for herself and persons similarly situated
16

17

18

19

20

21

22

23

24

25

26

27

28

PLTF. REPLY BRIEF ISO MTN. CLASS CERT.            - 16 -
No. C 11-01663-JST, Gaudin v. Saxon Mortgage