Pages 1 - 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
MARIE GAUDIN, individually,    )
and on behalf of others        )
similarly situated,            )
                               )
           Plaintiff,          )
                               ) NO. C 11-01663 JST
   vs.                         )
                               )
SAXON MORTGAGE SERVICES, INC., )
a Texas corporation, and Does  )
1-100,                         )
                               ) San Francisco, California
           Defendants.         ) Thursday, June 20, 2013
_____)
```

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

| | |
|---|---|
| **For Plaintiff** **Marie Gaudin**: | Law Office of Peter Fredman 125 University Avenue, Suite 102 Berkeley, CA  94710 (510) 868-2626 (510) 868-2627 (fax) |
| | BY:  **PETER B. FREDMAN** |
| **For Defendant** **Saxon Mortgage** **Services, Inc.**: | Bingham McCutchen, LLP 399 Park Avenue New York, NY  10022-4689 (212) 705-7646 (212) 593-6010 (fax) |
| | BY:  **LAILA ABOU-RAHME** **BRIAN R. SOGOL** |
| **For Defendant** **Saxon Mortgage** **Services, Inc.**: | Severson & Werson, APC One Embarcadero Center, Suite 2600 San Francisco, CA  94111 (415) 398-3344 (415) 398-0439 (fax) |
| | BY:  **ERIK WAYNE KEMP** |

Reported By:  Lydia Zinn, CSR No. 9223, Official Reporter

1          **THE CLERK:**  Calling Civil Case 11-1663, *Marie Gaudin*

2  *versus Saxon Mortgage Services, Incorporated*.  Counsel, will

3  you please make your appearance for the record?

4          **MR. FREDMAN:**  Good afternoon, Your Honor.

5  Peter Fredman, for the plaintiff and moving party,

6  Marie Gaudin.

7          **MS. ABOU-RAHME:**  Good afternoon, Your Honor.

8  Laila Abou-Rahme, on behalf of Saxon Mortgage Services.

9          **THE COURT:**  Welcome.  Okay.  We have a whole lot of

10 interesting cases this afternoon, including this one.  I don't

11 know that I have so much -- I've only brought out some of my

12 notes; I apologize.  I don't know that I have so much to tell

13 you, by way of a tentative.  Let me just make a few points,

14 though, before you argue.

15     There's lots of discussion from the plaintiffs about what

16 the common questions are, but in the commonality section of the

17 briefs what is said on that subject is the common question is,

18 quote, "Everyone in the class entered into the same TPP with

19 Saxon, and made at least three trial payments it called for,

20 but did not obtain the loan modification."  That seems more

21 like a class definition to me, as opposed to a question; a

22 common question.

23     The common question, though, actually permeates the briefs.

24 I mean, the common question that I think plaintiffs want there

25 to be permeates those briefs; and that is whether, once the TPP

1  has been fully executed by both sides, it becomes an

2  enforceable contract.  As far as I can tell, that's what they

3  want the common question to be.

4      And if the answer is "No," then all of the class members

5  lose.

6      And if the question is answered affirmatively, then, you

7  know, maybe something else happens.

8      So that's a minor point in some ways; but you can't get to

9  the question of commonality or typicality, unless I can confirm

10 that that's what you think the common question is, even if you

11 agree with the way plaintiffs think the TPP worked in the HAMP

12 process, and all that.  So plaintiffs would say, "You don't get

13 to individualized HAMP inquiry, because the TPP was

14 self-enclosed."

15     Even if the Court adopted that position, about 10 percent

16 of potential class members fall out, because there were TPP

17 criteria that were not met.  And there is a little percentage

18 chart which I didn't bring with me, but I have a list of the

19 criteria, because for one of them, it's, you know, 1 percent;

20 for one of them, it's 9 percent; for some, it's none.  And I

21 don't have those percentages right in front of me, but for

22 example, one person -- I think I want to say it's one person --

23 wasn't able to show that they were in default, or the default

24 was imminent; that sort of thing.

25     So my question for the plaintiffs is:  Even if the Court

1  sees it your way about the TPP, don't those 10 percent make it

2  difficult to certify that class?  Mightn't I actually just not

3  have a class that includes those people?

4      And then I know we don't have that much time.  Probably

5  something with a little more meat on it is:  I want to

6  understand all the remedies that the plaintiffs think this

7  class is entitled to, particularly contractual damages; but in

8  general, I don't have it clear in my mind what you think the

9  remedies are that these class members would be entitled to, if

10 the class is certified and if they prevail.

11     I apologize to the defendants.  I wish I had more questions

12 for you.

13     I'll let the plaintiff argue first.

14         **MR. FREDMAN:**  Your Honor, I think the common question

15 is interpretation of the TPP as a contract, and also as a

16 communication.  Even if the TPP is not a contract, the act of

17 signing it and sending it to the class members is deceptive,

18 because they're going to think it's a contract.  They're going

19 to think it says what it does appear to say, which is:  If you

20 make these three payments, you're going to get this loan

21 modification.  So that's the common question; the predominant

22 common question that predominates everything.

23     What does this document mean?  Once Saxon signs it and

24 returns it, is it a contract?  Is it an enforceable contract;

25 and even if it's not, is it deceptive, under the Rosenthal Act?

1  Is it misrepresenting something under the UCL?  Those are

2  common questions.

3      So I don't think we can limit it to the question of whether

4  it's an enforceable contract, both -- but it is -- it does

5  still off all flow from looking at that one document, and

6  interpreting it; construing it under the various legal theories

7  that have been presented to you.

8      With respect to the 9 percent -- the TPP criteria --

9  there -- I spotted one area where they said a certain number of

10 people were offered the loan modifications, and refused them.

11 And the class definition should be modified to exclude that.

12 And that can be done with a single word.  And it doesn't really

13 affect the numbers very much.  It's a very small percentage.

14     Other than that, you need to interpret the TPP document, as

15 a contract or otherwise, before you can say that these

16 9 percent people, themselves, were in breach of the TPP, or

17 were not legitimately --

18          **THE COURT:**  Well, let's take the example of the one

19 person or the one applicant who was not in default or was not

20 able to show -- I think this is close to the language that

21 default was imminent.  Do you have that person in mind?  Do you

22 have that fact in mind?

23          **MR. FREDMAN:**  Yes.

24          **THE COURT:**  So how could that person possibly claim

25 that there was a valid or binding contract, when that

1   applicant, by the terms of the TPP, was not able to meet a

2   necessary precondition to performance?  And how can that person

3   claim that they're -- that they were misled, when I'm assuming

4   there has to be some element of reasonable reliance?  How could

5   they reasonably have relied?  They didn't qualify for the

6   program.

7           **MR. FREDMAN:**  I don't disagree with that.

8      That's one person.

9           **THE COURT:**  So let's throw them out of the class,

10  then, because even their lawyer -- their putative class

11  lawyer -- agrees they shouldn't be in the class.  And then we

12  can move to the other criteria.

13     I guess the Court would benefit from hearing from you why,

14  as a matter of class-action management, if nothing else, these

15  10 percent should be in there.

16          **MR. FREDMAN:**  For that one person, because it's one

17  person, I think that person should remain in the class.

18     So we can take a little bit more detailed look at Saxon's

19  basis for concluding there was no imminent risk of default.

20          **THE COURT:**  All right.  Let's take the 9 percent of

21  people, because that will change the metrics.

22     This is from your brief at page 12:  The 9 percent of class

23  members who did not receive modifications, because they didn't

24  submit all of the required information.

25          **MR. FREDMAN:**  I think they're --

1      THE COURT:  Are they entitled to a remedy?

2      MR. FREDMAN:  We need to -- with respect to that,

3  first of all, there's an interpretation of that provision in

4  the TPP that needs to be undertaken, because the TPP -- the

5  process it describes is:  I'm sending you the TPP signed by me,

6  my first check, and my tax returns with the package.  And when

7  you send it back to me, you're telling me you've got enough

8  information.

9      What -- as I read that provision, 1(d), it says:  I am

10  providing or already have provided documentation for all the

11  income that I've received.

12      To me, it's a verification that they're truthfully

13  disclosing all of their income, and not some kind of ongoing

14  obligation to keep providing documents whenever Saxon asks for

15  more documents.

16      And remember.  These people are being -- average length is

17  10.5 months of being in this contract that's supposed to last 3

18  months; and you're supposed to get an answer in 1 month.  So --

19      THE COURT:  You agree Saxon doesn't later have the

20  right to toss them out of the program --

21      MR. FREDMAN:  No.

22      THE COURT:  -- if they complied with the TPP, because

23  they determined that whatever was sent to them was inadequate?

24      MR. FREDMAN:  Yes.  Exactly.

25      I mean, and there may be some more granular detail, all of

1   which is available in the loan data, that enhances our

2   understanding; but it's all going to start with the Court's

3   interpretation of that provision.  Does that provision create

4   an ongoing right for Saxon?

5        Or, first of all, does the TPP -- is it over?  After that

6   month, after it's signed, is it over?  After three months, is

7   Saxon in breach if it asks for something at Month Eight, and

8   then it says, "Well, you didn't send it.  You're out"?   That

9   -- you have to decide what the TPP means first, before you can

10  even reach that question.

11       So, you know, for that 9 percent, I think there's clearly

12  issues that are going to flow out of the Court's singular

13  interpretation of the TPP and what it means; and that these

14  different reasons that Saxon's presenting for denying

15  modifications will help frame all of these issues, and help the

16  Court make all of the necessary interpretations of the TPP for

17  the class; but it's all going to be a single document.  It's

18  still the single TPP that has a single meaning.

19       And at that point, there may be some people who are not

20  entitled to relief, for one reason or another.  And we'll look

21  at that as a matter of general proof through this data; but

22  right now, we're talking 90 percent of the class, who, under

23  plaintiff's theory of the case, none of the reasons matter;

24  another 9 percent where may or may not matter.

25       There's this issue --

1          THE COURT:  Let's talk about remedy.

2          MR. FREDMAN:  Yes.  The most obvious remedy is

3    restitution.  And I realize that's controversial, but in going

4    over --

5          THE COURT:  And you mean of late fees?

6          MR. FREDMAN:  Certainly of late fees, as a

7    contractual remedy; but of TPP payments.  If the TPP was

8    deceptive, and it violated the Rosenthal Act --

9          THE COURT:  Yes.

10          MR. FREDMAN:  -- then they continued making payments,

11    based on an unlawful document -- as the result of an unlawful

12    document, and those payments are subject to restitution -- the

13    same would be true for UCL fraud; fraud prong -- the same --

14    the same concept is raised with respect to the idea that we are

15    entitled to --

16          THE COURT:  Actually, I'm not sure I would agree with

17    you, but I also am not sure that I need to decide that today.

18      In other words, the reason I asked what all of the remedies

19    were is so that I can include that in how I think about this

20    case under Rule 23; and that is, "Is the remedy that you think

21    people are entitled to feasible on a classwide basis, and are

22    there, kind of, case-management concerns?" and not, "Do I think

23    they're legally entitled to it?"

24      The question of restitution of TPP payments is interesting,

25    because it begs the question of, you know, what is the

1   reliance.  What is the change in position that I typically

2   think of as being the basis for some kind of relief?

3      Presumably, an applicant was paying more per month than

4   they were under the TPP.  Certainly, they weren't paying less.

5   And so the idea that they are made worse off by making these

6   TPP payments -- oh, there was a deceptive communication, so

7   they made these TPP payments.  Well, what would they have made?

8   They were under an obligation to make their monthly mortgage

9   payment.

10      But I'm bending your ear about something that I don't know

11   that I need to decide today.

12      **MR. FREDMAN:**  That's a variation on the preëxisting

13   debt question, which is a predominant common question, if --

14   because they weren't making -- you know, their decision to

15   actually send the money definite -- send this money happened as

16   a result of this TPP.

17      **THE COURT:**  I don't think, by the way, that that's

18   the same thing as the consideration point that the defendants

19   make.  I think that's totally different.  I'm thinking that

20   might be where you're going.

21      **MR. FREDMAN:**  So we start off with:  The most obvious

22   remedy is Rosenthal statutory damages.

23      There's restitution, through the rescission mechanism.

24      And -- and, very briefly, again, it's a common question,

25   but rescission -- whether rescission depends on return of some

1    consideration depends on the Court's interpretation of the

2    document and what the consideration was.

3        They're trying to say the consideration was the discount;

4    but there really was no discount for these class members.  They

5    didn't -- their mortgage obligation stayed the same.  They

6    still owed the money.

7        So there's various methods to get at restitution.  The UCL

8    is probably the most straightforward, under California law.  We

9    know -- I understand the issues around that, but it's certainly

10   a very common question that predominates.

11       There's -- that's how I see this case going, is probably

12   cross-motions for summary judgment on those issues.  And then

13   if no restitution is available, then we need to start looking

14   at contract damages.  There's certainly the late fees.  And

15   there may be other more individualized damages that we need to

16   take a look at, at that point.

17       I think the law is clear -- and increasingly clear in this

18   Circuit -- that the need for individualized damage

19   computations, itself, is not going to upset class

20   certification; and certainly not at this point, where there is

21   no present need for those individualized calculations.

22       There's -- you know, we -- the Court's obviously going to

23   manage this case as it sees fit.  And we can get past that

24   first threshold of determining whether restitution is available

25   before we address what other remedies are available and whether

1  there is a breach of a contract, before we can address whether

2  there is -- what other particular remedies there might be, and

3  how to manage them.

4        **THE COURT:**  Thank you, Mr. Fredman.

5      Ms. Abou-Rahme, am I pronouncing your name correctly?

6        **MS. ABOU-RAHME:**  That's correct.

7        **THE COURT:**  Thank you.

8        **MS. ABOU-RAHME:**  Thank you, Your Honor.  May it

9  please the Court.

10      Your Honor said you read the papers and the briefs, so I

11  would like to focus my time, instead, on addressing some of the

12  concerns you raised before Mr. Fredman spoke, as well as some

13  of the points Mr. Fredman raised in the reply brief; but if

14  Your Honor has any specific questions for me, please let me

15  know.

16      I guess if I could take a minute to just put in this in

17  context -- I know I only have ten -- but understand what is

18  actually happening here, and what Ms. Gaudin is really saying;

19  what the plaintiff here is saying.

20      This was a Department of Treasury program.  It was directed

21  by the Department of Treasury.  Saxon signed a contract with

22  the Department of Treasury that required it to abide by the

23  Department of Treasury's directives, criteria, and guidelines.

24  Saxon did not have discretion on any of the facts that are

25  relevant to this case.  Whether somebody qualified or didn't

1  qualify was up to the Department of Treasury.

2      And what plaintiff is really saying is:  Even though it was

3  the Department of Treasury that specified the eligibility

4  rules, she wants to hold Saxon responsible if those rules don't

5  produce the outcome she and others may have wanted.  In fact,

6  she's asking this Court to find Saxon responsible, because she

7  believes that the Treasury's form of notice, which is what the

8  TPP is, was inherently deceptive.  This is a classic case of

9  shooting the messenger.  And the law doesn't permit that,

10  particularly as a class action.

11      But I want to address the points Your Honor raised; and

12  commonality being one of the key ones.  I think Your Honor is

13  absolutely right that the only common question that I have seen

14  in any of plaintiff's briefs is whether the contract -- whether

15  the TPP is an enforceable contract; and if so, how you

16  interpret its various provisions.  And that's simply not

17  enough, because you don't certify a class to decide if

18  something is a contract.  You certify a class to determine

19  liability.

20      And issues are sometimes certified by issue if it's, you

21  know, we'll certify a class as to breach of contract, or we'll

22  certify as to liability and split up damages.  I've never seen

23  in any cases I've read a class certified as to one element of

24  one cause of action, which is what this is really all about.

25  All it gets you is:  Is this a contract?

1     If it's a contract -- I mean, even if we assume for these

2   purposes that it's a contract that promised permanent

3   modification, there is no way to avoid the individual inquiry

4   that would be required, which is:  Was the contract breached?

5     Plaintiff doesn't deny that there are conditions.

6   Your Honor recognized conditions on the face of the TPP that

7   have to be met.

8     The only way to answer if there was a breach is to look at

9   every one of these borrowers, and see.  Did they fulfill every

10  one of these conditions; and if not, what was the reason?

11         **THE COURT:**  You're referring to the TPP -- the six

12  conditions outlined in the TPP, itself; not the other

13  requirements that you argue might have been necessary to

14  receive a modification?  Or are you --

15         **MS. ABOU-RAHME:**  Correct, Your Honor, except it's not

16  just in Section 1; it's in Section 2, as well.  And if --

17     I brought the TPP up with me, which I believe -- here we

18  go.  In Section 3 of the TPP it actually says -- and plaintiff

19  quoted this in his brief -- "If I comply with the requirements

20  in Section 2, and my representations in Section 1 continue to

21  be true."  So it's not just the representations in Section 1,

22  but there are requirements in Section 2, which are beyond

23  making the three payments.  They go A through G.

24     So I am limiting, for purposes of this discussion, to the

25  TPP, itself; although I would like to note that in plaintiff's

1  First Amended Complaint, plaintiff recognizes requirements

2  beyond the TPP.  Paragraph 1 of plaintiff's First Amended

3  Complaint recognizes that this HAMP was an income-based

4  program.  In paragraph 2 and paragraph 19, plaintiff recognizes

5  that she had to have made her three monthly payments, "and

6  satisfied various other requirements under the objective HAMP

7  guidelines," I believe, is the quote.

8      Elsewhere in the Complaint -- in 51(c), I believe -- he

9  refers to it as "the uniform HAMP guidelines."  So -- but

10  that's an aside.

11      So I think plaintiff has admitted there are requirements

12  beyond the TPP in the Complaint, even though, for purposes of

13  its class-certification motion, they've steered away from that;

14  but even if we go with their new version that it's just the

15  TPP, that --

16          **THE COURT:**  Judge Seeborg has had something to say

17  about this, also.

18          **MS. ABOU-RAHME:**  Correct.

19          **THE COURT:**  This question.

20          **MS. ABOU-RAHME:**  Judge Seeborg recognized that there

21  are contract conditions on a very face of the TPP that have to

22  be met, and that it, by no means, on its own, was promising a

23  permanent modification.

24      And I think the -- excuse me, Your Honor.  I think the

25  issue with the 9 percent, just to go for a minute to the class

1   size -- the 9 percent -- and this is our failing, I'm sure; but

2   the declaration that Ms. Monsivais submitted, where -- from

3   which plaintiff got this, you know, 10 percent fit into one or

4   the other category -- this was, by no means, an exclusive list.

5   It doesn't mean that the other 90 percent of the class had no

6   reason.

7        And she explains in her declaration, Saxon was required to

8   give Treasury our report.  And by looking at that report, there

9   were these easy buckets.  And these were sort of examples of

10  hundreds of people or nine people or however many it was in

11  various of these buckets; but you would still have to look at

12  every individual to see what other reason there was, and

13  whether that was a legitimate reason under the TPP, or not.

14       And, in fact, the conversation with Mr. Fredman earlier

15  proves plaintiff's point -- proves defendant's point that

16  it's -- there is no way to get around the individual inquiry.

17  I mean, you have to look at:  Did this person live in the

18  property?  Did this person give the deed that was required?

19       And the other issue about the reports -- I know Mr. Fredman

20  likes to say that these are all readily available in Saxon's

21  computers, but this --

22            **THE COURT:**  I'm not going to say this exactly in the

23  right way.  It's going to be inartful, but hopefully I can

24  communicate the essence of the question.  Let's say that the

25  Court were to certify a class of persons who signed the TPP,

1  submitted the required information, made three payments, got a

2  signed TPP back from Saxon, and were not deemed to have

3  violated any of the conditions contained in Section 1 or 2.

4      Now, I don't know whether there would be anybody left,

5  but -- and I'm not saying that that's your proposal.  I

6  understand that you think that that would not be a certifiable

7  class; but if I did do that, wouldn't it obviate the problem

8  that you're now describing?

9           **MS. ABOU-RAHME:**  It wouldn't, Your Honor, only

10 because the only way to figure out what that remaining bucket

11 is, is by looking at each individual file.

12     These -- the reasons that were given in Ms. Monsivais'

13 declaration -- the requirement by Treasury was to give a reason

14 for denial.  It did not require them to give all of the reasons

15 for denial, and it did not require them to correct the reason

16 for denial if there was an error.

17     For example, in Ms. Gaudin's case, it was reported as, "Did

18 not make her trial payments," which was an error that was

19 corrected.  It wasn't corrected in this record.  So these

20 numbers in this declaration is what was reported to Treasury,

21 based on the information available when they reported it, and

22 based on what was required.  So for --

23           **THE COURT:**  I hope I'm not stating the obvious, but I

24 probably am.  I gather that everybody in the proposed class, as

25 you understand it to be framed, did have a modification denial?

1      **MS. ABOU-RAHME:**  Everybody in the proposed class had

2  a modification denial, except for some, who -- who refused a

3  modification.  So it includes people -- it's everyone who did

4  not get a modification, whether it's because they were denied,

5  or because they found some other alternative.

6      But Your Honor, if I can get back to your question, even if

7  someone signed a TPP, made three payments, and were not deemed

8  to have violated any of the conditions of the TPP, then you get

9  into the problem of the ascertainable class, because to

10  identify those individuals, you would have to look at every

11  loan file for every one of the 2,700-some individuals to see if

12  anyone even fits in with that.  So that would be Step 1.

13      And Step 2 would still be that you can't get away from the

14  individualized proof.  Even if you get to, let's say, ten

15  people who did not violate something in the TPP, but violated

16  something in the HAMP objectives or the guidelines, and the

17  Court decides that those are not relevant, then you still can't

18  get around the damages issue.

19      And I'd like to address that for a second, if I may,

20  because I know that damages, themselves, are not -- do not

21  preclude class certification; but they do require, especially

22  after *Comcast*, that the plaintiff be able to identify how the

23  plaintiff class was damaged as a result of the conduct, and

24  whether those damages can be determined on a classwide basis,

25  without looking at each individual's individual circumstances.

1    And there's no way that can be done here.

2        And even the cases that plaintiff cites where they say

3    damages can be a separate inquiry, there is still at least a

4    method by which the damages can be calculated.  There's either

5    some kind of a formula, or there's a mechanical way in which to

6    do it.  And plaintiff hasn't offered anything here that works.

7        The return of TPP payments, leaving aside the problem of

8    the preëxisting debt -- the return -- you can't just return the

9    money, without seeing what the damages were.  I mean, this is

10   not -- they have to have shown how they were damaged.

11       For example, if somebody who made TPP payments for six

12   months beyond the three months -- during those six months, you

13   have to look at what benefit they got from those reduced

14   payments.  Were they able to pay down a credit-card bill?  Were

15   they able to avoid losing their car?

16       There are many short-term benefits that you'd have to look

17   at -- were they able to stay in their home longer than they

18   otherwise would have? -- that you would have to look at before

19   you decide what they are entitled to receive in return.

20       In other words, even if you ignore the preëxisting debt,

21   it's not just a matter of:  Here's your money.  It's:  Well,

22   what did you benefit from when you were paying the reduced

23   payments?  And you have to take all of that into account.

24       And Mr. Fredman -- you know, they didn't submit an expert

25   report, which we did, which really talks to how particularized

1  the damages issue is in this case.

2       So have I answered your question, Your Honor?

3            **THE COURT:**  I think you have.  I actually need to ask

4  you to wrap up.  I have some people waiting patiently in the

5  back of the courtroom who, I'm sure, are really anxious.

6            **MS. ABOU-RAHME:**  Okay.  Thank you, Your Honor.

7       Just the last thing I want to say about damages is the

8  Rosenthal Act; the statutory damages.  To me, that's a red

9  herring.  That is a cap on the amount of damages plaintiffs may

10  collectively receive.  It doesn't mean they're automatically

11  entitled to $500,000 if there's a violation of the

12  Rosenthal Act.

13       And the last point I would like to make is:  The

14  individualized issues pervade not just the breach-of-contract

15  claims, but also the Rosenthal Act and the UCL, for the

16  following reasons.

17       If you're going to look at what -- for Rosenthal Act, the

18  least-sophisticated investor -- how he would have interpreted

19  the TPP, you have to look at the whole picture.  And the whole

20  picture is the TPP, with the letter, with the phone calls they

21  all had before they got the letters, with the communications

22  that each of them subsequently had with Saxon, which were

23  numerous.  There's -- you don't just look at the contract.  If

24  we're talking about Rosenthal Act and if we're talking about

25  the UCL, you have to look at the complete picture.  And there's

1   no way to look at the complete picture here, without looking at

2   each individual's circumstances.

3       And I think not only do *Wal-Mart* and *Comcast* require a

4   denial in this case, but the Ninth Circuit decision in *Wang*

5   *versus Daily News* --

6   (Reporter requests clarification.)

7               **MS. ABOU-RAHME:**  *Wang versus Daily News*.

8       And the District Court has several decisions -- in *Campion*,

9   in *Hanni*, and in *Faulk* -- that all go to the fact of -- in UCL,

10  in breach of contract.

11      And then there's a decision, *O'Donovan* --

12              **THE COURT:**  Ms. Abou-Rahme, I don't want you to sit

13  down now, but I'm going to ask you to, anyway.

14              **MS. ABOU-RAHME:**  Thank you, Your Honor.

15              **THE COURT:**  Thank you.

16      Mr. Fredman, in three sentences, tell me why Ms. Abou-Rahme

17  is wrong with her point that the list that's in your brief of

18  the various reasons why some people didn't get modifications is

19  not a complete list, and so just determining whether there was

20  individual compliance with the TPP requirements, themselves,

21  will require a file-by-file examination.  Tell me why that's

22  wrong.

23              **MR. FREDMAN:**  Their statement that they can give the

24  wrong reason to Treasury for denying a modification is pretty

25  suspect.

1      **THE COURT:**  That isn't the question I asked you, so

2  I'm going to ask it again, because our time is short.

3      **MR. FREDMAN:**  Yes.

4      **THE COURT:**  And if I've misunderstood your opponent's

5  argument, or her argument's not based on the law, tell me that;

6  but I think what I said was a little different.

7      I heard your opponent to say that, even limiting the

8  question to the four corners of the TPP, as you're asking the

9  Court to do, that there were more requirements than simply

10  filling out the form, sending in the information, and signing

11  it, and getting a signed TPP back; that there were more things

12  that people had to do, under the Treasury program.

13      And if that's right, then, in order to determine whether

14  the defendants violated anybody's rights, you'd have to go

15  through each file to just see:  Did they comply with the TPP

16  requirements, or was the denial based on something else?

17      And my question for you is:  Are they incorrect in their

18  construction of the TPP when they say, "No.  There were other

19  things that individual borrowers had to do, which were a

20  legitimate basis for denial"?

21      And maybe they were incorrect, and that's the end of the

22  inquiry.

23      Or if they're not incorrect, why wouldn't the decider in

24  the case have to go through each file individually?

25      **MR. FREDMAN:**  I understand.

1    Were there other qualifications to get into the HAMP

2  program, so that Saxon could get its subsidy?

3    Yes.

4    Inside the TPP, were there other conditions?

5    No, in terms of:  There were no other conditions, than the

6  ones we've described.  And they're on the face of the TPP.

7    In terms of the idea that she said, well, maybe this list

8  we've given incomplete; we could have had other reasons -- and

9  if they want to go give those other reasons, just like they

10 gave these reasons, that's fine.

11    And that doesn't preclude class certification:  The fact

12 that they have to figure out what other reasons they might have

13 had that they didn't list for denying the modification, if I

14 understand that correctly.

15    They've given -- in other words, for every single person,

16 they've given the reason they denied it.  And they don't

17 matter.  And they're saying there might be other reasons we

18 denied modification.

19    If that's the case, that's evidence.  And they can --

20    **THE COURT:**  Your belief is that when somebody

21 executed the TPP -- when they signed it -- and they submitted

22 the information that was required, if they got it back signed,

23 at that moment Saxon was obligated to give them a loan

24 modification.  True?

25    **MR. FREDMAN:**  If they made the three payments.

1    That's exactly what the TPP says.

2             THE COURT:  I think that may be where the parties

3    disagree on this.

4        I'm enjoying this hearing very much, but unfortunately --

5    and the briefing.  May I just say the briefing on both sides

6    was quite good, really.  And I wish you were the only thing on

7    the calendar, but you're not.

8             MR. FREDMAN:  Thank you.

9             THE COURT:  So I'm going to take this under

10   submission.  Thank you.

11   (At 3:48 p.m. the proceedings were adjourned.)

12   I certify that the foregoing is a correct transcript from the

13   record of proceedings in the above-entitled matter.

14

15   _____    June 29, 2013

16   Signature of Court Reporter/Transcriber    Date
     Lydia Zinn

17

18

19

20

21

22

23

24

25