UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIE GAUDIN,<br><br>        Plaintiff,<br><br>  v.<br><br>SAXON MORTGAGE SERVICES, INC.,<br><br>        Defendant. | Case No.  11-cv-01663-JST<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL, SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: ECF No. 81 |

Plaintiff Marie Gaudin ("Plaintiff") alleges that Defendant Saxon Mortgage Services, Inc. ("Defendant") offered her a Trial Period Plan ("TPP") loan modification document pursuant to the federal Homeowners Affordable Modification Program ("HAMP"), and then unjustifiably failed to deliver on promises contained within the document.  First Amended Complaint ("FAC"), ECF No. 39, at ¶¶ 1-6.  Plaintiff now moves to certify a class of California borrowers who entered into HAMP TPPs with Defendant through October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications (the "Proposed Class").  Plaintiff's Notice of Motion and Motion for Class Certification and Appointment of Class Counsel; Memorandum of Points and Authorities ("Motion"), ECF No. 81, at 1:21-28.

After considering the papers, the arguments of the parties at oral argument, and good cause appearing, the Court now GRANTS the motion.

/ / /

/ / /

/ / /

/ / /

I.      **BACKGROUND**

A.      **Factual Background**[1]

        In October 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765.  "The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures."  Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 556 (7th Cir. 2012) (citing 12 U.S.C. § 5219(a)).  "Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure."  Id.  This program, the Making Home Affordable program, included HAMP as one of its central components.

        HAMP is a voluntary program designed to induce servicers to provide permanent loan modifications to borrowers who are in default or at risk of default.  Wigod, 673 F.3d at 556; see also U.S. Department of the Treasury, Supplemental Directive 09-01 (April 6, 2009), available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf.  Under HAMP, mortgage servicers receive financial incentives from the government for each permanent modification they provide.  Id.  The program is designed to authorize modifications when it is

---

[1] Both parties have requested that the Court take judicial notice of U.S. Treasury Department documents that have been posted on the Internet.  ECF Nos. 76 & 85.  "[I]nformation on government agency websites . . . [has] often been treated as [a] proper subject[] for judicial notice."  Paralyzed Veterans of Am. v. McPherson, Case No. C064670SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008).  The information contained in the documents is not disputed and the accuracy of the source is not reasonably questionable.  See Fed. R. Evid. 201(b).  Therefore, the Court grants the requests.  Plaintiff objects on hearsay grounds to certain representations in the Monsivais Declaration, but the Court did not need to consider the truth of those assertions in resolving this motion, and so the objections are overruled as moot.  See ECF No. 94, at 11:11-17.  Finally, Plaintiff objects to the expert damages report of Allan Kleidon, ECF No. 88-8, on the following grounds:  (1) that "it is essentially 17 extra pages of legal argument," in violation of the Local Rules; (2) "that it is not admissible expert opinion testimony because it cannot 'help  the trier of fact to understand the evidence or to determine a fact in issue,' Fed. R. Evid. 702(a)"; (3) that pages four through seven of the declaration "are complete hearsay and lacking in any foundation"; (4) "the recitation of the law with respect to what remedies are available, is impermissible expert witness testimony."  These objections are overruled.

United States District Court
Northern District of California

1  (1) possible to create an alternate payment schedule that is affordable for the borrower given his or

2  her income, and (2) financially profitable for the investor.  Id.  To accomplish these goals, the

3  program provided that a modification was warranted only if the borrower met certain income

4  requirements and other criteria, and if a net present value assessment showed that a modified

5  mortgage would produce a greater return to the servicer than the unmodified mortgage.  Id.

6          Defendant Saxon entered into an agreement with the Treasury Department to participate in

7  HAMP in April 2009.  Declaration of Veronica Monsivais in Opposition to Plaintiff's Motion for

8  Class Certification and Appointment of Class Counsel ("Monsivais Decl."), ECF No. 89, at ¶¶ 6-7

9  & Exh. 1.  Defendant received written and verbal direction in implementing the program from the

10  Treasury Department, including a form TPP that Defendant utilized through at least October,

11  2009.  Deposition of Tim Lightfoot, ECF No. 88-1, at 10:20-12:15, 21:12-22:3, 30:7-17, 43:6-14.

12          Plaintiff Marie Gaudin owns a condominium subject to a mortgage loan that has been

13  serviced by Defendant since December 2006.  Monsivais Decl., at ¶ 23; Declaration of Plaintiff

14  Marie Gaudin in Support of Motion for Class Certification ("Gaudin Decl."), ECF No. 74, at ¶ 4.

15  In April 2009, Plaintiff provided income and other information to Defendant's representatives for

16  a potential HAMP modification.  Monsivais Decl., at ¶ 24; Gaudin Decl., at ¶¶ 6-7.  In May 2009,

17  Saxon sent Plaintiff the subject TPP offer as part of a standard HAMP application package.

18  Monsivais Decl., at ¶ 24; Gaudin Decl., at ¶ 8.  The Court described the provisions of the TPP in a

19  previous order:

20              Gaudin's TPP bears an "effective date" of June 1, 2009, and is titled,
            "Home Affordable Modification Trial Period Plan." Immediately
21          below the title is a parenthetical stating, "Step One of Two–Step
            Documentation process." The first full paragraph of text provides, in
22          relevant part, "if I am in compliance with this Trial Period Plan (the
            "Plan") and my representations in Section 1 continue to be true in all
23          material respects, then the Lender will provide me with a Home
            Affordable Modification Agreement . . . ." (Emphasis added.)  The
24          second paragraph continues, "I understand that after I sign and
            return two copies of this Plan to the Lender, the Lender will send me
25          a signed copy of this Plan, if I qualify for the Offer or will send me
            written notice that I do not qualify for the Offer.  This plan will not
26          take effect unless and until both I and the Lender sign it and Lender
            provides me with a copy of this Plan with the Lender's signature."
27          (Emphasis added.)  The TPP is in fact signed by both Gaudin and
            the lender, thereby implying that the lender found Gaudin to be
28          qualified for a permanent loan modification.

United States District Court
Northern District of California

3

Paragraph 2 G of the TPP is also relevant to evaluating Saxon's potential obligations. It provides:

> I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of the a Modification agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan. I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as necessary, to ensure that the modified mortgage Loan retains its first Lien position and is fully enforceable. (Emphasis added).

> Finally, paragraph 3 of the TPP provides that the lender will make certain specified adjustments to calculate the new monthly payment amount. Then, "[i]f I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date." The paragraph concludes by explaining that upon execution of the Modification Agreement the TPP terminates and that the modified loan agreement thereafter governs the relationship between the parties.

Order Denying Motion to Dismiss Amended Complaint ("Second Order"), ECF No. 51, 2011 WL 5825144, at *2-3 (Nov. 17, 2011). Plaintiff signed and submitted the TPP, and Defendant countersigned it and returned it to her. Gaudin Decl., at ¶¶ 8-10. Plaintiff made the three monthly payments called for in the TPP, and continued making the monthly payments thereafter, eventually making 13 such payments. Gaudin Decl., at ¶¶ 12-13. Defendant later notified Plaintiff that it would not provide her with a loan modification – at first, on the erroneous grounds that she had not made her payments, but ultimately, on the grounds that she did not qualify for HAMP because her income was too low. Gaudin Decl., at ¶¶ 12-14; Monsivias Decl., at ¶ 26. Defendant claims that Plaintiff initially misstated her income in her conversations with Defendant. Monsivais Decl., at ¶¶ 24-26. Plaintiff denies this. Reply Declaration of Plaintiff Marie Gaudin, ECF No. 96, at ¶ 5.

**B.     Procedural Background**

Plaintiff brought a proposed class action complaint in April 2011, bringing causes of action for breach of contract/implied covenant of good faith and fair dealing, rescission and restitution pursuant to Cal. Civ. Code §§ 1688-89, violation of the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal Civ. Code §§ 1788 *et seq.*, and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  ECF No. 1.  Defendant moved to dismiss because, *inter alia*, the TPP was not an enforceable contract.  ECF No. 12.  The Court concluded that "the face of the document . . . strongly suggests" that it was an enforceable commitment, and that at least at the pleading stage Defendant had not shown that it failed for lack of consideration or indefinite terms.  Order Granting Motion to Dismiss, with Leave to Amend ("First Order"), ECF No. 36, 820 F. Supp. 2d 1051, 1053 (N.D. Cal. 2011).  However, after concluding that the TPP "was not, in and of itself a permanent modification, or an unconditional commitment by the lender to provide one," the Court dismissed the complaint without prejudice because Plaintiff "has not alleged that all of the conditions under which Saxon might be obligated to provide her a lender-executed permanent modification agreement were actually satisfied."  Id.

Plaintiff filed an amended complaint, bringing the same claims but this time expressly alleging that the TPP conditions had been satisfied.  FAC, at ¶¶ 29-30.  Defendant again moved to dismiss.  ECF No. 41.  Since "the original complaint was dismissed on grounds that Gaudin had entirely failed to allege satisfaction of the conditions set forth in the TPP, and "[t]he amended complaint remedie[d] that defect," the Court denied the motion.  Second Order, 2011 WL 5825144, at *4 (N.D. Cal. Nov. 17, 2011).  The Court also stated that:

> As the order dismissing the original complaint found, the TPP makes very clear that it is not, in and of itself, a loan modification nor is it an *unconditional* commitment by the lender to provide one. Saxon insists that any obligations it had under the TPP were limited to evaluating Gaudin's eligibility for a loan modification under the federal guidelines of the HAMP program, and to provide her a loan modification agreement if and only if she proved to be eligible under those guidelines and had otherwise complied with all her obligations under the TPP.  The flaw in Saxon's argument is that express language of the TPP simply does not include any such limitation or condition.  To the contrary, the TPP indicates that while it may initially be presented to the borrower only as an offer to determine eligibility, once the lender returns a signed copy of it to the borrower

United States District Court
Northern District of California

(rather than notifying the borrower that he or she does not "qualify for the Offer"), then the borrower's eligibility for permanent modification has been determined, and the only remaining contingencies are those listed specifically in the TPP and summarized above.

Saxon flatly states that, "[t]he TPP conditions Plaintiff's ability to obtain a permanent loan modification agreement on a number of factors, including . . . Plaintiff meeting all of the conditions required for modification under the HAMP guidelines," but it has pointed to no language in the TPP embodying such a limitation. While, as noted above, paragraph 2G requires the borrower to "meet all of the conditions required for modification," there is no indication that any of those conditions are to be found outside the four corners of the TPP. Additionally, to the extent that language arguably could be understood as referring to some broader (and unstated) rules for eligibility under HAMP or otherwise, then the lender's return of the signed TPP implies the borrower has been found to be qualified under such criteria.

Id., 2011 WL 5825144, at *3-4. Plaintiff then filed this motion for class certification.

## C.     Jurisdiction

This Court has jurisdiction pursuant to the provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.*

## D.     Legal Standard

Class certification under Rule 23 is a two-step process. First, Plaintiff must demonstrate that the four requirements of 23(a) are met: "numerosity," "commonality," "typicality," and "adequacy." "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, --- U.S. ---, 131 S.Ct. 2541, 2551 (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) are met. Here, Plaintiff invokes 23(b)(3), which requires plaintiffs to prove the elements of

"predominance" and "superiority": "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met. See Wal–Mart, 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

In addition, "[w]hile it is not an enumerated requirement of Rule 23, courts have recognized that "in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." Vietnam Veterans of Am. v. C.I.A., 288 F.R.D. 192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir.1970)). "[A] class definition is sufficient if the description of the class is 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.'" Vietnam Veterans, 288 F.R.D. at 211 (quoting O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998)).

## II.    ANALYSIS

### A.    Defined and Ascertainable Class

Plaintiff argues, and Defendant does not dispute,[2] that she has satisfied this requirement since Defendant's records identify each individual borrower who fits within the class. See Declaration of Peter Fredman, Esq. in Support of Motion for Class Certification and Appointment of Class Counsel, ECF No. 84, at ¶¶ 8-9. It is administratively feasible to ascertain whether

---

[2] Defendant's opposition brief contains no section specifically disputing that a class is ascertainable, but it does state in a footnote that the arguments it raises in opposition to commonality also apply to the requirement that there be an ascertainable class. Saxon Mortgage Services, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification and Appointment of Class Counsel ("Opp."), at 13:17, n. 22. Defendant does not raise any arguments relating to an ascertainable class beyond those that apply to commonality, however, and as discussed at III-C, infra, the Court finds that commonality is satisfied.

7

United States District Court
Northern District of California

individuals are members of the class.

**B.      Numerosity**

Plaintiff argues, and Defendant does not dispute, that the number of potential class members is large enough that the "joinder of all members is impracticable." Fed R. Civ. Pro. 23(a)(1).  After reviewing the large number of potential class members, the Court agrees.

**C.      Commonality**

"[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do.  Wal-Mart, 131 S. Ct. at 2556 (internal citation omitted).  Where questions common to class members present significant issues that can be resolved in a single adjudication "there is clear justification for handling the dispute on a representative rather than on an individual basis." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997) (internal quotation marks and citation omitted). However, the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S.Ct. at 2551. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 131–132 (2009)).

Here, there are significant common questions of law and fact concerning the nature and scope of the TPP.  Motion, at 14:25-27 ("everyone in the Class entered into the same TPP with Saxon and made at least the three trial payments it called for but did not obtain the loan modification.")  Among these questions are the following:  (1) "Saxon's uniform practices, including its admission that it did not consider the TPP legally binding", Motion at 17:27-28; (2) whether the TPP is an enforceable contract, once it has been fully executed, see Motion at 2:14-15, 16:8-11, 16:23-24; and if it became binding when executed, "whether the Class may recover some or all of their trial payments, nominal damages, or any other remedies under California law", id. at 16:27-17:1, see also id. at 17:10-12 ("the legal nature, meaning and effect of the TPP, and, as applicable, the remedy available for Saxon's failure to honor it"); and, with

8

respect to Plaintiffs' UCL claim, "whether the public would likely be deceived," id. at 19:24-20:2.

The parties strongly dispute the nature and scope of the TPP. To Defendant, it was merely an *application* for a loan modification, and any obligations Defendant incurred were contingent upon it further investigating and determining whether the applicant's circumstances qualified the applicant for inclusion in the program. To Plaintiff, it was a *binding contract*, which, after being signed and countersigned by both parties, affirmed that Defendant would provide a loan modification if Plaintiff made the three TPP payments. By determining whether the TPP is an enforceable contract and whether the parties' performance obligations are fully contained within it, the Court can resolve an issue central to the viability of the Proposed Class Members' claims.

**D.      Typicality and Adequacy of Representation**

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Id. (quoting Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal.1985). "The adequacy of representation requirement . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).

"The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." Amchem, 521 U.S. at 626, n. 20 (1997) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158, n. 13 (1982). Among other functions, these requirements serve as ways to determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Falcon, 457 U.S. at 158, n. 13.

Plaintiff's alleged injury is similar to, even precisely the same as, the injury for which class counsel will seek redress on behalf of all other members of the Proposed Class. Defendant's

issuance and countersigning of the TPP constitutes a single course of conduct to which all Class Members were subject.   Plaintiff's claims are sufficiently interrelated to the interests of the other Class Members.

Defendant argues that Plaintiff is subject to unique defenses because Defendant will argue that she misrepresented her income in her TPP application.   The Court is not convinced that this threat rises to a level posing "a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."   Hanon, 976 F. 2d at 508.   Defendant's argument is similar to the same arguments it intends to raise in response to all Class Members: it will argue that, even after the TPP was signed and countersigned, Defendant was still legally permitted to refuse to provide a loan modification for various reasons.   This defense does not defeat typicality.

Defendant also argues that Plaintiff cannot establish typicality and adequacy of representation because other members of the Proposed Class may not benefit from the relief Plaintiff is seeking.   For example, Defendant argues that some Class Members may not benefit from the remedy of rescission and restitution, because they may have benefitted from paying the lower TPP payments and may not want to be returned to the *status quo ante*.   Plaintiff's complaint, motion, and reply brief could be clearer in describing the theory of damages she will seek on behalf of the Proposed Class.   However, the Court does not understand Plaintiff to be committed to seeking rescission and restitution as the only remedy she will seek for all Class Members.   See FAC 13:3-23  (seeking, among other relief, rescission, restitution, monetary damages, and statutory damages).   In any case, typicality is primarily an inquiry into alignment of interest rather than an investigation into the forms of relief for which the named plaintiff has prayed.   See Hanon, 976 F.2d at 508; see also Simpson v. Fireman's Fund Ins. Co., 231 F.R.D. 391, 396 (N.D.Cal. 2005) ("In determining whether typicality is met, the focus should be 'on the defendants' conduct and plaintiff's legal theory,' not the injury caused to the plaintiff") (quoted approvingly in Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 734 (9th Cir. 2007).   "[A] class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings."   Newberg on Class Actions § 4:54 (5th ed.).   The Court can also at a later stage certify subclasses of plaintiffs depending upon their particular situations, if it turns out

10

to be necessary.  At this stage, the Court can conclude that Plaintiff's interest and injury are sufficiently typical of those possessed by the Proposed Class Members, and that she will adequately represent their interests in this litigation.

**E.      Predominance and Superiority**

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., --- U.S. ---, 131 S. Ct. 2179, 2184 (2011).  In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative defenses); then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried.  See Schwarzer, et al., Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:412.  The predominance inquiry requires that plaintiff demonstrate that common questions predominate as to each cause of action for which plaintiff seeks class certification.  Amchem, 521 U.S. at 620.

The Court analyzes each of the causes of action brought by Plaintiff in turn.

**1.      Breach of Contract**

"The elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011).  Plaintiff submits that "common issues predominate . . . because interpretation of the TPP is a matter of law," and that because the Proposed Class and Defendant "each executed the same TPP document, the questions pertaining to its nature, meaning and effect may be 'resolved with one stroke.'" Motion, at 16:13-14.  The question under 23(b)(3) is whether this common question predominates over individual questions.

Defendant argues that proving breach of contract will require individualized determinations going to each of the four elements of breach of contract.  Namely, it argues that the Court will need to determine whether each Class Member provided sufficient consideration (and thereby whether a contract existed), whether each Class Member performed her obligations under the contract (and therefore whether Defendant breached) and the amount of damages owed.

### a. Performance

Plaintiff's theory of the case is that the TPP is an enforceable contract and that it contains within it all of the obligations necessary to determine breach and performance.  See Transcript of Proceedings, ECF No. 100, at 23:20-24:1.  If that legal question is resolved in its favor, there are no individualized issues going to performance that remain to be addressed.  The question can be resolved with a legal determination that is common to the Proposed Class.

Plaintiff also argues in the alternative that, if there any other conditions on Defendant's obligation to perform, it is only those – as the Court said in its second order – that are "listed specifically in the TPP."  Second Order, 2011 WL 5825144, at *3; see also Reply Br., at 11:10-21.  The only performance obligations cited by Defendant that are in the TPP are that "[i]f prior to the prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate."  The Class Members by definition satisfy the first two of these categories.  The third condition incorporates by reference the lender's representations from Section 1 of the TPP, namely that:

A.  I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

B.  I live in the Property as my principal residence, and the Property has not been condemned;

C.  There has been no change in the ownership of the Property since I signed the Loan Documents;

D.  I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

E.  Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

F.  If Lender requires me to obtain credit counseling, I will do so.

United States District Court
Northern District of California

TPP, at 1.  To determine whether an individual lender performed under the alleged contract, the Court will need to determine individually not *whether* each of these representations were true, but whether the Lender *determined* that these representations were no longer true and correct.  This can be ascertained reasonably easily from the available evidence.  Defendant's records reveal that it did not deny modifications to borrowers for the reasons listed in Section 1-C, 1-E or 1-F.  Monsivias Decl., at ¶ 19.  Defendant only denied modifications to a single borrower for reasons relating to Section 1-A, denied modification to about 1% of Proposed Class Members for reasons relating to 1-B, and denied modification to about 9% of Proposed Class Members for reasons relating to 1-D.  Id.  Therefore, even on Plaintiff's secondary theory of the case, for at least 90% of the Proposed Class, it does not appear that individualized determinations will be necessary to determine performance.

### b.    Breach

Defendant's brief does not appear to cite individualized issues going to breach beyond those that form the other side of the coin of performance.  See Opp., at 19:7-19.  That is to say, Defendant argues that it can only unjustifiably fail to perform where the lender fulfilled the requirements of the alleged contract.  This begs the question discussed *supra*.

### c.    Consideration

"[T]o find consideration . . . the promisee must confer (or agree to confer) a benefit or must suffer (or agree to suffer) prejudice."  Steiner v. Thexton, 48 Cal. 4th 411, 420-21 (2010).  Defendant argued in both of its motions to dismiss that Plaintiff failed to incur any obligation because she had a pre-existing duty to make her mortgage payments.  The Court rejected this argument twice.   First Order, 820 F.Supp. 2d at 1054; Second Order, 2011 WL 5825144, at *4.  The first time, the Court agreed with the reasoning of another court in this district that "the TPP payments are sufficient consideration and the additional consideration suffered was the credit

13

consequences of their partial mortgage payments and fulfilling the burdensome documentation requirements of the loan modification approval process." Lucia v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 1059, 1067 (N.D. Cal. 2011) (although that court held the consideration was sufficient to support the existence of the contract to participate in the TPP for the three month trial period, but not a contract for permanent modification after the trial period expired). The second time, this Court went on to note that "[a]dditionally, by promising to comply with the terms of the TPP, Gaudin exposed herself to greater liability for interest and late charges should permanent modification not be consummated." Second Order, 2011 WL 5825144, at *4.

Defendants now contend that "[a]lthough Saxon maintains that Plaintiff cannot demonstrate consideration, at a minimum, the issue of consideration is individualized," and that the Court must determine whether each borrower was exposed to additional interest or charges, and whether any borrowers suffered negative credit consequences. If Plaintiff intends to argue that certain specific borrowers incurred legal detriment for reasons other than incurring the obligations in the TPP, then the Court agrees that individualized issues would predominate. But the Court understands Plaintiff to be arguing that incurring the obligations *in the TPP itself* constitutes valid consideration. That legal question can be resolved on a class-wide basis. If the question is resolved in Defendant's favor, then the class would be ripe for decertification, since the Court is unlikely to allow Plaintiffs to argue on a class-wide base that individual plaintiffs tendered sufficient consideration because of their particular circumstances. But if the common question is resolved in Plaintiff's favor, no individualized determination into the lenders' particular circumstances will be necessary.

### d.   Damages

Even if it would require the court to consider the underlying merits of a case, a court must "entertain arguments against [a Plaintiff's] damages model," where those arguments "[bear] on the propriety of class certification." Comcast Corp. v. Behrend, --- U.S. ---, 133 S. Ct. 1426, 1432

14

(2013).  However, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Indus. Inc., --- F.3d ---, Case No. 11-56849, 2013 WL 2306567, at *3 (9th Cir. May 28, 2013).

Defendant relies heavily on Comcast, in which the plaintiff's "[damages] model assumed the validity of all four theories of antitrust impact initially advanced by [plaintiffs]," even though only one of those theories remained in the case. Comcast, 133 S. Ct. at 1434.  Plaintiff proposes no calculation that would assess damages on the basis of dismissed or abandoned theories of liability.

Beyond a citation to the Eastern District of Kentucky, Defendants cite no authority in which courts found that individual damages issues predominated in similar situations.  Even in that case, the court denied certification because plaintiffs "have offered no manageable way to calculate damages across the entire class." Cowden v. Parker & Associates, Inc., Case No. CIV.A. 5:09-323-KKC, 2013 WL 2285163, at *7 (E.D. Ky. May 22, 2013).  In this case, the calculation of damages, if plaintiffs prevail, does not appear to be an obstacle.

"Courts in every circuit have . . . uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." 2 Newberg on Class Actions § 4:54 (5th ed.)  "Indeed, a class may also be certified solely on the basis of common liability, with individualized damages determinations left to subsequent proceedings." Id.  Given this standard, and the Court's understanding of Plaintiff's theory of damages, common issues predominate over individualized damage assessments.

**2.      Rescission and Restitution**

Restitution is "synonymous" with unjust enrichment, and "there is no cause of action in California for unjust enrichment." Melchior v. New Line Prods., Inc., 106 Cal. App. 4th 779, 793, (2003).  As for rescission, it is available under Cal. Civ. Code § 1689 when, inter alia, "the consent of the party rescinding . . . was given by mistake, or obtained through duress, menace,

fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds," or "[i]f the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds."  Proving this will involve substantially the same issues discussed *supra*, and the common issues predominate over individualized inquiries.

### 3.   Rosenthal Act

The Rosenthal Act creates state-law liability for a "debt collector collecting or attempting to collect a consumer debt," Cal. Civ. Code § 1788.17, who fails to comply with requirements of the Federal Debt Collections Practices Act ("FDCPA"), at 15 U.S.C. §§ 1692b-1692j.  15 U.S.C. § 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt."

Proving that Defendant made false representations or deceptive means to collect debt will mainly involve an inquiry into the nature of the TPP itself and Defendant's uniform practices related to issuing it to borrowers and countersigning it.  Defendant points out that Plaintiff's motion does mention other allegedly deceptive practices Defendant engaged in when it made other verbal and written communications to Plaintiff.  Opp. at 23:5-12.  Again, however, the Court understands Plaintiff to be arguing on that she can prove the falsity or deceptiveness of Defendant's practices from the four corners of the TPP itself and from Defendant's uniform practices.  On that understanding, common issues predominate.

Defendant argues that the Court will need to engage in an individualized inquiry to determine whether each borrower was in default at the time Defendant began serving his or her loan, because only borrowers so situated may bring a Rosenthal Act claim.  This determination would be a relatively simple one to undertake, and so it does not defeat predominance.  But in any case, it appears that the Rosenthal Act, unlike the FDCPA, does not require a borrower to be in default to bring a claim.  "Despite the overlap between the federal and state statutory schemes, the

16

definition of 'debt collector' is broader under California law" than it is under the FDCPA. <u>Selby</u> <u>v. Bank of Am., Inc.</u>, Case No. 09CV2079 BTM JMA, 2010 WL 4347629, at *6 (S.D. Cal. Oct. 27, 2010). The FDCA's definition of 'debt collector' specifically excludes those who collect "a debt which was not in default at the time it was obtained," but the Rosenthal Act's definition of 'debt collector' does not contain this limitation. <u>Compare</u> 15 U.S.C. § 1692a(6)(F)(iii) <u>with</u> Cal. Civ. Code § 1788.2(c).

Determining damages from the proposed Rosenthal Act violation may not be as formulaic as Plaintiff suggests. <u>See</u> Transcript of Proceedings, ECF No. 100, at 10:21-22. The $500,000 statutory damages amount in 15 U.S.C § 1692k(a)(2)(B) is a ceiling rather than an automatic entitlement. <u>See</u> Cal. Civ. Code § 1788.17 (incorporating "the remedies in Section 1692k" into the Rosenthal Act). But, for the same reasons discussed *supra*, the need to engage in an individualized damages inquiry does not defeat class certification.

### 4. UCL

"[U]nder the [UCL] 'there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent.'" <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 311 (2009) (<u>quoting</u> <u>Daugherty v. American Honda Motor Co., Inc.</u> 144 Cal.App.4th 824, 837 (2006)).

#### a. Unlawful Practices

"[U]nder the unlawful prong, the UCL ''borrows' violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.'" <u>Aryeh v.</u> <u>Canon Bus. Solutions, Inc.</u>, 55 Cal. 4th 1185, 1196 (2013) (<u>quoting</u> <u>Cel–Tech Communications,</u> <u>Inc. v. Los Angeles Cellular Telephone Co.</u>, 20 Cal.4th 163, 180 (1999)). Plaintiff's unlawful practices claim on her Rosenthal Act claim, and proving it will require the same proof. For the same reasons discussed at III-E-3, *supra*, common issues predominate.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17

### b.   Unfair Practices

Considering whether a business practice violates the UCL's unfair practices prong requires either that the court balance the practice's harm to the consumer against the benefit to the defendant, or else consider whether the practice violates the letter or spirit of a legislatively declared policy or poses an actual or threatened impact on competition.  See Lozano, 504 F.3d at 735-37.  In either case, as above, proving the claim will primarily require an investigation into the TPP itself and Defendant's uniform practices.  Plaintiff argues that Defendant's "systematic breach" of the TPP constitutes an unfair practice, and as discussed at III-E-1, *supra*, common issues predominate in determining that breach.  Determining whether the breach constitutes an "unfair practice" within the meaning of the UCL does not require an individualized inquiry that would predominate over the common issues.

### c.   Fraudulent Practices

"[T]o state a claim under . . . [the UCL's fraudulent prong] it is necessary only to show that members of the public are likely to be deceived."  Kasky v. Nike, Inc., 27 Cal. 4th 939, 951, (2002) (internal quotation omitted).  "The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud," a "distinction [that] reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices."  In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009).

For much the same reasons discussed above, common issues predominate in determining whether the practices at issue were "fraudulent" under the UCL.  As above, Defendant objects to the fact that the FAC mentions certain other allegedly fraudulent communications that were specifically made to Plaintiff and not to other members of the Proposed Class.  To the extent that Plaintiff seeks to recover under the UCL based on practices that were specific to her or on other practices that were specific to other individual members of the class, she is unlikely to be able to

18

maintain a certified class.  But to the extent that Plaintiff makes her claim on the basis of the TPP itself and Defendant's uniform practices as they apply generally to the Proposed Class, there is no predominance obstacle.

### 5.    Superiority

A class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir. 1998).  There is no reason to think any alternative procedures for adjudicating the claims of the individual class members would be superior to a class action proceeding.  Even if proposed Class Members could still maintain individual actions not barred by the applicable statute of limitations, it would not be fairer or more efficient for them to do so.

"[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'"  Hanlon, 150 F.3d at 1022 (quoting 7A Wright & Miller, Federal Practice & Procedure § 1777 (2d ed.1986)).  This is the case here.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff Marie Gaudin's motion to certify a class of California borrowers who entered into HAMP TPPs with Saxon effective on or before October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications.

/ / /

/ / /

/ / /

/ / /

1

2

3

        The Court also GRANTS Plaintiff's motion to appoint Plaintiff's counsel, Daniel
Mulligan, Esq. of Jenkins Mulligan & Gabriel LLP and Peter Fredman, Esq. of the Law Office of
Peter Fredman, as counsel for the aforementioned class.

4

        **IT IS SO ORDERED**.

5

Dated: August 3, 2013

6

7

8

9

        _____
                        JON S. TIGAR
                United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California