UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIE GAUDIN,<br><br>    Plaintiff,<br><br>    v.<br><br>SAXON MORTGAGE SERVICES, INC.,<br><br>    Defendant. | Case No. 11-cv-01663-JST<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Re: ECF No. 132 |

In this certified class action concerning mortgage modifications, Plaintiff Marie Gaudin now moves for preliminary approval of a settlement pursuant to Federal Rule of Civil Procedure 23. ECF No. 132. The Court will grant the motion, grant preliminary approval of the plan of distribution of the settlement fund with the modifications discussed herein, and direct the distribution of class notice.

**I.      BACKGROUND**

**A.      Factual Background**

In October 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-343, 122 Stat. 3765. "The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures.'" Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 556 (7th Cir. 2012) (citing 12 U.S.C. § 5219(a)). "Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure." Id. This program, the Making Home Affordable

1   ("MHA") program, included the Home Affordable Modification Program ("HAMP") as one of its
2   central components.
3       HAMP is a program designed to induce servicers to provide permanent loan modifications
4   to borrowers who are in default or at risk of default. Wigod, 673 F.3d at 556; Corvello v. Wells
5   Fargo Bank, N.A., 728 F.3d 878, 880 (9th Cir. 2013). Under HAMP, mortgage servicers receive
6   financial incentives from the government for each permanent modification they provide. Wigod,
7   673 F.3d at 556. The program is designed to authorize modifications when it is (1) possible to
8   create an alternate payment schedule that is affordable for the borrower given his or her income,
9   and (2) financially profitable for the investor. Id. at 557. To accomplish these goals, the program
10  provides that a loan modification is warranted only if the borrower meets certain income
11  requirements and other criteria, and if a net present value assessment shows that a modified
12  mortgage would produce a greater return to the servicer than an unmodified mortgage. Id. Once
13  the mortgagor has decided that a loan modification would be more beneficial, the borrower is
14  placed on a Trial Period Plan ("TPP") that resembles an estimate of what the mortgage payments
15  would be if the loan modification were approved. See Making Home Affordable Program,
16  Handbook for Servicers of Non-GSE Mortgages 13 (version 4.1 2012), available at
17  https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_41.pdf at 118.
18  According to the MHA Handbook, "[b]orrowers who make all trial period payments timely and
19  who satisfy all other trial period requirements will be offered a permanent modification." Id.
20      Defendant Saxon entered into an agreement with the U.S. Treasury Department to
21  participate in HAMP in April 2009. Gaudin v. Saxon Mortgage Servs., Inc., 297 F.R.D. 417, 421
22  (N.D. Cal. 2013). Plaintiff Marie Gaudin owns a condominium subject to a mortgage loan that
23  has been serviced by Defendant since December 2006. Id. In April 2009, Plaintiff provided
24  income and other information to Defendant's representatives in order to apply for a HAMP
25  modification. Id. at 422. In May 2009, Saxon sent Plaintiff the subject TPP offer as part of a
26  standard HAMP application package. Id. Plaintiff signed and submitted the TPP, and Defendant
27  countersigned it and returned it to her. Id. Plaintiff made the three monthly payments pursuant to
28  the TPP, and continued making the monthly payments thereafter, altogether making 13 such

United States District Court
Northern District of California

1  payments. Id. Although Plaintiff allegedly complied with the terms of the TPP, Defendant denied
2  Plaintiff a permanent loan modification. Id.

### B. Procedural Background

Plaintiff filed a proposed class action complaint in April 2011, bringing causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing ("the breach of contract claims"), rescission and restitution pursuant to Cal. Civ. Code §§ 1688-89, violation of the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code § 1788 *et seq.*, and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* ECF No. 1.

Defendant moved to dismiss the complaint, arguing that the TPP did not constitute an enforceable contract. ECF No. 12. The Court concluded that "the face of the document . . . strongly suggests" that it was an enforceable commitment, and that at least at the pleading stage Defendant had not shown that it failed for lack of consideration or indefinite terms. Gaudin v. Saxon Mortgage Servs., Inc., 820 F. Supp. 2d 1051, 1053 (N.D. Cal. 2011) ("Gaudin I"). However, after concluding that the TPP "was not, in and of itself a permanent modification, or an unconditional commitment by the lender to provide one," the Court dismissed the complaint without prejudice because Plaintiff "has not alleged that all of the conditions under which Saxon might be obligated to provide her a lender-executed permanent modification agreement were actually satisfied." Id. at 1054.

Plaintiff filed an amended complaint, bringing the same claims but this time expressly alleging that the TPP conditions had been satisfied. ECF No. 39 at ¶¶ 29-30. Defendant again moved to dismiss. ECF No. 41. Because "the original complaint was dismissed on grounds that Gaudin had entirely failed to allege satisfaction of the conditions set forth in the TPP, and "[t]he amended complaint remedie[d] that defect," the Court denied the motion. Gaudin v. Saxon Mortgage Servs., Inc., No. 11-1663, 2011 WL 5825144, *4 (N.D. Cal. Nov. 17, 2011) ("*Gaudin II*"). The Court stated that:

> As the order dismissing the original complaint found, the TPP makes very clear that it is not, in and of itself, a loan modification nor is it an

3

>*unconditional* commitment by the lender to provide one.  Saxon insists that any obligations it had under the TPP were limited to evaluating Gaudin's eligibility for a loan modification under the federal guidelines of the HAMP program, and to provide her a loan modification agreement if and only if she proved to be eligible under those guidelines and had otherwise complied with all her obligations under the TPP.  The flaw in Saxon's argument is that express language of the TPP simply does not include any such limitation or condition.  To the contrary, the TPP indicates that while it may initially be presented to the borrower only as an offer to determine eligibility, once the lender returns a signed copy of it to the borrower (rather than notifying the borrower that he or she does not "qualify for the Offer"), then the borrower's eligibility for permanent modification has been determined, and the only remaining contingencies are those listed specifically in the TPP and summarized above.
>
>Saxon flatly states that, "[t]he TPP conditions Plaintiff's ability to obtain a permanent loan modification agreement on a number of factors, including . . . Plaintiff meeting all of the conditions required for modification under the HAMP guidelines," but it has pointed to no language in the TPP embodying such a limitation.  While, as noted above, paragraph 2G requires the borrower to "meet all of the conditions required for modification," there is no indication that any of those conditions are to be found outside the four corners of the TPP.  Additionally, to the extent that language arguably could be understood as referring to some broader (and unstated) rules for eligibility under HAMP or otherwise, then the lender's return of the signed TPP implies the borrower has been found to be qualified under such criteria.

Id., *2-3.[1]

Plaintiff then filed a motion asking the Court to certify a class consisting of:

> All California residential mortgage borrowers who (a) entered into Homeowner Affordable Modification Program (HAMP) Trial Period Plans (TPPs) with Saxon Mortgage Services, Inc. effective on or before October 1, 2009, and (b) made at least three trial period payments, but (c) did not receive HAMP loan modifications.

ECF No. 81.  The Court concluded that certification was appropriate, as the class satisfied the numerosity, commonality, typical, and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3).  On August 5, 2013, the Court certified a class. ECF No. 102.

Defendant sought interlocutory appeal of the Court's certification order before the Ninth

---

[1] In August 2013, the Ninth Circuit decided Corvello v. Wells Fargo Bank, N.A., holding on similar facts that a bank was contractually required to offer the plaintiffs a permanent mortgage modification after they complied with the requirements of a trial period plan. 728 F.3d 878, 884 (9th Cir. 2013).

4

Circuit Court of Appeals pursuant to Rule 23(f).  See ECF No. 104.  The Ninth Circuit denied the motion.  ECF No. 111.  Following this denial, the parties entered into settlement negotiations.  Declaration of Peter Fredman ("Fredman Decl."), ECF No. 133 at ¶ 7.  The parties engaged in an unsuccessful full-day mediation session before the Honorable Ronald Sabraw (Ret.) of JAMS on February 4, 2014.  Id.  The parties exchanged "detailed settlement offer letters articulating their legal and factual positions" during June and July of 2014.  Id.  Finally, as a result of continuing verbal negotiations, the parties reached a settlement in principle that was memorialized in a memorandum of understanding executed on December 8, 2014.  Id.

On March 13, 2015, Plaintiff filed a notice of settlement of this action.  ECF No. 129.  On April 9, 2015, Plaintiff filed the present motion, asking the Court to grant preliminary approval of the settlement.  ECF No. 132.

### C.     Jurisdiction

This Court has jurisdiction pursuant to the provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.*

## II.    PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

### A.     Legal Standard

The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions.  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992).  Courts generally employ a two-step process in evaluating a class action settlement.  First, courts make a "preliminary determination" concerning the merits of the settlement.  See Manual for Complex Litigation, Fourth ("MCL, 4th") § 21.632 (FJC 2004).  "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge."  Class Plaintiffs, 955 F.2d at 1276.

The Court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval."  In re Tableware Antitrust Litig., 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quotation omitted); see also MCL, 4th § 21.633 (explaining that courts "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed

settlement, and date of the final fairness hearing."). Second, courts must hold a hearing to make a final determination of whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Here, Plaintiff asks the Court to take the first step in granting preliminary approval of the proposed settlement.

Preliminary approval of a settlement is appropriate if "[1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of possible approval." In re Tableware, 484 F. Supp. 2d at 1079 (quotation omitted). The proposed settlement need not be ideal, but it must be fair and free of collusion, consistent with a plaintiff's fiduciary obligations to the class. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1027 (9th Cir. 1998) (explaining that "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). To assess a settlement proposal, courts must balance a number of factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the state of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

See id. at 1026 (citations omitted); see also Molski v. Gleich, 318 F.3d 937, 953 (9th Cir. 2003). The proposed settlement must be "taken as a whole, rather than the individual component parts" in the examination for overall fairness. Id. Courts do not have the ability to "delete, modify, or substitute certain provisions" because the settlement "must stand or fall in its entirety." Id.

### B. Proposed Settlement and Plan of Distribution

Plaintiff asks the Court to approve a settlement in the amount of $4.5 million. See Plan of Distribution, ECF No. 132-1. Attorneys' fees, litigation expenses, settlement administration costs, and a service award will be paid from the settlement fund. Id. If Plaintiff's requested amounts are approved, $3,081,817 of the settlement fund will remain for distribution to the class members after deduction of these amounts. Id. The funds remaining will be distributed to class members on both

a global and a tiered basis. Id. "Tier 1" consists of class members who lost their homes to foreclosure or short sale without first being offered a loan modification of any type. Tier 1 class members will participate in the tiered distribution based on a pro rata share of two months' TPP payments. Id. "Tier 2" consists of class members who entered into a non-HAMP loan modification at any time. Tier 2 class members will participate in the tiered distribution based on a pro rata share of one month's TPP payment. Id.

### C. Analysis

The factors set forth in In re Tableware Antitrust Litigation and Hanlon weigh in favor of granting preliminary approval of the settlement. First, nothing in the record suggests the settlement negotiation process was collusive. Defendants brought two rounds of motions to dismiss, vigorously opposed class certification before this Court, and unsuccessfully sought interlocutory appeal of this Court's certification decision. Settlement negotiations spanned eleven months, which included an unsuccessful all-day mediation before retired Judge Sabraw. Fredman Decl., ECF No. 133 at ¶ 7.

Second, the settlement amount has no obvious deficiencies, and is adequate when compared to class members' total potential damages in the case. Following Plaintiff's submission of the motion for preliminary approval, the Court requested supplemental briefing on the total potential damages recoverable from this litigation, ECF No. 139, because Plaintiff's motion had failed to detail what the total best case recovery would be for class members if they were able to prevail on each of their claims. In her supplemental briefing, Plaintiff estimates that class members will receive 13.66% of the total damages they would receive at trial should they prevail.[2] ECF No. 141 at 1.

As Plaintiff acknowledges, the potential recovery for the class could total tens of millions of dollars if the Court were to impose the maximum amount of potential penalties. Plaintiff, however, convincingly explains the difficulties the class would face in recovering the entirety of

---

[2] Plaintiff's supplemental briefing indicated that the best potential overall recovery of damages on all of the class members' claims would total $32,953,369. The gross settlement amount of $4.5 million is 13.66% of this maximum potential recovery.

1   the maximum potential recoverable damages.  As a general matter, it is not unreasonable for a
2   plaintiff to receive less in settlement than her total potential recovery at trial.  In re Omnivision
3   Techs., Inc., 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008).  The lesser amount reflects the risk
4   associated with trial, and also the time and effort that must be invested to go to trial.

   Given the complexity of this case, the time and effort required to recover the total possible damages would be substantial, and certain novel damages theories would make total recovery challenging.  "Other than statutory damages under the Rosenthal Act, Plaintiff's only viable measure of economic damages is restitution of their TPP payments, which would require overcoming a formidable 'preexisting duty' defense."  ECF No. 132 at 12.  Further, Plaintiff notes that obtaining benefit-of-the-bargain damages for those class plaintiffs who received an alternate non-HAMP modification would likely require proving that the TPP was a binding and enforceable contract to provide a loan modification at a specified monthly payment (not just to provide an "affordability"-based modification).  Id. at 13.  According to Plaintiff, the calculation of such benefit-of-the-bargain damages would be "highly complex, expensive, difficult, and vigorously contested at every step."  Id.  The Court recognizes that Plaintiff may face difficulties establishing breach of contract damages on a class wide basis.  Courts within this district have held that the payments made pursuant to a TPP agreement do not constitute damages supporting a claim for breach of contract.  See Reyes v. Wells Fargo Bank, N.A., No. 10-01667, 2011 WL 30759, *16 (N.D. Cal. Jan 3, 2011) (explaining that "where the money paid under an agreement was already owed under a prior agreement, it is not consideration and cannot support a claim for damages"); see also Sutcliffe v. Wells Fargo Bank, N.A., 283 F.R.D. 533, 553 (2012) (holding the reduced payments plaintiffs made under the TPP do not constitute damages because there was already a preexisting duty to make payments on the loan).

   Under these circumstances, the Court finds that Plaintiff has adequately explained why a gross settlement amount of $4.5 million is fair, adequate, and reasonable in light of the strength of Plaintiff's case, and the risk, expense, complexity, and likely duration of this litigation.

   Fourth, the Court finds that the settlement appears to fall within the range of possible approval.  Particularly, the stage of the proceedings weighs in favor of preliminary approval.  The

1  parties reached the settlement after nearly four years of vigorous litigation. The parties litigated
2  two motions to dismiss, class certification, and a petition to the Ninth Circuit. ECF No. 132 at 11.
3  Plaintiff engaged in extensive discovery and investigation both before and after class certification.
4  Class Counsel reviewed and analyzed approximately 25,000 pages of documents obtained through
5  discovery of electronically stored information, about 2,400 pages of Saxon documents pertaining
6  to its HAMP TPP and related loss mitigation policies and procedure, and several large
7  spreadsheets of Saxon data pertaining to the class member HAMP applications, loans, and TPP
8  payments. Id. at 5. The parties engaged in three separate rounds of settlement negotiations,
9  including an unsuccessful JAMS meditation with a retired judge. Id. at 11. After extensive arms-
10 length negotiations, the parties reached a settlement agreement of a maximum all-cash, non-
11 reversionary recovery for the class reasonably available under the circumstances.

      Finally, experienced counsel for both parties endorse the settlement. No governmental actor is relevant to this action, rendering the factor immaterial to the settlement approval process. The Court must wait until the final approval hearing to assess class members' reactions to the settlement.

      The Court also finds the parties' agreement with respect to attorneys' fees and service enhancement awards for named Plaintiff Marie Gaudin falls "within the range of possible approval." In re Tableware, 484 F. Supp. 2d at 1079. The Court will evaluate the requests for fees and service enhancement awards at the final approval hearing, after Plaintiff's counsel has filed his motion for fees and costs, and the class has an opportunity to object. The Court notes, however, that Plaintiff's request for attorneys' fees based on 30% of the gross settlement amount is above the "benchmark" of 25% that the Ninth Circuit has established for class action attorneys' fee awards. See In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 942 (9th Cir. 2011). The Court also notes that Plaintiff's request for a service enhancement award not to exceed $15,000 for representative Plaintiff Gaudin is above the $5,000 figure which is the typical enhancement award in this Circuit. See e.g., See Harris, 2012 WL 381202, at *7 ("Several courts in this District have indicated that . . . as a general matter, $5,000 is a reasonable amount.") (citations omitted); Ko v. Natura Pet Prods., Inc., No. C 09-02619 SBA, 2012 WL 3945541, at

1  *14-15 (N.D. Cal. Sept. 10, 2012) (denying a $20,000 enhancement award request, and instead

2  awarding $5,000; though class representative expended approximately 100 hours and attended

3  mediation, the average award to class members was $35); cf. Boring v. Bed Bath & Beyond, No.

4  12-CV-05259-JST, 2014 WL 2967474, at *3 (N.D. Cal. June 30, 2014) (holding that $7,500 was a

5  reasonable enhancement award when average payment to class members was approximately

6  $170.83; class representative traveled to, and attended mediation, risked backlash from defendant

7  (his employer), contributed a significant amount of time and energy to the litigation, and signed a

8  broader release than did other class members).

9        The Court need not, at this juncture, resolve the specific amount of attorneys' fees and incentive awards, since both matters will be finally determined at the fairness hearing. However, Plaintiff should be mindful of addressing these issues and providing appropriate detail and documentation in connection with their motion for final approval and motion for attorneys' fees and service enhancement award.

14        For the foregoing reasons, the Court will preliminarily approve the class action settlement.

## III. CONDITIONAL APPROVAL OF NOTICE PLAN

16        The class notice in a Rule 23(b)(3) class action must comport with the requirements of due process. "The plaintiff must receive notice plus an opportunity to be heard and participate in litigation, whether in person or through counsel." Philips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985). The notice must be "the best practicable," "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id. (citations omitted). "The notice should describe the action and the plaintiffs' rights in it." Id. Rule 23(c)(2)(B) provides, in relevant part:

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

27        Additionally, "an absent plaintiff [must] be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to

the court." Shutts, 472 U.S. at 812.

The parties propose to use Gilardi & Co. as the claims administrator for the class. ECF No. 133-2. Gilardi & Co. will: cause the Notice of Settlement to be sent by first class mail to each member of the class at the best available address it has or can obtain through reasonable effort; conduct reasonable searches to determine a class member's address if the notice is returned as undeliverable; publish the settlement documents and information on the class website, www.saxonmortgagehampclassaction.com; establish a toll-free telephone number with interactive voice response and rollover to live operators for class member inquiries and requests for documentation and route inquiries to class counsel as appropriate; process requests for exclusion, objection, and supplemental claims; calculate the amounts that each settlement class member is entitled to recover; perform certain tax-related services; process and transmit award distributions to settlement class members; issue new checks upon request of settlement class members; and provide a final report to counsel for the parties. See ECF No. 129-1, 132-1. In return, the parties propose to compensate Gilardi & Co. $28,140 from the gross settlement amount. ECF No. 132 at 1. The Court approves Gilardi & Co. as the settlement administrator for the proposed settlement.

Although settlement class members are not required to take any action to receive their share of the settlement, the class notice will include a "supplemental claim form" that will allow any settlement class member to contest the settlement award category assigned to him. Settlement class members will have 60 days from the date of mailing to postmark any objections or requests for exclusion.

The Court finds that the parties' notice plan comports with due process requirements. In addition, the Court will approve the class notice subject to the following alterations:

1. For a class member to request exclusion from the settlement, the only information the class member must provide in a letter to the settlement claims administrator is: (1) the class member's name, (2) a statement that he or she wishes to be excluded from the settlement class in Gaudin v. Saxon Mortgage Services, Inc., Case No. 3:11-cv-01663-JST, and (3) his or her signature. Class members' telephone numbers and addresses are not required, contrary to what is currently indicated in the long-form notice;

1       2.      Any objections to the settlement should only be mailed to the Court. Once received
2  by the Court, the Clerk of the Court will file the objections on the Court's electronic filing system.
3  As currently worded, the long-form notice requires objections to be sent to the settlement claims
4  administrator, which is unnecessary, as electronic filing of an objection on the case docket
5  constitutes service on the parties; and

6       3.      Objectors will not be required to provide all of the detailed information that is
7  requested in the long-form notice. See ECF No. 129-3, Ex. B at 6. Instead, objectors must only
8  provide the information requested in the following proposed language:

> You may object to the proposed settlement in writing by providing your full name, the basis for your belief that you are a member of the settlement class, the basis of your objection, and your signature. You may not ask the Court to order a larger settlement; the Court can only approve or deny the settlement. You may also appear at the Final Approval Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for paying that attorney.
>
> All written objections and supporting papers must: (a) clearly identify the case name and number (*Gaudin v. Saxon Mortgage Services, Inc.*, Case No. 3:11-cv-01663-JST); (b) be submitted to the Court either by mailing them to the Clerk of the Court for the United States District Court for the Northern District of California, 450 Golden Gate Avenue, Box 36060, San Francisco, CA 94102, or by filing them in person at any location of the United States District Court for the Northern District of California; and (c) be filed or postmarked on or before [60 days from the date of mailing].

The parties may elect to use this format, or adopt a different format requesting the same, but not more, information.

## CONCLUSION

For the foregoing reasons, the Court hereby:

1.      GRANTS preliminary approval to the parties' class action settlement;

2.      VACATES the trial dates currently set in this action for September 21, 2015 through October 8, 2015;

3.      APPROVES the proposed notice program, and the content of the notices, with the modifications discussed above;

4.      APPROVES and ORDERS that the proposed exclusion and objection procedures be undertaken, with the modifications discussed above; and

5. SETS the final approval hearing for November 12, 2015 at 2:00 p.m. Plaintiff shall file her motion for final approval of the settlement, and her application for attorneys' fees, costs, expenses, and service awards no later than October 29, 2015.

IT IS SO ORDERED.

Dated: July 21, 2015

_____
JON S. TIGAR
United States District Judge