1
2
3
4
5

UNITED STATES DISTRICT COURT

6

NORTHERN DISTRICT OF CALIFORNIA

7
8

MARIE GAUDIN,

            Plaintiff,

Case No.  11-cv-01663-JST

9

    v.

10

SAXON MORTGAGE SERVICES, INC.,

**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

11

            Defendant.

ECF Nos. 143, 147

12
13

        Plaintiff Marie Gaudin moves for final approval of a settlement agreement reached in this

14

certified class action.  ECF No. 147.  Plaintiff also moves for final approval of attorneys' fees,

15

litigation expenses, and an incentive award for Plaintiff as class representative.  ECF No. 143.  No

16

objection to the settlement has been filed with the Court; and although two of the 2,705 class

17

members presented objections to the settlement administrator, the objections were not related to

18

deficiencies in the settlement.  ECF No. 147 at 1.  Only four class members have requested

19

exclusion from the settlement class in response to the settlement notice.  ECF No. 150 at 1.  The

20

Court held a fairness hearing on November 12, 2015.  For the reasons set forth below, the Court

21

will grant the Motion for Final Approval of Class Action Settlement and grant, with modifications,

22

the Motion for Class Counsel Attorney Fees and Expenses and Service Award to Class

23

Representative.

24

**I.       BACKGROUND**

25

        **A.       Factual Background**

26

        In October 2008, Congress enacted the Emergency Economic Stabilization Act, P.L. 110-

27

343, 122 Stat. 3765.  "The centerpiece of the Act was the Troubled Asset Relief Program (TARP),

28

which required the Secretary of the Treasury, among many other duties and powers, to 'implement

United States District Court
Northern District of California

1    a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the

2    underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures.'"

3    Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 556 (7th Cir. 2012) (citing 12 U.S.C. § 5219(a)).

4    "Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP

5    funds to induce lenders to refinance mortgages with more favorable interest rates and thereby

6    allow homeowners to avoid foreclosure."  Id.  This program, the Making Home Affordable

7    ("MHA") program, included the Home Affordable Modification Program ("HAMP") as one of its

8    central components.

9            HAMP is a program designed to induce mortgage servicers to provide permanent loan

10   modifications to borrowers who are in default or at risk of default.  Wigod, 673 F.3d at 556;

11   Corvello v. Wells Fargo Bank, N.A., 728 F.3d 878, 880 (9th Cir. 2013).  Under HAMP, mortgage

12   servicers receive financial incentives from the government for each permanent modification they

13   provide.  Wigod, 673 F.3d at 556.  The program is designed to authorize modifications when it is

14   (1) possible to create an alternate payment schedule that is affordable for the borrower given his or

15   her income, and (2) financially profitable for the investor.  Id. at 556–57.  To accomplish these

16   goals, the program provides that a loan modification is warranted only if the borrower meets

17   certain income requirements and other criteria, and if a net present value assessment shows that a

18   modified mortgage would produce a greater return to the servicer than an unmodified mortgage.

19   Id.  Once the mortgagor has decided that a loan modification would be more beneficial, the

20   borrower is placed on a Trial Period Plan ("TPP") that resembles an estimate of what the mortgage

21   payments would be if the loan modification were approved.  See Making Home Affordable

22   Program, Handbook for Servicers of Non-GSE Mortgages, at 118 (version 4.1 2012), *available at*

23   https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_41.pdf.

24   According to the MHA Handbook, "[b]orrowers who make all trial period payments timely and

25   who satisfy all other trial period requirements will be offered a permanent modification."  Id.

26           Defendant Saxon entered into an agreement with the U.S. Treasury Department to

27   participate in HAMP in April 2009.  Gaudin v. Saxon Mortgage Servs., Inc., 297 F.R.D. 417, 421

28   (N.D. Cal. 2013).  Plaintiff Marie Gaudin owns a condominium subject to a mortgage loan that

United States District Court
Northern District of California

has been serviced by Defendant since December 2006.  Id.  In April 2009, Plaintiff provided income and other information to Defendant's representatives in order to apply for a HAMP modification.  Id. at 422.  In May 2009, Defendant sent Plaintiff the subject TPP offer as part of a standard HAMP application package.  Id.  Plaintiff signed and submitted the TPP, and Defendant countersigned it and returned it to Plaintiff.  Id.  Plaintiff made the three monthly payments pursuant to the TPP, and continued making the monthly payments thereafter, altogether making 13 such payments.  Id.  Although Plaintiff allegedly complied with the terms of the TPP, Defendant denied Plaintiff a permanent loan modification.  Id.

### B.    Procedural Background

Plaintiff filed a proposed class action complaint in April 2011, bringing causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, rescission and restitution pursuant to Cal. Civ. Code §§ 1688-89, violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.*, and violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ECF No. 1.

Defendant moved to dismiss the complaint, arguing that the TPP did not constitute an enforceable contract.  ECF No. 12.  The Court concluded that "the face of the document . . . strongly suggests" that it was an enforceable commitment, and that at least at the pleading stage Defendant had not shown that the contract failed for lack of consideration or indefinite terms. Gaudin v. Saxon Mortgage Servs., Inc., 820 F. Supp. 2d 1051, 1053 (N.D. Cal. 2011) ("Gaudin I").  However, after concluding that the TPP "was not, in and of itself a permanent modification, or an unconditional commitment by the lender to provide one," the Court dismissed the complaint without prejudice because Plaintiff "has not alleged that all of the conditions under which Saxon might be obligated to provide her a lender-executed permanent modification agreement were actually satisfied."  Id. at 1054.

Plaintiff filed an amended complaint, raising the same claims but this time expressly alleging that the TPP conditions had been satisfied.  ECF No. 39 ¶¶ 29–30.  Defendant again moved to dismiss.  ECF No. 41.  Because "the original complaint was dismissed on grounds that Gaudin had entirely failed to allege satisfaction of the conditions set forth in the TPP, and "[t]he

amended complaint remedie[d] that defect," the Court denied the motion.  Gaudin v. Saxon

Mortgage Servs., Inc., No. 11-cv-1663, 2011 WL 5825144, *4 (N.D. Cal. Nov. 17, 2011)

("Gaudin II").  The Court stated:

> As the order dismissing the original complaint found, the TPP makes very clear that it is not, in and of itself, a loan modification nor is it an *unconditional* commitment by the lender to provide one. Saxon insists that any obligations it had under the TPP were limited to evaluating Gaudin's eligibility for a loan modification under the federal guidelines of the HAMP program, and to provide her a loan modification agreement if and only if she proved to be eligible under those guidelines and had otherwise complied with all her obligations under the TPP.   The flaw in Saxon's argument is that express language of the TPP simply does not include any such limitation or condition.   To the contrary, the TPP indicates that while it may initially be presented to the borrower only as an offer to determine eligibility, once the lender returns a signed copy of it to the borrower (rather than notifying the borrower that he or she does not "qualify for the Offer"), then the borrower's eligibility for permanent modification has been determined, and the only remaining contingencies are those listed specifically in the TPP and summarized above.
>
> Saxon flatly states that, "[t]he TPP conditions Plaintiff's ability to obtain a permanent loan modification agreement on a number of factors, including . . . Plaintiff meeting all of the conditions required for modification under the HAMP guidelines," but it has pointed to no language in the TPP embodying such a limitation.   While, as noted above, paragraph 2G requires the borrower to "meet all of the conditions required for modification," there is no indication that any of those conditions are to be found outside the four corners of the TPP.   Additionally, to the extent that language arguably could be understood as referring to some broader (and unstated) rules for eligibility under HAMP or otherwise, then the lender's return of the signed TPP implies the borrower has been found to be qualified under such criteria.

Id. at *2–3 (emphasis in original).[1]

Plaintiff then filed a motion asking the Court to certify a class consisting of:

> All California residential mortgage borrowers who (a) entered into Homeowner Affordable Modification Program (HAMP) Trial Period Plans (TPPs) with Saxon Mortgage Services, Inc. effective on or before October 1, 2009, and (b) made at least three trial period payments, but (c) did not receive HAMP loan modifications.

ECF No. 81.  The Court concluded that certification was appropriate, as the class satisfied the

---

[1] In August 2013, the Ninth Circuit decided Corvello v. Wells Fargo Bank, N.A., holding on similar facts that a bank was contractually required to offer the plaintiffs a permanent mortgage modification after they complied with the requirements of a trial period plan. 728 F.3d 878, 884 (9th Cir. 2013).

United States District Court
Northern District of California

United States District Court
Northern District of California

numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a) and the predominance and superiority requirements of Rule 23(b)(3).  On August 5, 2013, the Court certified the class.  ECF No. 102.

Defendant sought interlocutory appeal of the Court's certification order before the Ninth Circuit Court of Appeals pursuant to Rule 23(f).  See ECF No. 104.  The Ninth Circuit denied the motion.  ECF No. 111.  Following this denial, the parties entered into settlement negotiations. Declaration of Peter Fredman ("Fredman Decl."), ECF No. 133 at ¶ 7.  The parties engaged in an unsuccessful full-day mediation session before the Honorable Ronald Sabraw (Ret.) of JAMS on February 4, 2014.  Id.  The parties exchanged "detailed settlement offer letters articulating their legal and factual positions" during June and July of 2014.  Id.  Finally, as a result of continuing verbal negotiations, the parties reached a settlement in principle that was memorialized in a memorandum of understanding executed on December 8, 2014.  Id.

On March 13, 2015, Plaintiff filed a notice of settlement of this action.  ECF No. 129.  On April 9, 2015, Plaintiff filed a motion for preliminary approval of the settlement, ECF No. 132, which motion the Court granted.  ECF No. 142 at 9.  The Court also approved the proposed notice program with certain modifications.  ECF No. 142 at 12.  On September 15, 2015, Plaintiff filed a Motion for Class Counsel Attorney Fees and Expenses and Service Award to Class Representatives.  ECF No. 143.  On October 29, 2015, Plaintiff filed a Motion for Final Approval of the Class Action Settlement.  The Court now considers both Plaintiff's motion for final approval of class settlement and Plaintiff's motion for attorneys' fees.

### C.     The Proposed Settlement

The proposed settlement will dispose of all of Plaintiffs' claims against Defendant.  ECF No. 129-1 ("Settlement Agreement") ¶¶ 25–26.  The Settlement Agreement defines the class as: "California borrowers who entered into HAMP TPPs with Saxon effective on or before October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications."  Id. ¶ 2.e.  Pursuant to the agreement, Defendant will create a non-reversionary Settlement Fund of $4,500,000, which will be used to pay notice and administration costs, approved attorneys' fees and litigation costs, and class representative Gaudin's incentive award.

Id. ¶ 20.  The balance remaining in the Settlement Fund will be distributed to class members based on the Plan of Distribution (ECF No. 132-1) submitted by Class Counsel.[2]  In return for accepting the settlement, class members have agreed to release Defendant from:

> any and all claims, counterclaims, actions, causes of action, suits, set-offs, costs, losses, expenses, sums of money, accounts, reckonings, debts, charges, complaints, controversies, disputes, damages, judgments, executions, promises, omissions, duties, agreements, rights, and any and all demands, obligations and liabilities, of whatever kind or character, direct or indirect, whether known or unknown or capable of being known up until the Effective Date of this Settlement Agreement, arising at law or in equity, by right of action or otherwise, (a) arising out of (i) the legal, factual, or other allegations made in the Action or (ii) any legal theories that could have been raised based on the allegations of the Action, or (b) relating in any way to the decision to grant or not grant a loan modification during the time a Class Member's loan was serviced by Releasees. . . .

ECF No. 129-1 ¶ 25.

### D.      Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

## II.      FINAL APPROVAL OF CLASS ACTION SETTLEMENT

### A.      Legal Standard

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "Adequate notice is critical to court approval of a class settlement under Rule 23(e)."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1025 (9th Cir. 1998).  In addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable."  Id. at 1026.  To assess a settlement proposal, the district court must balance a number of factors:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class

---

[2] The Plan of Distribution includes both a "Global Award" and a "Tiered Distribution."  ECF No. 132-1 at 1.  All class members who do not opt out will all receive a "Global Award" of approximately $184.84.  Id. at 2.  The Tiered Distribution involves two tiers:  Tier 1 consists of class members who lost their homes to foreclosure or short sale without first being offered a loan modification of any type; Tier 2 consists of class members who entered into a non-HAMP loan modification at any time.  Id.  Tier 1 class members will receive a pro-rata share of two months' TPP payments.  Id.  Tier 2 class members will receive a pro-rata share of one month's TPP payment.  Id.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Id.

### B.    Analysis

The Court finds that the class members have received adequate notice and that the proposed settlement is fair, adequate, and reasonable.[3]

#### 1.    Adequacy of Notice

The Court previously approved, with alterations, the parties' proposed plan for providing notice to the class.  ECF No. 142 at 11–12.  Plaintiff has shown that the claims administrator has fulfilled the notice plan by mailing notices to class members on July 31, 2015 and re-mailing a second notice to an updated address for class members whose initial notice was returned as undeliverable.  ECF No. 148 ("Jue Decl.") ¶¶ 8–11.  As of October 29, 2015, only 49 notices (representing approximately 1.8% of the class) remain undelivered due to the claims administrator's inability to identify a current mailing address.  Id. ¶ 11.

As the Court required in its Order Granting Motion for Preliminary Approval of Class Action Settlement, ECF No. 142 at 11–12 (stating court-ordered alterations to the proposed notice plan), the parties modified the notice form by (1) striking the requirement that class members who wish to be excluded provide their phone number and address, (2) notifying objectors that they need only send their objections to the Clerk of the Court, and (3) instructing class members what information they need to provide to object to the class settlement.  ECF No. 148-2, Exhibit B (Notice of Class Action Settlement and Claims Process).

In light of the foregoing, the Court concludes that the parties have provided the best practicable notice to class members.  See Boring v. Bed Bath & Beyond of Cal. LLC, No. 12-CV-05259-JST, 2014 WL 2967474, at *1 (N.D. Cal. June 30, 2014) (finding adequate notice where parties implemented approved notice plan and only "[t]wenty-seven of the 1,374 class notices

---

[3] The Court also finds that the scope of the Settlement Agreement's release, ECF No. 129-1 ¶ 25, is permissible because the proposed release only releases claims based on the factual predicate of the complaint.  Hesse v. Sprint Corp., 598 F.3d 581, 590 (9th Cir. 2010).

1   [representing 1.97% of the notices initially sent] were returned undeliverable after a second

2   attempt and a skip trace.").

3                      **2.      Fairness, Adequacy, and Reasonableness**

4                              **a.      Strength of Plaintiffs' case and risk of continued litigation**

5          Approval of a class settlement is appropriate when plaintiffs must overcome significant

6   barriers to make their case.  Chun-Hoon v. McKee Foods Corp., 716 F. Supp. 2d 848, 851 (N.D.

7   Cal. 2010).  Difficulties and risks in litigating also weigh in favor of approving a class settlement.

8   Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009).

9          Here, Plaintiff has acknowledged, and the Court has previously found, that this case

10   presents significant "difficulties" for Plaintiff.  ECF No. 142 at 7–8.  If the parties did not settle,

11   Plaintiff would have to proceed through summary judgment and trial.  Given the complexity of

12   this case, the time and effort required to recover the total possible damages would be substantial,

13   and certain novel damages theories would make total recovery challenging.  "Other than statutory

14   damages under the Rosenthal Act, Plaintiff's only viable measure of economic damages is

15   restitution of their TPP payments, which would require overcoming a formidable 'preexisting

16   duty' defense."  Id. at 8 (quoting ECF No. 132 at 12).  Further, Plaintiff notes that obtaining

17   benefit-of-the-bargain damages for those class plaintiffs who received an alternate non-HAMP

18   modification would likely require proving that the TPP was a binding and enforceable contract to

19   provide a loan modification at a specified monthly payment (not just to provide an "affordability"-

20   based modification).  ECF No. 132 at 13.  According to Plaintiff, the calculation of such benefit-

21   of-the-bargain damages would be "highly complex, expensive, difficult, and vigorously contested

22   at every step."  Id.

23          The Court recognizes that Plaintiff may face difficulties establishing breach of contract

24   damages on a class-wide basis.  Indeed, courts within this district have held that the payments

25   made pursuant to a TPP agreement do not constitute damages supporting a claim for breach of

26   contract.  See Reyes v. Wells Fargo Bank, N.A., No. 10-cv-01667-JCS, 2011 WL 30759, *16

27   (N.D. Cal. Jan 3, 2011) (explaining that "where the money paid under an agreement was already

28   owed under a prior agreement, it is not consideration and cannot support a claim for damages");

United States District Court
Northern District of California

8

1    see also Sutcliffe v. Wells Fargo Bank, N.A., 283 F.R.D. 533, 553 (2012) (holding that "the

2    reduced payments Plaintiffs made under the TPP . . . do not constitute damages because Plaintiffs

3    had a preexisting duty to make payments on their loan."). Accordingly, the Court concludes that

4    the class members' risk of continued litigation, as well as the weaknesses in Plaintiff's case, favors

5    approval of the settlement. See Moore v. Verizon Commc'ns Inc., No. 09-cv-1823-SBA, 2013

6    WL 4610764, at *5 (N.D. Cal. Aug. 28, 2013) (finding that the relative strength of the defendant's

7    case favored settlement because plaintiffs admitted they would face hurdles in establishing

8    liability and damages).

9                         **b.      Settlement amount**

10         "In assessing the consideration obtained by the class members in a class action settlement,

11   'it is the complete package taken as a whole, rather than the individual component parts, that must

12   be examined for overall fairness." Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc., 221

13   F.R.D. 523, 527 (C.D. Cal. 2004) (quoting Officers for Justice v. Civil Service Comm'n of the

14   City and Cnty. of San Francisco, 688 F.2d 615, 628 (9th Cir. 1982)). "In this regard, it is well-

15   settled law that a proposed settlement may be acceptable even though it amounts to only a fraction

16   of the potential recovery that might be available to the class members at trial. Id. (citing Linney v.

17   Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998)).

18         Here, the settlement will provide class members with $4.5 million in damages, excluding

19   attorneys' fees, litigation expenses, and Plaintiff's incentive award. ECF No. 147 at 1; ECF No.

20   129-1 ¶ 20. On average, class members will receive over $1,100. ECF No. 147 at 5. Plaintiffs'

21   maximum potential damages after trial would be approximately $33 million. ECF No. 147 at 2;

22   ECF No. 141 at 1. The proposed settlement therefore would result in an approximately 13.6%

23   recovery of the maximum possible recoverable damages. ECF No. 147 at 2.

24         Plaintiff argues that the settlement amount is fair and just, especially given the anticipated

25   difficulties the case would face going forward. ECF No. 147 at 2; ECF No. 132 at 12–13; ECF

26   No. 141 at 2–3. Plaintiff also argues that a settlement of approximately 13.6% of the maximum

27   possible recoverable damages compares favorably to other similar settlements that have been

28   approved by courts. ECF No. 147 at 5; ECF No.132 at 9–10; ECF No. 141 at 2–3; see, e.g., Chao

United States District Court
Northern District of California

v. Aurora Loan Servs. LLC, No. 10-cv-3118-SBA, 2015 WL 294823 (N.D. Cal. Jan. 21, 2015)

(granting final approval of a $5.25 million settlement for HAMP claims brought on behalf of

approximately 15,000 class members).  The Court concludes that the approximately 13.6%

recovery provided for by the proposed settlement weighs in favor of approval, especially in light

of the difficulties that Plaintiff would face should this case proceed to trial.

### c.      Extent of discovery

"In the context of class action settlements, formal discovery is not a necessary ticket to the

bargaining table where the parties have sufficient information to make an informed decision about

settlement."  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (citation

omitted).   However, the extent of discovery completed supports approval of a proposed settlement

especially when litigation has "proceeded to a point at which both plaintiffs and defendants ha[ve]

a clear view of the strengths and weaknesses of their cases."  McKee Foods, 716 F. Supp. 2d 851–

52 (internal quotation marks omitted).

Here, Plaintiff argues that she has acquired a sufficient understanding of the case by,

among other things, conducting "extensive discovery and investigation (before and after class

certification)," reviewing "approximately 25,000 pages of [Defendant's] documents," and

participating in "three separate rounds of settlement negotiations."  ECF No. 132 at 7, 11.  The

adequacy of the settlement was further supported by the declaration of an expert witness with

substantial experience in financial modeling in the mortgage industry.  ECF No. 141-2.  The Court

is persuaded that Plaintiff has conducted sufficient discovery to make an informed decision

regarding the adequacy of the settlement.  See In re Omnivision, 559 F. Supp. 2d 1036, 1042

(N.D. Cal. 2007) (finding the parties were sufficiently informed about the case prior to settling

because they engaged in discovery, took depositions, briefed motions, and participated in

mediation).  This factor therefore weighs in favor of approval.

### d.      Counsel's experience

"The recommendations of plaintiffs' counsel should be given a presumption of

United States District Court
Northern District of California

10

1   reasonableness." Id. at 1043 (citation omitted).[4]

2          Lead class counsel here, who has more than 17 years of litigation experience, endorses the

3   settlement as fair, adequate, and reasonable.  ECF No. 144 at 1; ECF No. 133 at 2.  The Court is

4   not aware of any evidence to contradict this assertion.  Accordingly, class counsel's endorsement

5   weighs in favor of approving the settlement.  See In re Omnivision, 559 F. Supp. 2d at 1043

6   (finding class counsel's recommendation in favor of settlement presumptively reasonable).

7                          e.        Reaction of the class

8          Class members' positive reaction to a settlement weighs in favor of settlement approval;

9   "the absence of a large number of objections to a proposed class action settlement raises a strong

10  presumption that the terms of a proposed class settlement [] are favorable to the class members."

11  Id. (internal quotation marks omitted).

12         As of November 12, 2015, no class member has filed any objection with the Court.  The

13  settlement administrator has received 25 objection forms.  ECF No. 148 at 3; ECF No. 148-4,

14  Exhibit D.  Almost all of the objection forms indicated that the class member had been harmed in

15  some way by Defendant, but the vast majority of these objection forms raised no specific

16  objection to the settlement itself.  ECF No. 148-4, Exhibit D.  Two of the objections could be

17  construed as objecting to the settlement.  First, Prudencio Behena requested another house for her

18  family.  Id.  Second, Sergio Chavez believed the case "shouldn't settle" because Defendant

19  destroyed his credit.  Id.  Because neither of these objections addresses the sufficiency of the

20  settlement, these objections do not counsel in favor of rejecting the settlement.

21         The original class notice resulted in 21 class members opting out of the case.  ECF No.

22  148-3, Exhibit C.  After the settlement notice was distributed, the claims administrator received

23  only four additional opt-out requests, resulting in a total of 25 opt-out requests.  Id.; ECF No. 150

24  at 1.  As a result, the opt-out rate is less than 1%.  Because the class members appear to have

25

26  ─────────────────────
    [4] The Court considers this factor, as it must, but gives it little weight.  "Although a court might
27  give weight to the fact that counsel for the class or the defendant favors the settlement, the court
    should keep in mind that the lawyers who negotiated the settlement will rarely offer anything less
28  than a strong, favorable endorsement."  Principles of the Law of Aggregate Litigation, supra n.3,
    § 3.05 comment a.

United States District Court
Northern District of California

1    concluded that the settlement is favorable to their interests, this factor favors approval of the

2    settlement.  See, e.g., McKee Foods, 716 F. Supp. 2d at 852 (finding that 4.86% opt-out rate

3    strongly supported approval); Churchill Vill. LLC v. Gen. Elec., 361 F.3d 566, 577 (9th Cir. 2004)

4    (approving a settlement with forty-five objections and 500 opt-outs from a 90,000-person class,

5    representing 0.05% and 0.56% of the class, respectively).[5]

6          After reviewing these factors, the Court finds the settlement fair, adequate, and reasonable,

7    and grants Plaintiff's motion for final approval of the settlement.

8    **III.    FINAL APPROVAL OF PLAN OF ALLOCATION**

9          "Approval of a plan of allocation of settlement proceeds in a class action . . . is governed

10   by the same standards of review applicable to approval of the settlement as a whole: the plan must

11   be fair, reasonable and adequate."  In re Omnivision, 559 F. Supp. 2d at 1045 (internal quotation

12   marks and citation omitted).  "It is reasonable to allocate the settlement funds to class members

13   based on the extent of their injuries or the strength of their claims on the merits."  Id.

14         The plan of allocation proposed here meets these requirements.  The plan provides for both

15   a "Global Award" and a "Tiered Distribution."  ECF No. 132-1 at 1.  Each class member will

16   receive a "Global Award" of approximately $185.  ECF No. 132-1 at 2.  The vast majority of class

17   members will also receive a Tiered Distribution.  The Tiered Distribution contains two tiers.  Id.

18   Tier 1 "consists of Class Members who lost their homes to foreclosure or short sale without first

19   being offered a loan modification of any type OR lost their home to foreclosure or short sale after

20   receiving an inferior loan modification . . . ."  Id.  Tier 1 class members will receive a pro-rata

21   share of the net settlement fund based on 2 months of their TPP payment amount.  Id.  Tier 2

22   "consists of Class Members who entered into a non-HAMP loan modification at any time."  Id.

23   Tier 2 class members will receive a pro-rata share of the net settlement fund based on one month

24   of their TPP payment amount.  Id.

25         Such a plan "fairly treats class members by awarding a pro rata share" to the class

26   members based on the extent of their injuries.  See In re Heritage Bond Litig., No. 02-ML-1475,

27

28   ------------------------
     [5] Because no governmental actor is involved in this case, this factor is not material to settlement
     approval.

United States District Court
Northern District of California

1   2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005).  Moreover, "[t]he fact that there has been no

2   objection to this plan of allocation favors" the Court's approval.  Id.  Finally, "[t]he fact that the

3   plan of allocation is recommended by experienced and competent counsel further cuts in favor of

4   approving" the plan of allocation.  Id.  Accordingly, the Court approves Plaintiff's proposed plan

5   of allocation.

6   **IV.**     **ATTORNEYS' FEES**

7        **A.**     **Legal Standard**

8            "While attorneys' fees and costs may be awarded in a certified class action where so

9   authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent

10  obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have

11  already agreed to an amount."  In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th

12  Cir. 2011).  "Where a settlement produces a common fund for the benefit of the entire class," as

13  here, "courts have discretion to employ either the lodestar method or the percentage-of-recovery

14  method" to determine the reasonableness of attorneys' fees.  Id. at 942.  "Because the benefit to

15  the class is easily quantified in common-fund settlements," the Ninth Circuit permits district

16  courts "to award attorneys a percentage of the common fund in lieu of the often more time-

17  consuming task of calculating the lodestar."  Id.  "Applying this calculation method, courts [in the

18  Ninth Circuit] typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award,

19  providing adequate explanation in the record of any 'special circumstances' justifying a

20  departure."  Id.

21       **B.**     **Analysis**

22           Plaintiff's Counsel moves the Court for $1,350,000 in attorneys' fees, representing 30% of

23  the overall $4.5 million settlement fund.  ECF No. 147 at 1.  Plaintiff's Counsel argues that an

24  award of 30% of the overall settlement fund is reasonable because "(a) they did an excellent job

25  with a complex and very risk contingency case, (b) a fee enhancement above the 25% benchmark

26  percentage is generally appropriate due to the relatively small size of the fund, and (c) the lodestar

27  cross-check indicates that the resulting risk multiplier [of 1.5] is quite reasonable under the

28  circumstances."  Id. at 6.

United States District Court
Northern District of California

1     The Court finds that the results achieved in this case do not favorably distinguish it to

2  warrant an attorneys' fee award above the presumptively reasonable rate of 25%.  While the court

3  continues to conclude that the settlement itself was fair, adequate, and reasonable—and no class

4  member has specifically objected to the attorneys' fees proposed by Plaintiff's Counsel, ECF No.

5  143 at 8—the objection forms filed by class members demonstrate that the injuries suffered by

6  absent class members is many times greater than their recovery from the settlement.  For example,

7  one class member explained that she was left homeless with her three children after her loan

8  modification was denied, and another class member attested that the loss of his home drove him to

9  alcoholism.  ECF No. 148, Exhibit D.  Furthermore, in the other HAMP-related settlements the

10  Court is aware of, plaintiffs recovered more money.  See Wigod v. Wells Fargo Bank, NA, No.

11  10-cv-2348 at ECF No. 268 (N.D. Ill. June 27, 2014) (granting preliminary approval of award

12  providing in excess of $10 million in loan modifications, cash payments, and other relief to a class

13  containing 835 members); see also SunTrust HAMP Settlement at

14  https://www.suntrusthampsettlement.com/ (settlement resolving investigation by United States

15  Department of Justice that provided up to $274 million to eligible borrowers, with individual

16  awards ranging from $100 to more than $50,000).  While these settlements by no means establish

17  a floor for recovery in HAMP cases, they do suggest that an award of fees at the presumptive

18  percentage is adequate.  The Court concludes that the attorneys' fees award should be no greater

19  than the "presumptively reasonable" award of 25%, resulting in a total fee award of $1,125,000.[6]

20  See Ching v. Siemens Industry, Inc., No. 11-cv-04838-MEJ, 2014 WL 2926210, at *7 (N.D. Cal.

21  June 27, 2014) (citing In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d at 942).

22  **V.     EXPENSES**

23       **A.     Legal Standard**

24     An attorney is entitled to "recover as part of the award of attorney's fees those out-of-

25  pocket expenses that would normally be charged to a fee paying client."  Harris v. Marhoefer, 24

26

27  [6] Moreover, the Court has cross-checked this award against the lodestar recovery.  The Court has reviewed the documentation provided by Class Counsel and has calculated the anticipated lodestar

28  to be approximately $894,000, resulting in a multiplier of 1.25.  See ECF Nos. 144, 145.  This multiplier confirms the reasonableness of an award of $1,125,000.

14

*United States District Court*
*Northern District of California*

1    F.3d 16, 19 (9th Cir. 1994) (citation omitted).  To support an expense award, Plaintiffs should file

2    an itemized list of their expenses by category and the total amount advanced for each category,

3    allowing the Court to assess whether the expenses are reasonable.  Wren v. RGIS Inventory

4    Specialists, No. 06-cv-05778-JCS, 2011 WL 1230826, at *30 (N.D. Cal. Apr. 1, 2011),

5    supplemented, No. 06-cv-05778-JCS, 2011 WL 1838562 (N.D. Cal. May 13, 2011).

6        **B.      Analysis**

7        Here, Plaintiff has provided an itemized list of the costs incurred during this litigation,

8    separated by category.  ECF No. 143 at 8.  Most of the expenses incurred resulted from mediation

9    and expert consulting fees.  Id.  Overall, the Court finds the charged costs reasonable.  The Court

10   therefore holds that Class Counsel is entitled to reimbursement of $38,518 for litigation expenses.

11   **VI.    PLAINTIFF'S INCENTIVE AWARD**

12       **A.      Legal Standard**

13       "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs,

14   are eligible for reasonable incentive payments."  Staton v. Boeing Co., 327 F.3d 938, 977 (9th Cir.

15   2003).  The district court must evaluate a Plaintiff's incentive award using "'relevant factors

16   includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to

17   which the class has benefitted from those actions, . . . [and] the amount of time and effort the

18   plaintiff expended in pursuing the litigation . . . .'"  Id. at 977 (citing Cook v. Niedert, 142 F.3d

19   1004, 1016 (7th Cir. 1998)).  In the Ninth Circuit, district courts must scrutinize "all incentive

20   awards to determine whether they destroy the adequacy of the class representatives."  Radcliffe v.

21   Experian Info. Solutions, Inc., 715 F.3d 1157, 1164 (9th Cir. 2013).  Courts have also considered

22   as additional factors: the disparity between the amount the average class member will receive and

23   the amount of the incentive award, id. at 1165, and the percentage of the total common fund

24   comprised by the incentive award.  Krzesniak v. Cendant Corp., No. 05-cv-05156-MEJ, 2008 WL

25   4291539, at *2 (N.D. Cal. Sept. 18, 2008).  Many courts in the Ninth Circuit have also held that a

26   $5,000 incentive award is "presumptively reasonable."  See e.g., In re Toys-R-Us Delaware, Inc.

27   FACTA Litig., 295 F.R.D. 438, 470–72 (C.D. Cal. 2014); Harris v. Vector Marketing Corp., No.

28   08-cv-5198-EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) ("Several courts in this

United States District Court
Northern District of California

1 | District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that,

2 | as a general matter, $5,000 is a reasonable amount.").

3 | **B.      Analysis**

4 | Plaintiff argues that she should receive an incentive award of $15,000 (approximately 14

5 | times the average class member award) for her service to the class.  ECF No. 143 at 8–10.  Among

6 | other things, she believes this award is appropriate because she spent at least 50 hours on the case,

7 | reviewed court documents, submitted to a deposition, and endured stress caused by the litigation.

8 | Id. at 9.  Plaintiff's involvement in this case is commendable.  In particular, the Court notes that

9 | when Defendant offered Plaintiff a loan modification in exchange for dropping her case, Plaintiff

10 | rejected that offer "based on her commitment to serving as class representative."  ECF No. 146 ¶

11 | 13; ECF No. 143 at 9.  As a result, Plaintiff "lived with uncertainty and the looming fear of

12 | foreclosure throughout most of the case."  ECF No. 146 ¶ 14.  In light of Plaintiff's service to the

13 | class, including the personal risk she took to maintain her membership in the class, the Court finds

14 | that a service award of $15,000 is fair and reasonable.

15 | **VII.   CONCLUSION**

16 | For the foregoing reasons, the Court orders as follows:

17 | 1.      The Court grants final approval of the proposed settlement and the plan of

18 | allocation.

19 | 2.      The Court grants Plaintiff's counsel $1,125,000 in attorneys' fees.

20 | 3.      The Court grants Plaintiff's counsel $38,518 in litigation expenses.

21 | 4.      The Court grants Class Representative Marie Gaudin a service award of $15,000.

22 | 5.      The class members who requested to opt out of the settlement are excluded from

23 | the class.

24 | IT IS SO ORDERED.

25 | Dated:  November 23, 2015

26

27 | _____

28 | JON S. TIGAR
United States District Judge